## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| XUREX, INC., | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Case No: Case No. 14-43536-drd |
| _____ | ) | |
| JERALD S. ENSLEIN, in his capacity as Chapter | ) | |
| 7 Trustee for XUREX, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Adv. Proc. No. _____ |
| GIACOMO E. DI MASE, | ) | |
| LEONARD P. KAISER, | ) | |
| TRISTAM G. JENSVOLD, | ) | |
| STEVE McKEON, | ) | |
| LEE O. KRAUS, JR., | ) | Jury trial demanded on all claims so triable. |
| JOSE DI MASE, | ) | |
| DURASEAL PIPE COATINGS COMPANY LLC, | ) | |
| n/k/a ENERGY COATINGS LLC, | ) | |
| DURASEAL HOLDINGS S.r.L., | ) | |
| JOE JOHNSTON, | ) | |
| DIETMAR ROSE, | ) | |
| ROBERT OLSON, AND | ) | |
| JOHN DOES 1-10. | ) | |
| | ) | |
| Defendants. | | |

## COMPLAINT

Jerald S. Enslein, Chapter 7 Trustee (the "Trustee") of the bankruptcy estate (the "Estate") of Xurex, Inc. (the "Debtor" or "Xurex"), by and through his undersigned counsel, hereby asserts his claims against the above-named defendants, and in support thereof, states and alleges as follows:

## I.     NATURE OF THE ACTION

1.      The Trustee, on behalf of the Estate, brings this action to assert federal statutory claims and state common law claims against Defendants arising, in part, from the breach of long-

52450816.12

term agreements to make minimum purchases of Debtor's products, for misappropriation of Debtor's trade secrets, and/or for related breaches of fiduciary duties, among other causes of action.

## II.    JURISDICTION AND VENUE

2.      On October 17, 2014, certain defendants herein caused Debtor to file a voluntary Petition pursuant to Chapter 7 of Title 11 of the United States Code.

3.      This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

4.      This Court has original jurisdiction under 28 U.S.C. § 1334(b), in that this is a civil proceeding relating to the underlying case arising under Title 11 of the United States Code.

5.      This adversary proceeding presents both "core" and "non-core" proceedings under 28 U.S.C. § 157(b).

6.      Jurisdiction is proper in the United States District Court for the Western District of Missouri.  The Trustee does not consent to the non-core claims and/or the claims on which he is entitled to a jury trial, to be tried by the Bankruptcy Court, nor does the Trustee consent to the Bankruptcy Court hearing and/or determining such claims.

7.      Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

8.      The acts and omissions hereinafter alleged either occurred in this District and/or caused injury in this District.

## III.   THE PARTIES

9.      The Debtor is a Delaware corporation with its principal place of business in Jackson County, Missouri.  Prior to certain defendants herein discontinuing Xurex's operations and causing it to file the Chapter 7 Petition, Xurex was in the business of developing,

2

manufacturing, and selling anti-corrosion and anti-abrasion chemicals primarily used in the oil and gas industry.

10.     The Trustee was appointed by the United States Trustee to serve as interim trustee in this case pursuant to 11 U.S.C. § 701(a)(1), and serves as trustee pursuant to 11 U.S.C. § 701(c).  The Trustee has standing, pursuant to 11 U.S.C. § 704, to pursue this action to collect and reduce to money the assets of the Debtor's Estate.

11.     Defendant Giacomo E. Di Mase was a member of the Board of Directors of Xurex, Defendant DuraSeal Pipe Coatings Company LLC ("DuraSeal Pipe"), and Defendant DuraSeal Holdings S.r.L ("DuraSeal Holdings") at relevant times herein.  Giacomo Di Mase is Defendant Jose Di Mase's son.  He has also served in various capacities at Piaggio Aero Industries S.p.A ("Piaggio Aero"), an aircraft manufacturing company in Genoa, Italy, which has been owned in significant in part by Jose Di Mase.  Giacomo Di Mase can be served at Largo dell'olgiata 15 isola 11D, Rome, Italy 00123.

12.     Defendant Leonard P. Kaiser ("Kaiser")  was a member of the Board of Directors of Xurex and also served as its Chief Executive Officer ("CEO") at relevant times herein.  He was also a Manager of DuraSeal Pipe.  Following the filing of Xurex's Chapter 7 Petition, Kaiser returned to his position of Chief Financial Officer ("CFO") of Piaggio America, Inc., ("Piaggio America") a subsidiary of Piaggio Aero, which is owned in significant part by Jose Di Mase.  On information and belief, he also worked for DuraSeal Pipe and/or DuraSeal Holdings after Xurex filed for bankruptcy protection.  Kaiser has worked for Jose Di Mase, head of the "Di Mase Group", for a number of years.  Kaiser became president, CEO and a director of Xurex in September 2013.  Kaiser worked for Piaggio America from  2002 through  2010 and on

3

information and belief, from late-2014 to present. Kaiser can be served at 145 Emily Dr., Moore, South Carolina 29369-8478.

13.     Defendant Tristam G. Jensvold ("Jensvold") was a member of the Board of Directors of Xurex, DuraSeal Pipe, and DuraSeal Holdings at relevant times herein. He was also the son-in-law of Defendant Jose Di Mase. Jensvold can be served at 624 Zion Street, Apt. 3, Nevada City, California 95959-2928.

14.     Defendant Steve McKeon ("McKeon") was a member of the Board of Directors of Xurex at relevant times herein.     He can be served at 48 Livingston Place, Ladera Ranch, California 92694-0615.

15.     Defendant Lee O. Kraus, Jr. ("Kraus") has been a member of the Board of Directors of DuraSeal Pipe and DuraSeal Holdings since late-2013. He has also served as DuraSeal Pipe's CEO since that time. He is a long-time business associate of Jose Di Mase. He can be served at 505 Stanwich Road, Greenwich, Connecticut 06831-3131.

16.     Defendant Jose Di Mase is an investor and a controlling shareholder in DuraSeal Pipe through his financial holdings in DuraSeal Holdings, which he formed in 2010. He is the Chairman of the Board of both DuraSeal Pipe and DuraSeal Holdings. He served as the CEO of Piaggio Aero from 1998 to February 2009, and currently served as one of its directors. On information and belief, Jose Di Mase owns and/or controls an entity commonly referred to as "the Di Mase Group", through which he makes his personal investments. Jose Di Mase can be served at Piazza Galvani 3, Bologna, Italy 40124.

17.     Defendant DuraSeal Pipe is a Missouri limited liability company organized on July 29, 2008 and has its principal place of business at 3456 E. 155th Street, Jackson County, Kansas City, MO 64147. It is now known as Energy Coatings LLC and has been formally

known as DuraSeal Coatings Company, LLC. The DuraSeal Pipe board consists of Jose Di Mase, Kraus, Giacomo Di Mase, and Jensvold. It can be served via its last-known registered agent, National Registered Agents, Inc., 120 S. Central Ave., Clayton, MO 63105.

18. Defendant DuraSeal Holdings is an entity organized under the laws of the Country of Italy and lists its principal place of business as Largo San Giuseppe 3/32, 16121 Genoa Italy. It was formed by Jose Di Mase in 2010 for the purpose of purchasing a 36% interest in Xurex and 100% of DuraSeal Pipe, and to enter into a long-term global supply agreement with Xurex. Jose Di Mase serves as its Chairman and President, and Giacomo Di Mase, Jensvold, and Kraus serve as its officers or directors. DuraSeal Holdings can be served at Piazza Galvani 3, Bologna, Italy 40124.

19. DuraSeal Pipe and DuraSeal Holdings are sometimes collectively referred to as "DuraSeal."

20. Defendant Joe Johnston was a director and officer of both Xurex and DuraSeal Pipe at relevant times herein. He also owns and/or controls CVM Technology LLC "(CVM Technology"). Joe Johnston can be served at 1501 Madison Street, Raymore, Missouri 64083.

21. Defendant Dietmar Rose was a director of Xurex at relevant times herein. He can be served at 6624 High Ridge Place NE, Albuquerque, New Mexico 87111-8714.

22. Defendant Robert Olson was a director of Xurex at relevant times herein. He can be served at 15944 S. Clairborne Street, Olathe, KS 66062-7025.

23. While the Xurex and DuraSeal boards of directors substantially, if not completely, overlapped particularly beginning in 2013, Johnston, Rose, and Olson are sometimes referred to herein as "the First Di Mase Xurex Board;" Giacomo Di Mase, Kaiser, Jensvold, and McKeon are sometimes referred to herein as "the Second Di Mase Xurex Board;" and Kraus, Jose Di

52450816.12

Mase, DuraSeal Pipe, and DuraSeal Holdings are sometimes referred to herein as "the DuraSeal Defendants," even though Johnston, Giacomo Di Mase, Kaiser, and Jensvold were also DuraSeal directors and officers and were acting in the interests of DuraSeal, rather than Xurex, as alleged herein below.

24.     The members of First Di Mase Xurex Board are named as defendants herein in connection with the 1/13/10 Agreement, the 12/31/10 Agreement, and the 1/12/12 Amendment (as all defined below) prior to the installation of the Second Di Mase Xurex Board.

25.     Respecting Johnston, while the Trustee is investigating and anticipates that he may bring a second action against Johnston, CVM Technology, and perhaps others in connection with CVM Technology's misappropriation and use of Xurex's intellectual property and trade secrets, those claims are not brought herein.[1]

26.     At all times pertinent, the true names and addresses of John Doe Defendants 1 - 10 have been, and remain, unknown, despite Trustee's reasonable and diligent attempts to discover their names and addresses.  It is known that the John Doe Defendants are individuals, partnerships and/or corporations who are or were engaged in aiding, abetting, conspiring and otherwise assisting the other defendants hereto in the acts and omissions alleged in this adversary complaint.  Upon their identities becoming known, the Trustee will move to substitute them as defendants.

## IV.   GENERAL ALLEGATIONS

**A.     Xurex Forms and Begins Developing Its Coatings.**

27.     Xurex was initially started in Florida in 2005 for the purpose of developing liquid coatings for use in a variety of different applications, and holding the related patents.  These liquid coatings form a bond with the surface to which they are applied that results in a variety of

---

[1] The Trustee also anticipates filing a separate preference action.

benefits, including the preservation of the surface coated in caustic environments, the reduction of friction, and others.

28.    While Xurex's technology was extremely promising, it initially struggled to commercialize its technology.

**B.    Joe Johnston Discovers Unique Method of Using Xurex Coatings in Oil and Gas Industry and Forms DuraSeal Pipe.**

29.    Given some of Xurex's initial struggles to capitalize on its technology, Joe Johnston, an investor in Xurex in its early years, set out to identify applications where Xurex's technology might succeed and be commercially profitable.

30.    Pursuant to the findings of fact made by Vice Chancellor J. Travis Laster of the Court of Chancery of the State of Delaware following a two-day bench trial among certain Xurex shareholders (C.A. No. 6567-VCL), "It took approximately $600,000 and countless hours of research and testing, but Johnston and his team eventually discovered a unique method of using Xurex coatings to prevent corrosion, reduce abrasion, and extend the life of down-hole pumps and pipes in the oil and gas industry."

31.    Subsequently, on July 29, 2008, Johnston formed DuraSeal Pipe, for the purpose of entering into a long-term exclusive license and supply agreement with Xurex.

32.    In short, DuraSeal Pipe would purchase Xurex coatings, apply them to the pipes and other equipment used in the oil and gas industry to increase their efficiency and useful life, and sell those pipes and other equipment in the oil and gas industry.

33.    As a result of positive test results about this time, Xurex was also able to begin raising significant private placement equity capital. As will be seen, the elimination and/or avoidance of the independent equity interests motivated much of the wrongful conduct discussed below.

52450816.12

**C. DuraSeal Pipe Enters Into Exclusive License Agreement for North America Requiring Substantial Minimum Purchases Through September 2018. ("the 1/13/10 Agreement").**

34. In October 2008, DuraSeal Pipe and Xurex entered into a letter agreement authorizing DuraSeal Pipe to distribute Xurex's HabraCoat-SA and PenetrAct-SA products.

35. Slightly more than a year later, on January 13, 2010, Xurex and DuraSeal Pipe entered into an exclusive license agreement whereby DuraSeal Pipe became Xurex's exclusive licensee for certain intellectual properties ("IP") for applications in the oil and gas industry in North America, excluding Xurex's CVM technology; that is, "Ceramic Vacuum Microspheres" used in the fracking industry.[2] This agreement is hereinafter referred to as "the 1/13/10 Agreement."[3]

36. The 1/13/10 Agreement provided, among other things, "[DuraSeal Pipe] has developed plans, scientific data, application protocols, case studies, test reports, dyno-test results, and sales and marketing data pertaining to the use of Xurex, Inc.'s products."

37. The parties also agreed, as stated in the preamble to the 1/13/10 Agreement, that "Xurex is a specialty chemical company focusing entirely on industrial protective coatings that leverage its unique expertise and proprietary Nano technologies to produce a line of industrial products which it markets and sells in number of industries, including the oil and gas industry."

38. Paragraph 10 of the 1/13/10 Agreement required that DuraSeal Pipe make minimum purchases of 50 gallon barrels of Xurex's coating product through October 1, 2018, to result in annual revenue initially of $600,000 per year and eventually escalating to $2.7 million per year beginning in the year 2015.

---

[2] This CVM technology related to "proppants" which are mineral agents that are used in the fracking process for the extraction of oil and gas from underground wells.
[3] The 1/13/10 Agreement, the 12/31/10 Agreement (defined below), and the purported amendments will be provided to the Court upon request.

8

39.     In short, the 1/13/10 Agreement required DuraSeal Pipe to purchase at least 1,334 barrels of Xurex's product for $12,500 per barrel resulting in total revenue from minimum purchases alone, during the life of the agreement, in the amount of $16,675,000.

40.     Under ¶ 11 of the 1/13/10 Agreement, DuraSeal Pipe was also to pay Xurex a 5% royalty on all "monthly coating revenues" related to coatings sold by DuraSeal Pipe.

**D.     Jose Di Mase Acquires all of DuraSeal Pipe and 36% of Xurex.**

41.     During 2010, Jensvold brought Xurex's technology to the attention of his father-in-law, airplane manufacturing magnate, Jose Di Mase.

42.     According to Vice Chancellor Laster's findings of fact, "In mid-2010, Jensvold became interested in DuraSeal and its attractive prospects for exponential growth within the oil and gas industry. Jensvold is the son-in-law of Jose Di Mase, a Venezuelan-Italian businessman with at least one successful privately held company to his credit and access to well-heeled, high net-worth partners."

43.     Also according to Vice Chancellor Laster's findings of fact, it was Jensvold's idea at the time that Jose Di Mase invested in Xurex and DuraSeal Pipe to find a way to "combine" the two companies.

44.     On December 31, 2010, Johnston sold both DuraSeal Pipe and his shares in Xurex for $6 million to a holding company created by Jose Di Mase, DuraSeal Holdings.

45.     DuraSeal has admitted in other litigation that the Di Mase family owns DuraSeal.

46.     Through this transaction, Jose Di Mase acquired 100% of the stock of DuraSeal Pipe, but only approximately 36% of the stock of Xurex.

47.     On information and belief, the Di Mases hold their interests in DuraSeal Holdings, DuraSeal Pipe and Xurex through an entity which Jose Di Mase owns and/or controls that is commonly referred to as "the Di Mase Group."

9

48.     On information and belief, the entity commonly known as "the Di Mase Group" is one of the John Doe defendants in this action. After additional facts respecting the Di Mase Group become known, it is likely that the Trustee will move to substitute it as a named party-defendant.

**E.     DuraSeal Holdings Enters Into Exclusive License Agreement (outside of North America) Requiring Minimum Purchases Through year 2021 ("the 12/31/10 Agreement").**

49.     At the same time that Jose Di Mase acquired DuraSeal Pipe and approximately 36% of the shares of Xurex, Xurex entered into an exclusive worldwide license agreement on December 31, 2010 with DuraSeal Holdings for applications in oil & gas, automotive, and aerospace (excepting oil & gas rights to North America which subsidiary DuraSeal Pipe held). This agreement is hereinafter referred to as "the 12/31/10 Agreement."

50.     And, like the agreement with DuraSeal Pipe, DuraSeal Holdings was obligated to make minimum purchases of 50 gallon barrels of Xurex's coatings, only in increased amounts, ranging from $1.2 million per year in 2012 and escalating to $18.7 million per year in the final contract year 2022.

51.     In short, ¶ 4(b) the 12/31/10 Agreement required DuraSeal Holdings to purchase at least 8,100 barrels of Xurex's products at $12,500 per barrel, resulting in total revenue from minimum purchases alone, during the life of the agreement, in the amount of $101,250,000.

52.     Other DuraSeal Holdings' obligations included:

(a)     paying Xurex a 5% royalty on DuraSeal Holdings' revenue related to coatings sold by it pursuant to ¶ 4(c) of the 12/31/10 Agreement;

(b)     preparing and implementing a business plan for the global commercialization of Xurex's products pursuant to ¶ 3;

(c)     agreeing not to manufacture, market or sell products in competition with Xurex's products nor attempting to reverse engineer Xurex's products pursuant to ¶ 9; and

10

(d)     agreeing not to hire Xurex's employees or contractors for a two-year period after employment ceases pursuant to ¶ 19.

53.     The 12/31/10 Agreement also stated in ¶ 15(c), "[I]n [the] unlikely event that [DuraSeal Holdings] determines that the marketing and distribution of the products is not commercially viable, it may terminate this Agreement with at least 180 days written notice to Xurex, Inc."

54.     On information and belief, DuraSeal Holdings never invoked ¶ 15(c) of the 12/31/10 Agreement and gave Xurex notice that the marketing and distribution of its products were not commercially viable.

55.     Jose Di Mase signed this agreement as DuraSeal Holding's President.

## F.     Di Mases/DuraSeal Commence Plans to Operate and Control Xurex for the Benefit of DuraSeal.

56.     Beginning in 2011, there was a significant amount of litigation for board control that ensued in the Delaware Chancery Court between Jose Di Mase and DuraSeal on the one hand, and representatives of the independent equity investors on the other hand.

57.     On September 23, 2011, Chancellor Laster ruled that the Xurex board consisted of Johnston, Dietmar Rose, Bill O'Brien, and Nate Hutchings, which was the Di Mase/DuraSeal slate of directors.  The independent equity interests lost control of Xurex.

58.     On September 29, 2011, the new board held its first meeting and appointed Johnston as Xurex's President, CEO, and Chairman.

59.     As Johnston himself admitted in later litigation filings, "At that time in late 2011, [Johnston] was simultaneously DuraSeal's President, and Xurex's President, CEO and Chairman of the Board."[4]  Jose Di Mase had control over both DuraSeal and Xurex through Johnston.

---

[4] Petition for Decl. Relief, ¶ 18, in *Johnston, et al. v. DuraSeal Coatings Company, LLC et al.*, Case No 13CV07036, in the District Court of Johnson County, Kansas.

52450816.12

60.     It soon became abundantly clear to outside Xurex directors, Bill O'Brien and Nate Hutchings, that the Xurex board was not making decisions solely in the interests of Xurex.

61.     On December 30, 2011, O'Brien and Hutchings sent a letter to Joe Johnston, Chairman of the Xurex board, noisily resigning from the board and stating,

> Our participation on the Xurex Board was strictly contingent on the members' mutual, good faith effort to facilitate and advance the business affairs of Xurex through independent, objective and reasonable management practices - *with extra special and careful attention being paid to the Delaware Court's stern advisory that the Xurex Board earnestly pursue and maintain the independence of the Company for the primary benefit of the Xurex shareholders* within an admittedly heretofore broken and conflict laden business environment. In our opinion, the material facts around the prevailing: corporate culture; business strategy; decision making process; communications and information sharing practices; and, operational leadership are, in our view, insufficient to enable us to fulfill our duties as directors.

(emphasis added).

62.     Xurex accepted the noisy resignations of O'Brien and Hutchings on January 11, 2012, the same day that Xurex entered into an amendment to the prior agreements ("the 1/11/12 Amendment").

63.     Accordingly, at the time the 1/11/12 Amendment was entered into, only three of the five board positions were filled -- by Johnston, Rose, and Olson, who are sometimes referred to herein as "the First Di Mase Xurex Board."

**G.     Illegal Contract Amendments.**

64.     Once Jose Di Mase and DuraSeal gained control over Xurex, the First Di Mase Xurex Board caused Xurex to enter into the 1/11/12 Amendment to the 1/13/10 Agreement and the 12/31/10 Agreement.

65.     Among other changes, this amendment:

    (a)     shortened the contract termination date for minimum purchases from 2021 to 2015 pursuant to ¶ 5(b);

52450816.12

(b)     significantly curtailed the minimum number of barrels DuraSeal Pipe and DuraSeal Holdings were required to purchase annually pursuant to ¶ 5(b);

(c)     reduced the royalty rate from a flat 5% to a sliding scale ranging from 1.5% to 5% pursuant to ¶ 5(c);

(d)     provided DuraSeal with the right to purchase Xurex's IP upon certain occurrences pursuant to ¶ 14(a);

(e)     provided that DuraSeal owns all IP conceived or reduced to practice by its employees and agents that is supposedly not derived from Xurex IP pursuant to ¶ 14(e);

(f)     provided that Xurex and DuraSeal shall jointly own all IP jointly conceived or reduced to practice pursuant to ¶ 14(e); and

(g)     provided for a purported right to termination (and elimination of DuraSeal's minimum purchase requirements) upon notification by DuraSeal of an "Uneconomic Condition," pursuant to ¶¶ 1(m) and 16.

66.     The reported consideration for the 1/11/12 Amendment was recited in ¶ 2(b) to be $175,000, "$150,000 of which has already been paid, plus a $25,000 wire by January 15, 2012."

67.     In fact, the 1/11/12 Amendment lacked consideration or adequate consideration, was the product of the First Di Mase Xurex Board's interestedness and lack of independence, was not the product of fair dealing and did not represent fair value, and was entered into hastily and without proper care and consideration.

68.     Jose Di Mase's former son-in-law, Jensvold, signed the 1/11/12 Amendment as Vice President of DuraSeal Holdings, Jack F. Angel signed as the CEO of DuraSeal Pipe, and Rose signed as "Director" on behalf of Xurex.

69.     According to Kaiser's 2004 Exam, he does not have any knowledge as to why Rose, a board member of Xurex, would have executed the 1/11/12 Amendment, rather than an officer of the company.

52450816.12

70.     According to Kaiser's 2004 Exam, it is extremely unusual for a director to execute a document in the nature of the 1/11/12 Amendment, instead of an officer of the company.

71.     According to Rose, Johnston, the Chairman and CEO of Xurex and a DuraSeal Pipe board member at the time, directed and/or coerced him to sign the 1/11/12 Amendment because Johnston did not want to be on record as having been involved with the purported approval of the 1/11/12 Amendment.

72.     While entered into unlawfully and in violation of the First Di Mase Xurex Board's fiduciary duties, ¶ 4 of the 1/11/12 Amendment still provided that DuraSeal agrees to prepare and implement a North American plan and final global plan for the commercialization of Xurex's products with the following target dates:  Automotive R & D Plan – December 31, 2012; Preliminary North American Plan – March 31, 2012; Preliminary Global Plan – December 31, 2013; and Final Global Plan – December 31, 2014.

73.     Paragraph 4(f) of the 1/11/12 Amendment also provided that DuraSeal agrees to have an organization staffed and sales efforts within 12 months after each target date.

74.     Paragraph 5(b) of the 1/11/12 Amendment provided that DuraSeal shall purchase 543 barrels of Xurex products through 2015 at $12,500 per barrel, resulting in total revenue of approximately $6,787,500 through 2015.   Additional minimum purchases were required thereafter, through December 31, 2022.

75.     Paragraph 9 of the 1/11/12 Amendment also provided DuraSeal with the ability to maintain quality control.  It provided that "DuraSeal shall have the right to establish reasonable specifications and related quality control standards for the manufacture, packaging, storage and delivery of the Authorized Products."

14

76.     And, ¶ 10 of the 1/11/12 Amendment provided that DuraSeal agrees not to sell products that compete with those of Xurex and will not attempt to reverse engineer or duplicate Xurex's products.

**H.     Xurex Shuts Down Its Separate Operations and Moves Into DuraSeal's Facility at the Former Richards Gebaur Air Force Base.**

77.     On about March 31, 2012, after he had gained control of Xurex board of directors, Jose Di Mase caused Xurex to move its operations from Albuquerque, New Mexico into DuraSeal Pipe's place of business in Kansas City.  Both operations were eventually moved to the former Richards Gebaur Air Force Base at 3456 E. 155th Street, Kansas City, Missouri.

78.     On March 6, 2012, the First Di Mase Xurex Board had caused Xurex to sell most of its equipment in an online bid process.  This was done in conjunction with DuraSeal causing Xurex to shut down its operations in New Mexico and moving its facilities to DuraSeal Pipe's facility in Kansas City.

79.     In or about August and September, 2012, the Di Mases and DuraSeal offered to purchase the remaining equity in Xurex for $4.1 million.  This was consistent with the Di Mases' goal of finally combining DuraSeal and Xurex and obtaining unfettered rights to its intellectual property and trade secrets.

80.     The offer was rejected because it was deemed to be far below fair value.

81.     Subsequently, on October 29, 2012, Jose Di Mase, on information and belief, had Giacomo Di Mase installed as a new Xurex board member.

82.     But Giacomo Di Mase, who was also a Director of both DuraSeal Pipe and DuraSeal Holdings, conflicted with the First Di Mase Xurex Board notwithstanding their previous approval and/or acquiescence of the 1/11/12 Amendment.

52450816.12

83.     At least by late 2012, the relationship between the Xurex board (formerly hand-picked by the Di Mases and DuraSeal), and the Di Mases was rapidly deteriorating in significant part due to the rejection of DuraSeal's $4.1 million offer to purchase the remaining equity of Xurex which would enable the Di Mases to formally combine Xurex and DuraSeal without having to answer to Xurex's other stockholders.

84.     Giacomo Di Mase also conflicted with Johnston, former Di Mase confidant and insider, for completely different reasons, as discussed below.

**I.     Johnston and Di Mase Have a Falling-Out Over Johnston's Self-Dealing, Including Johnston's Formation of CVM Technology.**

85.     By the Spring of 2013, Jose Di Mase and Johnston also had a falling out over the Xurex board's issuance to themselves of 10.2 million shares of Xurex common stock and Johnston's formation of CVM Technology which became active in the fracking industry, using Xurex technology.

86.     As of February 4, 2013, Johnston was no longer an officer of DuraSeal Pipe.

87.     On March 26, 2013, DuraSeal filed an action against Xurex's board, including Johnston, for breach of fiduciary duties related to the unauthorized stock issuance to Johnston and other directors purportedly aligned with him, and for Johnston's and CVM Technology's theft of Xurex's corporate opportunities.[5]

88.     Di Mase and Jensvold also had DuraSeal file yet another declaratory judgment action in Delaware Chancery Court on June 18, 2013, seeking a declaration that following the June 14, 2013 annual meeting of Xurex, the board consisted of Thomas E. Appleton, and Defendants Kaiser, McKeon, Jensvold, and Giacomo Di Mase, also referred to "the Second Di

---

[5] 3/26/13 Verified Complaint in *DuraSeal Coatings Company LLC v. Johnston, et al.*, Case No. 8436, in the Court of Chancery of Delaware.

52450816.12

Mase Xurex Board," excepting Appleton who resigned shortly after taking office.[6] This board continued to be hopelessly conflicted with all but McKeon holding an office or board position with DuraSeal Pipe and/or DuraSeal Holdings.

89. In filing that Delaware action, Jose Di Mase sought to oust the old board members that were previously in the Di Mase camp but who were supposedly cronies of Johnston and therefore no longer aligned with Jose Di Mase and DuraSeal.

**J.    Having Gained Complete Control Over Xurex, Di Mase and the Xurex Board Undertake to Eliminate Xurex and Transfer Its Assets, Rights, and Operations to DuraSeal which He Owns 100%.**

90. By August 30, 2013, Di Mase and DuraSeal had again gained control of the Xurex board. It is believed that by this time Xurex, which had been operating out of DuraSeal's facility since March 2012, no longer was manufacturing its products for sale to DuraSeal.

91. Rather, on information and belief, DuraSeal was improperly either manufacturing the products itself or outsourcing the manufacturing to third parties.

92. Xurex was now being run by Jose Di Mase's son, Giacomo Di Mase (who was also a DuraSeal director), his son-in-law, Jensvold (also a director and Vice President of DuraSeal), and long-time Di Mase company employee, Kaiser (also a Manager of DuraSeal Pipe and the former CFO of Piaggio America). Appleton (a DuraSeal Pipe Manager and the former President of Piaggio America) resigned from the board in October 2013. McKeon was the only outside director.

93. On October 8, 2013, DuraSeal CEO Jack Angel sent a letter to Kaiser, director and CEO of Xurex, claiming that DuraSeal has entered into "an Uneconomic Condition as of

---

[6] 6/18/13 Verified Complaint, ¶ 1, in *DuraSeal Coatings Company LLC v. Dietmar Rose, et al.*, Case No. 8660, in the Court of Chancery of Delaware.

52450816.12

September 30, 2013," pursuant to ¶¶ 1(m) and 16 of the 1/11/12 License Agreement, "as a result of an inventory reduction initiative from DuraSeal's largest customer, Pioneer/Petrol Amigos."

94.     Kaiser, who received the letter, had just recently joined the board of Xurex at the request of the Di Mase family.  He was also a Manager of DuraSeal Pipe.

95.     Following receipt of the uneconomic condition letter, Kaiser claims he contacted the Xurex board to discuss it.  On the call was Kaiser, Appleton, Jensvold, Giacomo Di Mase, and McKeon.

96.     On information and belief, Appleton resigned from his positions at Xurex very shortly after DuraSeal sent this letter.

97.     The Xurex board took absolutely no action in response to DuraSeal's letter, including any investigation to determine whether DuraSeal had the right to invoke the provision or whether the 1/11/12 Amendment was even valid.

98.     DuraSeal did not, in fact, satisfy the requirements to invoke ¶¶ 1(m) and 16 of the 1/11/12 Amendment, to the extent it is otherwise valid and enforceable.

99.     In furtherance of a conspiracy between the Second Di Mase Xurex Board and the DuraSeal Defendants to shut down Xurex's operations to the benefit of DuraSeal, Giacomo Di Mase proposed on November 15, 2013 that Xurex's own board should attempt to get a written statement from Xurex chemist John Lowry to the effect that Xurex's own products never worked.

100.     In response to Giacomo Di Mase's suggestion, Kaiser initially stated, "we should never ask John Lowry for such a statement."  However, he did exactly that only a few days later and reported back to the Second Di Mase Xurex Board on November 18, 2013.

52450816.12

101.    On November 18, 2013, in an apparent effort to establish that DuraSeal Pipe and DuraSeal Holdings were not obligated to make minimum purchases from Xurex, Xurex CEO Kaiser called Xurex chemist, John Lowry, and asked him to send DuraSeal a letter stating that Xurex's products, which DuraSeal had been using for years, "did not work."

102.    In other words, Xurex's CEO sought to discredit Xurex's own products so that DuraSeal could discontinue the significant minimum purchases under its agreements with Xurex.

103.    It warrants noting that DuraSeal has repeatedly represented and acknowledged the viability of Xurex's products, including by judicial admissions in other litigation that "Xurex offers innovative industrial protective coatings that create deep bonds by chemically altering substrates.  In particular, Xurex's products provide for enhanced performance of equipment used in the oil and gas industry."

104.    It is believed that by the beginning of 2014, the DuraSeal Defendants and the Second Di Mase Xurex Board had caused Xurex's operations to be completely shut down and it no longer had any employees.

105.    For instance, the December 16, 2013, Xurex board minutes provide, "the board reviewed and evaluated the Consolidated Balance Sheet along with pictures as presented by Leonard P. Kaiser and determined to dispose of all materials stored by the previous Xurex, Inc. leadership team at the Interstate Warehouse and Distribution Center.  The board evaluated the need of the laboratory at the Kansas Bioscience Authority and determined to cancel the month-to-month lease effective December 31, 2013."

106.    After DuraSeal shuttered Xurex's lab, DuraSeal set up its own lab.

107.    It was becoming abundantly clear by late-2013, that the DuraSeal Defendants were intent on shutting down Xurex's operations for the benefit of DuraSeal with the Second Di

Mase Xurex Board, all of whom were also directors or officers of DuraSeal except for McKeon, doing the DuraSeal Defendants' bidding.

108.    As early as November 7, 2013, the Second Di Mase Xurex Board was evaluating bankruptcy scenarios for Xurex.

109.    Jose Di Mase was also directly involved with making decisions respecting Xurex, even though he held no formal position directly with Xurex.

110.    For instance, Appleton had regular communication with Jose Di Mase, including on January 3, 2014, to discuss Kaiser's compensation package, even though Jose Di Mase purported to hold no position with Xurex and Appleton had resigned from the board.

111.    Further, because DuraSeal had wrongfully suspended its purchases under the long-term minimum purchase requirements of the parties' agreement in the Fall of 2013, Xurex began having cash flow difficulties and needed periodic cash infusions.

112.    On information and belief, these cash infusions were being made by the entity Kaiser referred to during his 2004 Exam as "The Di Mase Group."[7]

113.    As will be seen, Jose Di Mase was also directly involved in the misappropriation of Xurex's trade secrets for DuraSeal.

## K.    DuraSeal Successfully Obtains Xurex Lab Books, Source Code, and Other Trade Secrets at the Behest of Jose Di Mase.

114.    As part of the conspiracy, and at the direction and request of Jose Di Mase, Kaiser, Giacomo Di Mase, and Jensvold undertook to misappropriate Xurex's trade secrets and disclose them to DuraSeal, with which they were also directors and/or managers.

115.    In May and June, 2014, Kaiser, Giacomo Di Mase, and Jensvold undertook efforts to obtain Xurex intellectual property and trade secret information which was being held by a

---

[7] One such wire transfer was effected on January 10, 2014, by Ugo Anatra, the Director General of Piaggio Aero. On information and belief, Mr. Anatra is also a representative of The Di Mase Group.

third party escrow company, Escrow Associates, so that this information could be provided to DuraSeal in furtherance of the conspiracy.

116.    However, at first when Kaiser sought the information, Escrow Associates expressed concern and confusion as to the relationship between the various players and their respective representation of Xurex and/or DuraSeal.

117.    In response, Kaiser e-mailed Escrow Associates on May 19, 2014 and copied Jensvold and Giacomo Di Mase stating, "Alexandra: I have spoken to Tris [Jensvold] on this matter and I am responding on behalf of Xurex, Inc. Over the years, there have been numerous organizational changes for Xurex, so I can understand your company's concern and confusion."

118.    He then advised Escrow Associates that he, Giacomo Di Mase, and Jensvold were acting in Xurex's interest, rather than DuraSeal's, in order to secure the release of the source code that Kaiser was intending to send to DuraSeal.

119.    Because of the impending Chapter 7 bankruptcy filing, pursuant to which it would lose control over the Xurex books and records to the Trustee, the Second Di Mase Xurex Board's e-mails reflect that they were urgently attempting to obtain this source code from Escrow Associates.

120.    On June 17, 2014, after Kaiser received the source code from Escrow Associates, he e-mailed the files that were on a CD that Escrow Associates had provided to him to Giacomo Di Mase and to Jensvold, at the e-mail address graymattersinc@gmail.com, rather than to Jensvold's Xurex address.

121.    This source code was then provided to DuraSeal.

122.    At the same time that the Xurex board was attempting to obtain the source code from Escrow Associates in order to disclose it to DuraSeal, it was also attempting to obtain Xurex lab books going back to 2008 for disclosure to DuraSeal.

123.    For instance, an e-mail from Kaiser dated May 22, 2014, to Giacomo Di Mase, DuraSeal CEO Kraus, Jensvold, and Randy Fields, stated: "Giacomo:  Randy and I went to the Denton Law Firm today to see if there was any formulation data in the files.  We found copies of lab books going back to 2008.  Hopefully this is the lab data that Bishop and Johnson say they have copies of.  This is the first of a string of about 12 e-mails on this topic."

124.    Kaiser then proceeded to e-mail all of the lab book information containing Xurex trade secrets to DuraSeal.

125.    When he was finished sending the trade secret information to DuraSeal about 30 minutes later, Kaiser e-mailed Giacomo Di Mase, Jensvold, Randy Fields, and someone with the e-mail address "leek@durasealcoatings.com," with the subject "Intellectual Property," and stated, "Giacomo: That's everything.  A hard copy is on file at Denton's and a hard copy will be retained in the DuraSeal fire safe."

126.    About an hour later at 4:34 p.m. on May 22, 2014, Kaiser sent another e-mail in a misguided attempt to cover up the wrongdoing of the Second Di Mase Xurex Board and the DuraSeal Defendants stating, "Gentlemen:  After rethinking my prior communication, please delete this string of 15 e-mails as they were sent in error."

127.    However, making abundantly clear that the e-mails were not to actually be deleted, Kaiser e-mailed Giacomo Di Mase at 8:05 p.m. on May 22, 2014, and stated that the reason he sent the e-mail was because "Tris [Jensvold] was concerned that it would cause potential problems with [Xurex] shareholders if I provided DuraSeal with IP.  He asked me to e-

mail them to delete the e-mails. *You should absolutely look at the documents. They are the last possibility to find the original formulas*." (emphasis added).

128. Jose Di Mase was directly involved in having the Second Di Mase Xurex Board compile all of the intellectual property and trade secrets of Xurex for disclosure to DuraSeal as made apparent by e-mail communications.

129. Approximately two weeks after Kaiser provided the lab books to DuraSeal, he sent Giacomo Di Mase an e-mail on June 6, 2014, asking whether "the copies of the lab books I e-mailed you two weeks [was] *the documentation Jose was looking for*?" (emphasis added).

**L. Having Secured Xurex's IP and Trade Secret Information for DuraSeal, the Second Di Mase Xurex Board Agree to Put Xurex Into Bankruptcy.**

130. Having secured Xurex's IP and trade secret information and given it to DuraSeal, the Second Di Mase Xurex Board then agreed to put Xurex into bankruptcy.

131. On July 29, 2014, Jensvold e-mailed Giacomo Di Mase, Kaiser, and McKeon to advise them that he had a call scheduled with a bankruptcy attorney on behalf of Xurex.

132. According to Kaiser's 2004 Exam, the Second Di Mase Xurex Board made the final decision in mid to late-August 2014 to put Xurex into bankruptcy, although it had been discussed as early as November 2013.

133. In anticipation of Xurex's impending bankruptcy filing, DuraSeal preordered four barrels of product from Xurex.

**M. The Second Di Mase Xurex Board and the DuraSeal Defendants Place Massive Debt on Xurex's Balance Sheet in Effort to Justify the Shuttering of Xurex.**

134. As part of the conspiracy to shut down Xurex's operations and to justify a bankruptcy filing, the Second Di Mase Xurex Board and the DuraSeal Defendants purported to cause a massive amount of debt to be placed on Xurex's balance sheet. Xurex had no significant liabilities otherwise.

52450816.12

135.    For instance, on August 11, 2014, Kaiser sent a formal letter to all shareholders telling them that Xurex's debt totaled more than $5.7 million.

136.    However, this $5.7 million figure was comprised of $2.7 million of DuraSeal's own attorneys' fees and other purported debt to DuraSeal, plus a $3 million default judgment the Second Di Mase Xurex Board would later permit Richard Polley to take against Xurex, through its decision not to further defend a lawsuit Polley had filed long-ago against Xurex.

137.    On August 28, 2014, the Second Di Mase Xurex Board permitted the $3 million judgment to be taken against Xurex in favor of Richard Polley, a case which all had previously agreed should be vigorously defended and which was without merit.

138.    Kaiser also claims that as of June 3, 2014, Xurex owed DuraSeal $2,387,278.70 which represented DuraSeal legal expenses plus other debt.

139.    Kaiser testified that he accepted this amount as a Xurex liability based upon a mere representation from DuraSeal that DuraSeal's attorney said that this sum could be reimbursed by Xurex.

140.    The Second Di Mase Xurex Board conducted no investigation into whether this was proper or whether Xurex, a nominal party in the Delaware litigation, was actually responsible for the $2.3 million plus in attorneys' fees incurred by DuraSeal and the Di Mases.

141.    Further, Kaiser did not even confer with Xurex's accountant regarding the legal fees incurred by DuraSeal.

142.    Rather, Kaiser simply presented Xurex's accountant with "the bill and we booked it as a liability."

143.    According to Kaiser's 2004 Exam, Giacomo Di Mase, board member of both DuraSeal and Xurex, directed Kaiser to do so.

144.    Xurex, in fact, is not and has never been responsible for these attorneys' fees.

**N.    Defendants Cause Xurex to Enter into the 9/25/14 Amendment on the Eve of Filing for Chapter 7 Bankruptcy Protection.**

145.    Having misappropriated Xurex's trade secrets for DuraSeal and made the decision to cause Xurex to file for bankruptcy on the purported ground that it had massive debt, Xurex and DuraSeal then entered into an amendment to the 1/11/12 Amendment on September 25, 2014 that gutted DuraSeal's prior obligations to Xurex ("the 9/25/14 Amendment").

146.    First, this amendment completely eliminated the prior obligations of DuraSeal to make minimum purchases of Xurex product by simply declaring in ¶ 5, "Minimum Purchases have been suspended," and "revenue sharing is suspended."

147.    Other changes included (a) that upon a bankruptcy filing by Xurex, DuraSeal had the right to manufacture the product itself and has the exclusive right to the Xurex IP placed in escrow under ¶ 13; and (b) that DuraSeal owns all IP "that is derived from, an improvement of, or a modification to, the Xurex intellectual property," under ¶ 1(c).

148.    Paragraph 4 of the 9/25/14 Amendment also completely removed extensive sections on DuraSeal's obligations to complete development and commercialization plans and implementation of those plans for Xurex's products, an obligation which DuraSeal had never fulfilled.

149.    The supposed consideration for this amendment was that "DuraSeal agrees to loan to Xurex an amount not less than $100,000 during the calendar year 2014… *which amount has previously been paid*." (emphasis added).

150.    However, there is not any promissory note between the two companies reflecting any such loan, and Kaiser admitted during his 2004 Exam that there are not even "any writings between the two companies that reflects that amount being a loan."

52450816.12

151.    According to a 2004 Exam of Kaiser, every month from October, 2013 through September, 2014, DuraSeal provided working capital to Xurex.

152.    However, in May 2014, "the loans at the time to date were converted to equity" because "DuraSeal didn't think that they were going to be reimbursed as a loan, so, they increased their investment in the company called Xurex."

153.    On June 9, 2014, Xurex and DuraSeal purported to enter into an amendment to a May 1, 2014 stock purchase agreement that provided, "In the event that, between May 1, 2014 and January 31, 2015, the Purchaser loans money to the Company in an amount or amounts not to exceed $500,000 in the aggregate.  The Purchaser shall have the right, upon notice to the Company, to convert such additional indebtedness into shares of the Company's common stock at a conversion price of $.04/share and upon such other terms and conditions as set forth herein."

154.    The conversion of DuraSeal's debt to equity had the effect of diluting the other shareholders of Xurex.

155.    On information and belief, Xurex and DuraSeal were not permitted to do so without giving notice to the other shareholders.

156.    While in May of 2014, DuraSeal recharacterized its purported loans to Xurex as equity because it did not have any expectation that the loans were going to be repaid, DuraSeal purported to characterize infusions of capital by DuraSeal to Xurex subsequent to May, 2014, as loans even though there also was not any expectation that the new loans were going to be repaid.

157.    In short, there was no consideration for the 9/25/14 Amendment.

158.    In fact, the 9/25/14 Amendment lacked consideration or adequate consideration, was the product of the Second Di Mase Xurex Board's interestedness and lack of independence,

was not the product of fair dealing and did not represent fair value, and was entered into hastily and without proper care and consideration.

159.    Approximately three weeks later, on October 17, 2014, Xurex filed for Chapter 7 bankruptcy in the United States District Court for the Western District of Missouri.

160.    At his 2004 Exam, when asked whether there was any benefit to Xurex entering into the 9/25/14 Amendment, Kaiser, Xurex's Director, CEO and the individual who signed the amendment on behalf of Xurex said, "*I don't believe there was any benefit.  It just restated that DuraSeal didn't have to go through Xurex to purchase product*." (emphasis added).

161.    Kaiser also claimed during his 2004 Exam that there was not any official action taken to review and approve the 9/25/14 Amendment by the Second Di Mase Xurex Board, although he did have a telephone call with Giacomo Di Mase, Jensvold, and McKeon about it.

162.    According to Kaiser's 2004 Exam, DuraSeal wanted to enter into the 9/25/14 Amendment because "if a third party acquired the intellectual property, DuraSeal would not have to be burdened by any kind of minimum purchase requirements *unlike the case under early versions*." (emphasis added).

163.    Also, according to Kaiser's 2004 Exam, DuraSeal proposed the 9/25/14 Amendment because "they wanted to be able to produce a Xurex product whether Xurex owned the patents or whomever purchased the patents."

164.    Kaiser also admitted that the Xurex board did not obtain the advice of counsel when entering into the 9/25/14 Amendment.

165.    The earlier versions of the agreement provided that DuraSeal owns all intellectual property conceived or reduced to practice solely by its employees and agents "*that is not derived*

52450816.12

from an improvement of or modification to the Xurex intellectual property during the term." (emphasis added).

166. But the 9/25/14 Amendment provided that DuraSeal shall own all intellectual property conceived or reduced to practice solely by its employees and agents "*including intellectual property that is derived from the improvement or modification to the Xurex intellectual property during the term,*" which represented a 180 degree change in meaning.

167. Kaiser admitted that this was a significant difference between the two agreements and that he was aware of the change in this provision.

168. On information and belief, Kraus was tasked by the DuraSeal Defendants in pushing through the 9/25/14 Amendment. Kaiser has admitted that the Second Di Mase Xurex Board dealt with Kraus in entering into it.

169. Kraus also signed it on behalf of DuraSeal.

**O. Concerned with Personal Liability for Their Acts and Omissions in Furtherance of the Interests of DuraSeal and the DuraSeal Defendants, the Second Di Mase Xurex Board Seek and Obtain Promises from DuraSeal that it Will Indemnify Them for Any Claims for Breaches of their Fiduciary Duties to Xurex.**

170. As far back as September 2013, Kaiser, Giacomo Di Mase, Appleton and McKeon (and later Jensvold) started becoming concerned about potential liabilities that they may incur as a result of their self-dealing and their advancement of DuraSeal's interests to the detriment of Xurex.

171. As reflected in a September 14, 2013 e-mail from Appleton to Jack Angel, Kaiser, Giacomo Di Mase, Jensvold and McKeon, entitled "DuraSeal Indemnity," Appleton stated, "you will recall at the June meeting in Kansas City, we discussed the requirement for an indemnity to be provided by DuraSeal to Len Kaiser, Steve McKeon, and me, from DuraSeal, for our personal protection. *This was verbally agreed between me and Jose prior to my agreeing to be appointed*

*to the Xurex Board*, however, it was not actioned at the time due to the disputed outcome of the DuraSeal shareholders meeting." (emphasis added).

172.    The same day, Attorney Eric Graben sent Kaiser indemnification agreements for him and Appleton to sign, pursuant to which both DuraSeal and Xurex agreed to indemnify them for wrongdoing.

173.    These indemnification agreements recite that not only were Kaiser and Appleton directors and officers of Xurex, as was well known at the time, but that Kaiser and Appleton were also each "a manager and/or officer" of DuraSeal, which the DuraSeal Defendants and the Second Di Mase Xurex Board kept secret.

174.    Concerned with the wrongdoing that they were undertaking on behalf of DuraSeal, the Xurex board not only sought and obtained indemnification agreements from DuraSeal, but also sought to ensure that there was directors and officers liability insurance coverage in place, and there are numerous communications throughout 2014, up until the bankruptcy filing, describing the potential dearth of coverage as "a very serious issue."

175.    Notably, on May 21, 2014, the Xurex board was reviewing the status of its officers' and directors' liability insurance with brokers from IBG.  Not only were Kaiser, Giacomo Di Mase, and Jensvold present, but Kraus of DuraSeal was also inexplicably present.

176.    Clearly concerned with personal liability, Jensvold e-mailed Kaiser and Giacomo Di Mase on September 30, 2014, as the bankruptcy filing approached, asking numerous insurance policy questions should he get sued for his conduct.

177.    On October 17, 2014, Xurex filed for Chapter 7 bankruptcy protection.

# V. CLAIMS FOR RELIEF

### COUNT I
### BREACH OF CONTRACT
### (Trustee v. DuraSeal Pipe)

178.    Trustee incorporates by reference herein the allegations of paragraphs 1 through 177 above as if set forth fully herein.

179.    Xurex and DuraSeal Pipe entered into the 1/13/10 Agreement, whereby DuraSeal Pipe agreed to (a) purchase a minimum amount of Xurex product through October 1, 2018, at an agreed upon price, and (b) pay Xurex a 5% license fee on certain products sold by DuraSeal Pipe.

180.    The 1/13/10 Agreement was supported by good and valuable consideration.

181.    Xurex substantially performed under the 1/13/10 Agreement.

182.    DuraSeal Pipe materially breached the 1/13/10 Agreement by failing to make the minimum purchases required of it.

183.    It also materially breached the 1/13/10 Agreement by failing to pay Xurex the required 5% license fee.

184.    As a result of DuraSeal Pipe's breach of the 1/13/10 Agreement, Xurex and/or its Estate, has sustained damages.

### COUNT II
### BREACH OF CONTRACT
### (Trustee v. DuraSeal Holdings)

185.    Trustee incorporates by reference herein the allegations of paragraphs 1 through 177 above as if set forth fully herein.

186.    Xurex and DuraSeal Holdings entered into the 12/31/10 Agreement, whereby DuraSeal Holdings agreed to (a) purchase a minimum amount of Xurex product through December 31, 2022, at an agreed upon price, (b) pay Xurex a 5% license fee on certain products

52450816.12

sold by DuraSeal Holdings, (c) develop and commercialize Xurex's products, (d) not to manufacture, market, or sell products in competition with Xurex's products, or attempt to reverse engineer or duplicate Xurex's products, and (e) not to hire or retain Xurex's employees or contractors for two years after their work ceases for Xurex.

187.    The 12/31/10 Agreement was supported by good and valuable consideration.

188.    Xurex substantially performed under the 12/31/10 Agreement.

189.    DuraSeal Holdings materially breached the 12/31/10 Agreement by failing to meet each of the contractual requirements set forth above.

190.    As a result of DuraSeal Holdings' breach of the 12/31/10 Agreement, Xurex and/or its Estate, has sustained damages.

**COUNT III**
**ALTERNATIVE BREACH OF CONTRACT**
**(Trustee v. DuraSeal Pipe and DuraSeal Holdings)**

191.    Trustee incorporates by reference herein the allegations of paragraphs 1 through 177 above as if set forth fully herein.

192.    In the event it is somehow determined that the 1/11/12 Amendment is valid and enforcement, the Trustee asserts the instant breach of contract claim in the alternative.

193.    Xurex, DuraSeal Pipe, and DuraSeal Holdings entered into the 1/11/12 Amendment, whereby DuraSeal Pipe and DuraSeal Holdings agreed to (a) purchase a minimum amount of Xurex product through December 31, 2022, at an agreed upon price, (b) pay Xurex license fees on certain products sold by DuraSeal Pipe and DuraSeal Holdings, (c) develop and commercialize Xurex's products, (d) not to manufacture, market, or sell products in competition with Xurex's products, or attempt to reverse engineer or duplicate Xurex's products, and (e) not to hire or retain Xurex's employees or contractors for two years after their work ceases for Xurex.

52450816.12

194. The 1/11/12 Amendment was supported by good and valuable consideration.

195. Xurex substantially performed under the 1/11/12 Amendment.

196. DuraSeal Pipe and DuraSeal Holdings materially breached the 1/11/12 Amendment by failing to meet each of the contractual requirements set forth above.

197. As a result of DuraSeal Pipe's and DuraSeal Holdings' breach of the 1/11/12 Amendment, Xurex and/or its Estate, has sustained damages.

**COUNT IV**
**BREACH OF COVENANT AND GOOD FAITH AND FAIR DEALING**
**(Trustee v. DuraSeal Pipe and DuraSeal Holdings)**

198. Trustee incorporates by reference herein the allegations of paragraphs 1 through 177 above as if set forth fully herein.

199. Xurex and DuraSeal Pipe entered into the 1/13/10 Agreement, whereby DuraSeal Pipe agreed to (a) purchase a minimum amount of Xurex product through October 1, 2018, at an agreed upon price, and (b) pay Xurex a 5% license fee on certain products sold by DuraSeal Pipe.

200. Xurex and DuraSeal Holdings entered into the 12/31/10 Agreement, whereby DuraSeal Holdings agreed to (a) purchase a minimum amount of Xurex product through December 31, 2022, at an agreed upon price, (b) pay Xurex a 5% license fee on certain products sold by DuraSeal Holdings, (c) develop and commercialize Xurex's products, (d) not to manufacture, market, or sell products in competition with Xurex's products, or attempt to reverse engineer or duplicate Xurex's products, and (e) not to hire or retain Xurex's employees or contractors for two years after their work ceases for Xurex.

201. Alternatively, Xurex, DuraSeal Pipe, and DuraSeal Holdings entered into the 1/11/12 Amendment, whereby DuraSeal Pipe and DuraSeal Holdings agreed to (a) purchase a minimum amount of Xurex product through December 31, 2022, at an agreed upon price, (b) pay

32

52450816.12

Xurex license fees on certain products sold by DuraSeal Pipe and DuraSeal Holdings, (c) develop and commercialize Xurex's products, (d) not to manufacture, market, or sell products in competition with Xurex's products, or attempt to reverse engineer or duplicate Xurex's products, and (e) not to hire or retain Xurex's employees or contractors for two years after their work ceases for Xurex.

202. The 1/13/10 and 12/31/10 Agreements and alternatively the 1/11/12 Amendment, were supported by good and valuable consideration.

203. Xurex substantially performed under the 1/13/10 and 12/31/10 Agreements, and alternatively the 1/11/12 Amendment.

204. DuraSeal Pipe and DuraSeal Holdings failed to exercise discretion afforded to them under the parties' contract reasonably and in good faith and/or prevented Xurex from receiving the expected fruits of its contract, thereby breaching their implied duty of good faith and fair dealing, in making decisions respecting and in failing to meet the contractual requirements set forth above, under the 1/13/10 and 12/31/10 Agreements, and alternatively the 1/11/12 Amendment.

205. As a result of DuraSeal Pipe's and DuraSeal Holdings' breaches of the respective 1/13/10 and 12/31/10 Agreements, and alternatively the 1/11/12 Amendment, Xurex and/or its Estate, has sustained damages.

### COUNT V
### MISAPPROPRIATION OF TRADE SECRETS
**(Trustee v. the DuraSeal Defendants and the Second Di Mase Xurex Board)**

206. Trustee incorporates by reference herein the allegations of paragraphs 1 through 177 above as if set forth fully herein.

52450816.12

207.     Xurex developed formulas, processes, and other information related to its coating products which had commercial utility and value, including but not limited to, source code information held by a third-party in escrow, and Xurex lab books.

208.     Xurex took measures to keep this information secret and from becoming available to persons other than those selected by Xurex to have access thereto for limited purposes.

209.     The information therefore constituted and included trade secrets.

210.     Through unlawful and improper means, the DuraSeal Defendants and the Second Di Mase Xurex Board obtained and/or used the trade secret information to the injury of Xurex.

211.     Xurex is thereby entitled to recover the damage and loss caused by the misappropriation, the unjust enrichment caused by the misappropriation, and/or the value of a reasonable royalty for the DuraSeal Defendants' and the Second Di Mase Xurex Board's unauthorized use of the trade secrets.

## COUNT VI
## CIVIL CONSPIRACY
### (Trustee v. All Defendants)

212.     Trustee incorporates by reference herein the allegations of paragraphs 1 through 177 above as if set forth fully herein.

213.     Xurex and DuraSeal Pipe entered into the 1/13/10 Agreement, whereby DuraSeal Pipe agreed to (a) purchase a minimum amount of Xurex product through October 1, 2018, at an agreed upon price, and (b) pay Xurex a 5% license fee on certain products sold by DuraSeal Pipe.

214.     Xurex and DuraSeal Holdings entered into the 12/31/10 Agreement, whereby DuraSeal Holdings agreed to (a) purchase a minimum amount of Xurex product through December 31, 2022, at an agreed upon price, (b) pay Xurex a 5% license fee on certain products sold by DuraSeal Holdings, (c) develop and commercialize Xurex's products, (d) not to

34

manufacture, market, or sell products in competition with Xurex's products, or attempt to reverse engineer or duplicate Xurex's products, and (e) not to hire or retain Xurex's employees or contractors for two years after their work ceases for Xurex.

215.    Alternatively, Xurex and DuraSeal Pipe and DuraSeal Holdings entered into the 1/11/12 Amendment, whereby DuraSeal Pipe and DuraSeal Holdings agreed to (a) purchase a minimum amount of Xurex product through December 31, 2022, at an agreed upon price, (b) pay Xurex license fees on certain products sold by DuraSeal Pipe and DuraSeal Holdings, (c) develop and commercialize Xurex's products, (d) not to manufacture, market, or sell products in competition with Xurex's products, or attempt to reverse engineer or duplicate Xurex's products, and (e) not to hire or retain Xurex's employees or contractors for two years after their work ceases for Xurex.

216.    The DuraSeal Defendants, excepting Kraus, the First Di Mase Xurex Board, and John Does 1-10, had an agreement or meeting of the minds to commit an unlawful act to cause (a) Xurex to enter into the 1/11/12 Amendment, (b) DuraSeal Pipe and DuraSeal Holdings to fail to meet the appropriate minimum purchase requirements, (c) DuraSeal Pipe and DuraSeal Holdings to fail to pay Xurex appropriate royalty fees, and (d) DuraSeal Pipe and DuraSeal Holdings to develop and commercialize Xurex's products.

217.    The DuraSeal Defendants, including Kraus, the Second Di Mase Xurex Board, and John Does 1-10, had an agreement or meeting of the minds to commit an unlawful act to cause (a) Xurex to enter into the 9/25/14 Amendment, (b) DuraSeal Pipe and DuraSeal Holdings to fail to meet the appropriate minimum purchase requirements, (c) DuraSeal Pipe and DuraSeal Holdings to fail to pay Xurex appropriate royalty fees, (d) DuraSeal Pipe and DuraSeal Holdings to develop and commercialize Xurex's products, (e) DuraSeal Pipe and DuraSeal Holdings to

52450816.12

misappropriate Xurex's IP and trade secret information, (f) DuraSeal Pipe and DuraSeal Holdings to manufacture, market, or sell products in competition with Xurex, or attempt to reverse engineer or duplicate Xurex's products, and (g) DuraSeal Pipe and DuraSeal Holdings to hire or retain Xurex's employees and contractors.

218.    In furtherance of their conspiracy, Defendants committed unlawful acts, including:  breach of contract, fraudulent transfer, aiding and abetting breach of contract, breach of fiduciary duty, and aiding and abetting breaches of fiduciary duties owed to Xurex.

219.    As a direct result of the conspiracy among Defendants, Xurex and/or its Estate sustained damage in an amount to be determined at trial.

**COUNT VII**
**BREACH OF FIDUCIARY DUTY**
**(Trustee v. All Defendants, excepting Kraus)**

220.    Trustee incorporates by reference herein the allegations of paragraphs 1 through 177 above as if set forth fully herein.

221.    By virtue of their status as directors and/or officers of Xurex, the First Di Mase Xurex Board, the Second Di Mase Xurex Board, and controlling shareholders, the DuraSeal Defendants, excepting Kraus, owed fiduciary duties to Xurex including the duties of loyalty, good faith, and care in the management and administration of Xurex.

222.    These directors, officers, and controlling shareholders breached their fiduciary duties to Xurex including, but not limited to, by

(a)      authorizing, approving, ratifying, acquiescing, inducing or causing Xurex to enter into the 1/11/12 Amendment and 9/25/14 Amendment;

(b)      authorizing, approving, ratifying, acquiescing, inducing or causing  Xurex to fail to enforce its rights under the 1/13/10 and 12/31/10 Agreements and alternatively the 1/11/12 Amendment with DuraSeal Pipe and DuraSeal Holdings, respectively;

(c)      authorizing, approving, ratifying, acquiescing, inducing or causing  Xurex to purportedly enter into amendments to the 1/13/10 and 12/31/10 Agreements and

36

alternatively the 1/11/12 Amendment to the benefit of DuraSeal Pipe, DuraSeal Holdings, and their shareholders, directors, officers, employees, and representatives, including for their own benefit;

(d)     authorizing, approving, ratifying, acquiescing, inducing or causing  Xurex to disclose trade secret information to DuraSeal Pipe, DuraSeal Holdings, and other third-parties;

(e)     authorizing, approving, ratifying, acquiescing, inducing or causing Xurex's operations to be transferred to DuraSeal Pipe, and/or DuraSeal Holdings;

(f)     authorizing, approving, ratifying, acquiescing, inducing or causing Xurex's corporate opportunities to be usurped by DuraSeal Pipe, DuraSeal Holdings, and their shareholders, directors, officers, employees, and representatives, including for their own benefit;

(g)     failing to disclose to Xurex'  shareholders that the directors and/or officers had disclosed Xurex's trade secrets to DuraSeal Pipe, DuraSeal Holdings, and other third-parties;

(h)     authorizing, approving, ratifying, acquiescing, inducing or causing Xurex not to defend and/or by permitting Richard Polley to take a $3 million default judgment against Xurex;

(i)     authorizing, approving, ratifying, acquiescing, inducing or causing Xurex to purportedly assume several million dollars of legal fees incurred by DuraSeal in shareholder litigation in the Chancery Court of the State of Delaware; and/or

(j)     otherwise breaching their duties of loyalty, good faith, and care in the management of Xurex.

223.    At the time of these breaches of fiduciary duties, these directors, officers, and controlling shareholders of Xurex lacked independence, were not disinterested, and had conflicts of interest.

224.    As a result of the Xurex directors', officers', and controlling shareholders' breaches of fiduciary duties as aforesaid, Xurex and/or its Estate sustained damages in an amount to be determined at trial.

225.    Further, as a result of the Xurex directors', officers', and controlling shareholders' breaches of fiduciary duties as aforesaid, the 1/11/12 Amendment and 9/25/14 Amendment to the 1/13/10 and 12/31/10 Agreements should be deemed unlawful, void, and/or voidable by Xurex.

52450816.12

# COUNT VIII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Trustee v. The DuraSeal Defendants and John Does 1-10)

226.   Trustee incorporates by reference herein the allegations of paragraphs 1 through 177 above as if set forth fully herein.

227.   The First Di Mase Xurex Board and the Second Di Mase Xurex Board breached their fiduciary duties to Xurex including, but not limited to, by

(a)   authorizing, approving, ratifying, acquiescing, inducing or causing Xurex to enter into the 1/11/12 Amendment and 9/25/14 Amendment;

(b)   authorizing, approving, ratifying, acquiescing, inducing or causing Xurex to fail to enforce its rights under the 1/13/10 and 12/31/10 Agreements and alternatively the 1/11/12 Amendment with DuraSeal Pipe and DuraSeal Holdings, respectively;

(c)   authorizing, approving, ratifying, acquiescing, inducing or causing Xurex to purportedly enter into amendments to the 1/13/10 and 12/31/10 Agreements and alternatively the 1/11/12 Amendment to the benefit of DuraSeal Pipe, DuraSeal Holdings, and their shareholders, directors, officers, employees, and representatives, including for their own benefit;

(d)   authorizing, approving, ratifying, acquiescing, inducing or causing Xurex to disclose trade secret information to DuraSeal Pipe, DuraSeal Holdings, and other third-parties;

(e)   authorizing, approving, ratifying, acquiescing, inducing or causing Xurex's operations to be transferred to DuraSeal Pipe, and/or DuraSeal Holdings;

(f)   authorizing, approving, ratifying, acquiescing, inducing or causing Xurex's corporate opportunities to be usurped by DuraSeal Pipe, DuraSeal Holdings, and their shareholders, directors, officers, employees, and representatives, including for their own benefit;

(g)   failing to disclose to Xurex' shareholders that the directors and/or officers had disclosed Xurex's trade secrets to DuraSeal Pipe, DuraSeal Holdings, and other third-parties;

(h)   authorizing, approving, ratifying, acquiescing, inducing or causing Xurex not to defend and/or by permitting Richard Polley to take a $3 million default judgment against Xurex;

52450816.12

(i)     authorizing, approving, ratifying, acquiescing, inducing or causing Xurex to purportedly assume several million dollars of legal fees incurred by DuraSeal in shareholder litigation in the Chancery Court of the State of Delaware; and/or

(j)     otherwise breaching their duties of loyalty, good faith, and care in the management of Xurex.

228.     The DuraSeal Defendants and John Does 1-10 knowingly participated in those breaches.

229.     As a result of the concerted action between the Xurex directors and officers, and the DuraSeal Defendants and John Does 1-10, Xurex and/or its Estate has sustained damages in an amount to be determined at trial.

230.     Further, as a result of the concerted action between the Xurex directors and officers, and the DuraSeal Defendants and John Does 1-10, the purported 1/11/12 and/or 9/25/14 Amendments to the 1/13/10 and 12/31/10 Agreements should be deemed unlawful, void, and/or voidable by Xurex.

## COUNT IX
## AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 544, 548, and 550
### (Trustee v. DuraSeal Pipe, DuraSeal Holdings, and John Does 1-10)

231.     Trustee incorporates by reference herein the allegations of paragraphs 1 through 177 above as if set forth fully herein.

232.     In connection with the purported 9/25/14 Amendment, and the release of trade secret information, Xurex transferred valuable property and rights of the Estates within one year of the petition date.

233.     Xurex did not receive reasonably equivalent value or fair consideration in exchange for its transfers made in connection with the 9/25/14 Amendment, or the release of trade secret information.

52450816.12

234.     Xurex was insolvent at the time of the conveyance or rendered insolvent as a result thereof.

235.     Accordingly, the transfers are fraudulent transfers under §§ 544 and 548 of the Bankruptcy Code and are recoverable by Xurex under § 550 of the Bankruptcy Code.

**COUNT X**
**AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS UNDER THE
UNIFORM FRAUDULENT TRANSFER ACT**
**(Trustee v. DuraSeal Pipe, DuraSeal Holdings, John Does 1-10)**

236.     Trustee incorporates by reference herein the allegations of paragraphs 1 through 177 above as if set forth fully herein.

237.     In connection with the Agreement, the purported 9/25/14 Amendment, and the release of trade secret information, Xurex transferred valuable property and rights to DuraSeal Pipe, DuraSeal Holdings, and John Does 1-10.

238.     Xurex did so without receiving a reasonably equivalent value in exchange for the transfer in connection therewith.

239.     Xurex was insolvent or was rendered insolvent by the transfers.  Alternatively, Xurex intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due at the time of the transfers.

240.     Accordingly, the transfers to DuraSeal Pipe, DuraSeal Holdings, and John Does 1-10 constitute fraudulent transfers and are recoverable under the Uniform Fraudulent Transfer Act.

**COUNT XI**
**OBJECTION TO BANKRUPTCY CLAIMS PURSUANT TO 11 U.S.C. § 502
AND FED. R. BANKR. 3007**
**(Trustee v. DuraSeal Pipe)**

241.     Trustee incorporates by reference herein the allegations of paragraphs 1 through 177 above as if set forth fully herein.

40

242.     DuraSeal Pipe has filed one or more proofs of claim in the bankruptcy estate of Xurex.

243.     DuraSeal Pipe's claims (Claim Nos. 38-1 and 39-1) are not enforceable in accordance with applicable non-bankruptcy law and should be disallowed because it has failed to provide adequate explanation or documentation supporting the amounts, basis of liability, or consideration for the claims.

244.     Further, DuraSeal Pipe's Claim No. 38-1 for $2,648,996.96 for legal fees purportedly incurred in litigation in the Delaware Chancery Court shareholder litigation, were not incurred by Xurex, which was merely a nominal party to such litigation.  Rather, these fees were incurred by DuraSeal Pipe, DuraSeal Holdings, and/or Jose Di Mase.

245.     To the extent that DuraSeal Pipe's claims are established in any amount and at any level of priority, they should be disallowed under § 502(d) of the Bankruptcy Code.

**COUNT XII**
**EQUITABLE SUBORDINATION PURSUANT TO 11 U.S.C. §§ 510(c) AND 105(a)**
**(Trustee v. DuraSeal Pipe and DuraSeal Holdings)**

246.     Trustee incorporates by reference herein the allegations of paragraphs 1 through 177 above as if set forth fully herein.

247.     DuraSeal Pipe and DuraSeal Holdings have not only filed proofs of claim in this matter but also hold significant equity interests in Xurex.

248.     Therefore, should a recovery be made in this matter, DuraSeal Pipe and DuraSeal Holdings, would stand to benefit from their own wrongdoing.

249.     To the extent DuraSeal Pipe and DuraSeal Holdings assert a claim or otherwise seek a recovery from the Estate through an equity interest in Xurex, they should be equitably subordinated in their entirety below the other equity holders of Xurex.

52450816.12

250.     DuraSeal Pipe and DuraSeal Holdings used its dominion and control over Xurex to inequitably advance their interests over Xurex's other unsecured creditors as well as other equity holders, as hereinabove described in detail.

251.     As a result of DuraSeal Pipe's and DuraSeal Holdings' inequitable conduct, they obtained an unfair advantage over Xurex's other unsecured creditors, equity holders, and caused injury to them.

252.     Subordination of DuraSeal Pipe's and DuraSeal Holdings' debt and equity interests to those of other creditors and equity interests is consistent with the provisions of the Bankruptcy Code.

253.     Pursuant to §§ 510(c) and 105(a) of the Bankruptcy Code, for purposes of distribution, DuraSeal Pipe's and DuraSeal Holdings' debt and equity interests should be subordinated to the claims of Xurex's other unsecured creditors and equity holders.

**COUNT XIII**
**DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201(a)**
**AND FED. R. CIV. P. 57**
**(Trustee v. All Defendants)**

254.     Trustee incorporates by reference herein the allegations of paragraphs 1 through 177 above as if set forth fully herein.

255.     As alleged herein above, Defendants purported to authorize, approve, ratify, acquiesce, induce or cause Xurex to purportedly enter into amendments to the 1/13/10 and 12/31/10 Agreements to the benefit of DuraSeal Pipe and DuraSeal Holdings, said contract amendments purporting to dramatically alter the rights between Xurex, DuraSeal Pipe, and DuraSeal Holdings, including but not limited to,

        (a)     the reduction and/or elimination of minimum purchase requirements,

        (b)     reduction of license fees,

42

(c)     providing DuraSeal Pipe and DuraSeal Holdings the ability to suspend their obligations based on the declaration of an "uneconomic condition,"

(d)     the transfer of certain rights from Xurex related to intellectual property and trade secrets,

(e)     "suspension" of minimum purchase requirements and revenue sharing by DuraSeal Pipe and DuraSeal Holding, and

(f)     covenants that they will not compete against Xurex.

256.     An actual controversy of a justiciable nature currently exists between the parties as to whether these purported contract amendments are valid and enforceable.

257.     The Trustee contends that these purported contract amendments are unlawful, void, and/or voidable by him and of no effect, for a number of reasons, including but not limited to, that they were the product of self-dealing, conflicts of interest, and breaches of fiduciary duty, and that they lacked consideration.

258.     The Trustee requests a judgment declaring that the 1/11/12 and 9/25/14 Amendments are invalid and unenforceable, and that the parties' rights are governed by the 1/13/10 and 12/31/10 Agreements.

**COUNT XIV**
**DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201(a)**
**AND FED. R. CIV. P. 57**
**(Trustee v. All Defendants)**

259.     Trustee incorporates by reference herein the allegations of paragraphs 1 through 177 above as if set forth fully herein.

260.     The 60-day period to assume or reject the license agreements at issue in this case, pursuant to 11 U.S.C. §365(d)(1), was most recently extended by the Bankruptcy Court from April 15, 2016, to August 31, 2016, pursuant to the Order which granted the Ninth Motion of Trustee for Extension of Time Within Which to Assume or Reject Executory Contract or Unexpired Lease with DuraSeal Holding, S.R.L., and DuraSeal Coatings Company LLC.

43

261. Contemporaneously with the filing of this adversary complaint, the Trustee has filed a Tenth Motion of Trustee for Extension of Time Within Which to Assume or Reject Executory Contract or Unexpired Lease with DuraSeal Holding, S.R.L., and DuraSeal Coatings Company LLC, seeking an extension to twenty (20) days after entry of a final, non-appealable judgment resolving the adversary complaint, including the instant count for declaratory relief.

262. An actual controversy of a justiciable nature currently exists between the parties as to whether the license agreements are executory and whether, upon DuraSeal's pre-petition material breach of the original 2010 Agreements, the damages accruing from said breach, including future damages arising under the long-term minimum purchase requirements of the 1/13/10 and 12/31/10 Agreements, became an asset of Xurex and later an asset of the bankruptcy estate at the petition date.

263. Accordingly, the Trustee seeks a declaration herein that the Amended Agreement is not an executory contract subject to assumption or rejection under 11 U.S.C. § 365(a).

264. The Trustee also seeks a declaration that upon DuraSeal's pre-petition material breach of the original 2010 Agreements, the damages accruing from said breach, including future damages arising under the long-term minimum purchase requirements of the 1/13/10 and 12/31/10 Agreements, became an asset of Xurex and later an asset of the bankruptcy estate at the petition date.

## VI. PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully prays, for the benefit of Debtor's Estate, that judgment be entered in his favor and against Defendants for its damages (including actual and punitive), interest, attorneys' fees and expenses, for the statutory, declaratory, and equitable relief which he seeks herein, and for such other and further relief as the Court seems just and proper.

52450816.12

## JURY DEMAND

The Trustee requests a jury trial on all claims so triable.


Dated: August 31, 2016

Respectfully submitted,

**POLSINELLI PC**

By:     */s/ Todd H. Bartels*

TODD H. BARTELS          MO #45677
ROBERT V. SPAKE, JR.     MO #66813
900 W. 48th Place, Suite 900
Kansas City, MO 64112
(816) 753-1000
tbartels@polsinelli.com
rspake@polsinelli.com

**ATTORNEYS FOR CHAPTER 7 TRUSTEE**

45