IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

JERALD S. ENSLEIN, in his capacity )
as Chapter 7 Trustee for Xurex, Inc., )
                                      )
              Plaintiff,              )
                                      )
vs.                                   )     Case No. 16-09020-CV-W-ODS
                                      )
GIACOMO E. DI MASE, et al.,           )
                                      )
              Defendants.             )


ORDER AND OPINION ON THE PARTIES' *DAUBERT* MOTIONS
AND THE PARTIES' DISPOSITIVE MOTIONS


         Pending are two motions to strike, exclude, or limit expert opinion testimony
(Docs. #348 and 356) and eleven motions for summary judgment (Docs. #347, 350,
358, 359, 360, 361, 362, 363, 365, 366, and 367).  As examined in section II, the
parties' motions to strike, exclude, or limit expert opinion testimony are denied.  As
discussed in section III, the parties' motions for summary judgment are granted in part
and denied in part.

# TABLE OF CONTENTS

I.   **BACKGROUND**.................................................................................1

    A. The Early Years of Xurex.............................................................1

        (1) *Agreement with DuraSeal Pipe*..........................................1

        (2) *Initial Communications with the Di Mases and Jensvold*.........1

        (3) *Loven's Audit*...................................................................2

    B. The 1/13/10 Agreement..............................................................2

    C. Formation of DuraSeal Holdings..................................................3

    D. The 12/31/10 Agreement and Acquisition of DuraSeal Pipe............4

    E. Events Occurring Between January 2011 and November 2011.........6

        (1) *Negotiations Between DuraSeal Holdings and Xurex*..............6

        (2) *Reports from John Lowry*...................................................6

        (3) *Proxy Contest and Subsequent Lawsuit*................................7

    F. Events and Communications Immediately Preceding the 1/11/12 Amendment.....9

    G. The 1/11/12 Amendment............................................................11

    H. HDI, Xurex Stock Issuance, and Changes to the Xurex Board........12

    I. Another Delaware Lawsuit...........................................................13

    J. DuraSeal Pipe's Uneconomic Condition Notice & Xurex's Bankruptcy Filing.......13

    K. This Lawsuit.............................................................................15


II.  **MOTIONS TO STRIKE, EXCLUDE, OR LIMIT EXPERT OPINION TESTIMONY**....16

    A. Standard................................................................................. 16

    B. Michele Pavone, Ph.D...............................................................17

        (1) *Relevance*......................................................................17

        (2) *Reliability*.......................................................................19

    C. Robert F. Reilly........................................................................20

        (1) *Limits on Lost Profits*.......................................................21

        (2) *Additional Minimum Purchase Obligations*............................24

        (3) *Purchases and Penalties*...................................................26

        (4) *Xurex's Business Reality*...................................................27

        (5) *Tort Claim Damages*........................................................28

**III. MOTIONS FOR SUMMARY JUDGMENT**..................................................29

   A. <u>Standard</u>.....................................................................................30

   B. <u>Motions for Summary Judgment on Plaintiff's Claims</u>.........................30

      *(1) Breach of Contract (Counts II and III)*..................................30

      *(2) Breach of Implied Covenant of Good Faith and Fair Dealing (Count IV)*.........31

      *(3) Misappropriation of Trade Secrets (Count V)*.........................35

      *(4) Breach of Fiduciary Duty (Count VII)*....................................35

         (a) Standard of Review.....................................................36

         (b) Substantive Claims.....................................................38

         (c) Immunity from Damages.............................................38

      *(5) Civil Conspiracy (Count VI)*................................................39

      *(6) Aiding and Abetting Breach of Fiduciary Duty (Count VIII)*........................41

         (a) Choice of Law............................................................41

         (b) Internal Affairs Doctrine...............................................42

         (c) Most Significant Relationship.......................................45

      *(7) Declaratory Judgments (Counts XIII and XIV)*........................46

   C. <u>Plaintiff's Motion for Summary Judgment on Affirmative Defenses</u>.................46

      *(1) Prior Material Breach by Xurex.*.........................................47

      *(2) Commercial Frustration or Impossibility of Performance.*........................47

      *(3) Ratification.*...................................................................47

      *(4) Lack of Consideration and/or Failure of Consideration.*............................48

      *(5) Failure to Mitigate Damages.*.............................................48

      *(6) Fraud in the Inducement.*...................................................48

   D. <u>Plaintiff's Request for Ruling as a Matter of Law</u>...........................49

   E. <u>Plaintiff's Summary Judgment Statement of Uncontroverted Facts</u>.................49

      (1) *Failure to Cite Materials in the Record*..................................49

      (2) *Reliance on Inadmissible Evidence*......................................50

      (3) *References to Exhibits*......................................................50

      (4) *Rose's Responses to Plaintiff's Statement of Uncontroverted Facts*............51

   F. <u>McKeon's Motion for Summary Judgment</u>................................................52

      *(1) Attempts to Incorporate Facts and Arguments*........................52

      *(2) Plaintiff's Counter-Statement of Uncontroverted Material Facts*.................53

      *(3) Responses to Counter-Statement of Uncontroverted Material Facts*............53

   G. <u>Rose's Motion for Summary Judgment</u>...................................................54

      *(1) Failure to Abide by Federal and Local Rules*..........................54

      *(2) Exhibit 96*......................................................................54

      *(3) Arguments Related to Plaintiff's Claims*................................55

(4) Rose's Affirmative Defenses..…………………………………………………56

(5) Failure to State a Claim Argument.………………………………………57

(6) Plaintiff's Responses to Rose's Motion for Summary Judgment.……………57

H. Olson's Motion for Summary Judgment.…………………………………………58

(1) Attempts to Incorporate Facts and Arguments.…………………………………58

(2) Plaintiff's Responses to Olson's Statement of Facts.……………………………59

(3) Plaintiff's Counter-Statement of Additional Uncontroverted Material Facts.…59

I. Johnston's Motion for Summary Judgment.…………..……………………………60

(1) Plaintiff's Responses to Johnston's Statement of Facts...………………………60

(2) Plaintiff's Counter-Statement of Additional Uncontroverted Material Facts.…60

J. HDI's Motion for Summary Judgment.…..……………………………………………61

(1) Parties' Facts and Counter-Facts.……………………………………...…………61

(2) Personal Jurisdiction.………………………………………………………..…..61

(3) Liability for Alleged Tortious Conduct of Subsidiary.……………………………65

IV. PARTIES' SEALED EXHIBITS.………………………………………………...………65

V. CONCLUSION.……………………………………………………………………………66

A. Summary of the Court's Rulings.…………………………………………………66

B. Claims to Be Tried.……………………………………………………………………...67

# I. BACKGROUND

The Court will provide information about the entities and individuals in this lawsuit as well as supply some context for the events leading up to the filing of this lawsuit, the parties' pending motions, and the Court's consideration of those motions. This background section is not meant to be comprehensive. Moreover, nothing in this section should be construed as a finding of fact by the Court. Unless otherwise noted, the information contained in this section is either undisputed by the parties or extracted from exhibits accompanying the parties' summary judgment filings.

## A. The Early Years of Xurex

Founded in 2005, Xurex, Inc. ("Xurex") is a Delaware corporation with its principal place of business in Jackson County, Missouri. At inception, Xurex engaged in the development and sale of protective coatings derived from nano-technology invented by Bo Gimvang. Since its founding, Xurex struggled to commercialize Gimvang's technology, and to date, has not developed a commercial product of its own.

### (1) Agreement with DuraSeal Pipe

In 2008, Defendant Joseph Johnston discovered a unique method of applying Xurex coatings to prevent corrosion, reduce abrasion, and extend the life of "down-hole" pumps and pipes in the oil and gas industry. To pursue this business, Johnston and co-investors formed Defendant DuraSeal Pipe Coatings Company LLC ("DuraSeal Pipe"),[1] a Missouri limited liability company with its principal place of business in Missouri. DuraSeal Pipe was able to develop a functional product from Xurex's technology. In October 2008, Xurex authorized DuraSeal Pipe to distribute two Xurex products, HabraCoat-SA and PenetrAct-SA.

### (2) Initial Communications with the Di Mases and Jensvold

In 2008 and 2009, Defendants Jose Di Mase and Tristram Jensvold communicated with Xurex about potential investment in the company and received

---

[1] Before forming DuraSeal Pipe, Johnston, through SealAmerica LLC, purchased Xurex products.

marketing materials from Xurex explaining how HabraCoat worked.  Jose Di Mase[2] visited the Xurex facility in Albuquerque and attended meetings with Johnston at the facility.  At the time, Jensvold was Jose Di Mase's son-in law.

In August 2009, Xurex provided an Offering Memorandum and Subscription Agreement to Jose Di Mase.  Doc. #364-21.  Therein, Xurex represented the following:

> HabraCoat® is different than a traditional coating product because it has "nano-penetrating" reactive chemistry, as opposed to most coatings, which merely bond with the substrate surface without any such reaction. PenetrAct® is Xurex's surface preparation aid for use with its nano coatings.  PenetrAct® penetrates and activates the surface and subsurface matrix of metals and alloys, which allows penetration into the substrate.

*Id.* at 4.  The agreement was forwarded to Defendant Giacomo Di Mase, Jose Di Mase's son.  Although the agreement was not executed, Jose Di Mase and Jensvold continued to communicate with Johnston in 2009 and 2010.

### (3) Loven's Audit

In 2009, Bill Loven became Xurex's CEO.  As CEO, Loven audited the entire Xurex business, and investigated allegations that Gimvang and Bob Bishop, an early CEO of Xurex, defrauded investors and misused company funds.  Loven purportedly found evidence supporting the allegations.  Shortly thereafter, Loven was removed as Xurex's CEO, and the remainder of the Xurex board was also removed.  Subsequently, Robert Clifford and Ken Pedersen became directors on the Xurex board.

### B.  The 1/13/10 Agreement

On January 13, 2010, Xurex and DuraSeal Pipe entered into an Exclusive License, Marketing and Distribution Agreement (the "1/13/10 Agreement").  Doc. #364-29.  Johnston negotiated the 1/13/10 Agreement on behalf of DuraSeal Pipe, and Rex Powers, then a Xurex board member, negotiated on Xurex's behalf.  The 1/13/10

---

[2] According to the Delaware Court of Chancery, Jose Di Mase is a Venezuelan-Italian businessman who has "at least one successful privately held company to his credit and access to well-heeled, high-net-worth partners."  *Johnston v. Pedersen*, 28 A.3d 1079, 1088 (Del. Ch. 2011).

Agreement granted DuraSeal Pipe an exclusive license to market and sell Xurex Authorized Products – including but not limited to HabraCoat, PenetrAct, Oxilane, and ProGlide – to the North American oil and gas industry.

Per the 1/13/10 Agreement, DuraSeal Pipe was to pay $50,000 to Xurex for four fifty-gallon barrels of HabraCoat 200. *Id.* at 2.[3] Upon the later of January 1, 2010, or Xurex's completion of an IP escrow, DuraSeal Pipe was to pay an additional $50,000 to Xurex for four more fifty-gallon barrels. *Id.* "The Parties agree that the Initial Product Purchase shall apply and be counted towards [DuraSeal's] Product Purchase Minimums." *Id.* The Agreement required DuraSeal Pipe to make minimum purchases of Xurex products and pay royalties. Beginning in January 2010, DuraSeal was required to make minimum monthly purchases. *Id.* at 4, 17. If DuraSeal failed to purchase the monthly minimum product for two consecutive months, it would be deemed to be in default. *Id.* at 4.

The 1/13/10 Agreement indicated DuraSeal Pipe had the option to purchase intellectual property rights upon the occurrence of certain events. *Id.* at 6-7. Eleven publicly available patent applications were identified in an exhibit to the 1/13/10 Agreement. *Id.* at 18. That exhibit specified "all product knowhow and formulas" must be included "to enable [DuraSeal Pipe] to reproduce and manufacture all Xurex products upon a purchase of the IP…in accordance with the terms" of the 1/13/10 Agreement. *Id.* The 1/13/10 Agreement was to be "governed by and construed and enforced in accordance with the internal laws of the State of Delaware." *Id.* at 8.

### C. Formation of DuraSeal Holdings

In mid-2010, Johnston met with Jensvold and his then-wife (Jose Di Mase's daughter, Daniela Di Mise) and delivered a presentation on Xurex products. After the presentation, Jensvold became interested in investing in Xurex. Johnston later contacted Jose Di Mase about a proposal to acquire and combine DuraSeal Pipe and Xurex into a new company. Sometime thereafter, Defendant DuraSeal Holdings,

---

[3] The Court's references to pagination in documents filed on ECF are taken directly from the pagination ECF applies to filings, not the parties' pagination.

S.r.L.,[4] an Italian company, was formed for the purpose of acquiring 100% of DuraSeal Pipe. At that time, Jose Di Mase was the president of DuraSeal Holdings. According to Jose Di Mase, the initial DuraSeal Holdings board consisted of him, Ugo Anatra,[5] and Defendant Lee Kraus, who has decades of experience in the oil and gas industry. Before closing on its purchase of DuraSeal Pipe, DuraSeal Holdings executed an agreement with Xurex.

### D. The 12/31/10 Agreement and Acquisition of DuraSeal Pipe

On December 31, 2010, DuraSeal Holdings entered into an Exclusive License, Marketing and Distribution Agreement with Xurex (the "12/31/10 Agreement").[6] Doc. #375-1. The 12/31/10 Agreement granted DuraSeal Holdings a worldwide license to market and sell Xurex "Products" in the oil and gas, aerospace industry, automobile industry, and ceramic tile applications in the construction industry. *Id.* at 1. The North American oil and gas market subject to the 1/13/10 Agreement between Xurex and DuraSeal Pipe was excluded. *Id.*

Effective December 31, 2010, the 12/31/10 Agreement concluded on December 31, 2022. *Id.* It would "be automatically extended and renewed for one-year periods after December 31, 2022, unless either party notifies the other at least 180 days prior to December 31, 2022 or any anniversary thereafter of its intent to allow the term of this Agreement to expire." *Id.* The 12/31/10 Agreement permitted termination before December 31, 2022, in limited instances: (1) default in performance; (2) bankruptcy or insolvency; or (3) "[i]n the unlikely event that [DuraSeal Holdings] determines that the marketing and distribution of the Products is not commercially viable, it may terminate this agreement with at least 180 days written notice to Xurex." *Id.* at 11. The parties

---

[4] The parties often use "DMN" when referring to this entity, and sometimes refer to it as "DuraSeal Holding." For consistency, the Court uses "DuraSeal Holdings."

[5] Anatra, who is not a defendant in this matter, was the Chief Financial Officer and sole director of Defendant Holding Development SA ("HDI") when he was a DuraSeal Holdings board member.

[6] Some Defendants occasionally refer to this agreement as the 12/13/10 Agreement. *See* Doc. #364, at 15; Doc. #373, at 15; Doc. #387, at 6; Doc. #412, at 49. These appear to be typographical errors. The Court refers to this agreement by its effective date, December 31, 2010. Doc. #375-1, at 1.

agreed the 12/31/10 Agreement would be governed by and interpreted in accordance with the laws of the United States and the State of New York. *Id.* at 13.

Subject to completion of an IP escrow and upon execution of the 12/31/10 Agreement, DuraSeal Holdings was to pay Xurex a $200,000 fee. *Id.* at 4. During the "R&D Period,"[7] DuraSeal Holdings was obligated to purchase a target quarterly amount of Xurex product and pay "a penalty of $10,000 per drum short of target payable." *Id.* at 5-6. Purchases during the R&D Period "will be credited against the minimum purchase requirements" after the expiration of the R&D Period. *Id.* at 5.

The 12/31/10 Agreement granted DuraSeal Holdings and its "Affiliates"[8] the "right to practice the Xurex Intellectual Property as needed in the application, use, marketing and sale of the Products, which specifically excludes the right to manufacture the Products." *Id.* at 4. Xurex Intellectual Property included, inter alia, "formulas of the Xurex Products…all technical and non-technical know-how used in the mixing and preparation of the Products…all Know-How; and…all trademarks, trade secrets, and other intellectual property owned or used by Xurex." *Id.* at 3. Know-How was defined as "all knowledge, enhancements, technology practices, processes, methods of manufacture, application protocols, materials, discoveries, improvements, developments, trade secrets, inventions, data or similar other information relating to the Products." *Id.* Four publicly available patent applications were identified as Xurex Intellectual Property. *Id.* at 3, 22.

In the 12/31/10 Agreement, DuraSeal Holdings agreed "to retain [Defendant] Lee Kraus[9] as a non-executive director under a five-year agreement." *Id.* at 12. The Agreement was signed by Pedersen, who identified himself as CEO of Xurex, and Jose Di Mase, who identified himself as president of DuraSeal Holdings. *Id.* at 16.

---

[7] The "R&D Period" was defined as the later of (1) "December 31, 2011 if [DuraSeal Holdings] acquires [DuraSeal Pipe] within 6 months of the Effective Date," or (2) "June 30, 2012 if [DuraSeal Holdings] does not acquire [DuraSeal Pipe] within 6 months of the Effective Date." Doc. #375-1, at 4.

[8] "Affiliates" included "any corporation, partnership, limited liability company, sole proprietorship, or other business entity controlled by, controlling, or under common control with a party to this Agreement." Doc. #375-1, at 3.

[9] On December 31, 2010, it appears Kraus was still a member of the DuraSeal Holdings board.

In January 2011, DuraSeal Holdings closed on its purchase of DuraSeal Pipe and acquired DuraSeal Pipe's members' shares of Xurex stock.

### E. Events Occurring Between January 2011 and November 2011

#### (1) Negotiations Between DuraSeal Holdings and Xurex

From January 2011 to September 2011, Pedersen, then-director of Xurex, negotiated with Jensvold,[10] on behalf of DuraSeal Holdings, to combine and renegotiate the 1/13/10 and 12/31/10 Agreements. In April 2011, Xurex and DuraSeal Holdings agreed to negotiate a combined license agreement. On August 20, 2011, Xurex communicated it was prepared to negotiate a "complete new agreement." The parties dispute what offers or agreements, if any, Xurex made about minimum purchase obligations and/or licensing fees during this timeframe. On September 23, 2011, Xurex sent a draft counter-proposal to Johnston and Jensvold.[11] The draft counter-proposal was not executed.

#### (2) Reports from John Lowry

In January 2011, John Lowry, who was Xurex's Director of Operations from August 2009 through January 2010 and worked as a consultant for Xurex from August 2010 through January 2012,[12] sent a memorandum to Pedersen, then-CEO of Xurex. Lowry's memorandum indicated that, during a three-day visit to DuraSeal Pipe, there were extensive discussions about DuraSeal Pipe's successes and failures with HabraCoat. Lowry wrote, "[i]t is clear from this review that there are certain environments in which Habracoat will not work." Doc. #364-54, at 15-18. Later that same month, Lowry stated, "[o]il and gas well success and failure data provided by DuraSeal was analyzed," and results "point[] to a very narrow window in which current

---

[10] It is unclear what, if any, position Jensvold held with DuraSeal Holdings when negotiations began.

[11] Another individual, Steve Brauerman, was also included on the email but it is unclear who he is. Doc. #364-53, at 1.

[12] In January 2012, Lowry was rehired as Director of Operations, a position he held until he retired in December 2013.

silane formulations[13] can successfully operate."  *Id.* at 19.  In July 2011, Lowry wrote another memorandum to Pedersen stating, "[i]nitial test results from New Mexico tech show corrosion rates consistent with Albuquerque laboratory weight loss tests and confirm the weaknesses of the habracoat technology related to existing technology in the oil and gas market to prevent tubing corrosion."  *Id.* at 71.  According to Lowry's memorandum, "[t]he 'degree' of corrosion protection for [a version of HabraCoat] is 'minimal' according to these results and therefore confirms why there are some failures in the field."  *Id.* at 72.

### (3) Proxy Contest and Subsequent Delaware Lawsuit

According to Johnston, as of January 2011, DuraSeal Pipe was considering a proxy contest to unseat the Xurex board.  In March 2011, Jensvold emailed Johnston, Jose Di Mase, and others regarding an "update" about an objective to "[c]omplete the take over of Xurex."  Doc. #353-20.  In April 2011, DuraSeal began soliciting proxies from Xurex shareholders to remove the incumbent Xurex directors and elect a new board.  Once the Xurex board learned of the solicitations, it began counter-solicitations.

On May 23, 2011, Jensvold emailed an individual named Mackeno Lee,[14] stating, among other things, he was "engineering a coup on June 25th, [which was] the next Xurex Shareholders meeting."  Doc. #354-3, at 2.  He reported he had "secured over 50% support through proxy solicitation and now I need to win the hearts and minds of the rest of the Xurex shareholders to keep my costs low once I am in control.  I am successfully eliminating all opposition."  *Id.*

In the meantime, in June 2011, the Xurex board sent a letter to Gimvang, and forwarded a copy of the letter to its shareholders.  The letter represented field tests of Xurex's products "were pretty much all failures" and Gimvang's inventions did not work. Doc. #364-17.

On June 14, 2011, written consents were delivered to Xurex.  The written consents purportedly removed the directors of the Xurex board, fixed the number of directors on the Xurex board to five directors, and elected new board members.  That

---

[13] According to the parties, "silane formations" refers to "HabraCoat."  Doc. #403, at 25.
[14] The record does not indicate who this person is or why he received the email.

same day, Johnston and others filed an action in the Delaware Court of Chancery against the then-current members of the Xurex board and sought a determination that the written consents validly removed the directors and replaced them with a new slate of directors. On September 23, 2011, the Delaware Court of Chancery found Johnston, Defendant Dietmer Rose,[15] Bill O'Brien,[16] and Nate Hutchings[17] were validly elected by written consents, and therefore, constituted the new Xurex board. Doc #364-1; *Johnston v. Pedersen*, 28 A.3d 1079, 1089-93 (Del. Ch. 2011).

At the September 29, 2011 Xurex board meeting, the board decided the Xurex board directors would "not receive compensation other than stock." Doc. #386-7. According to Rose, Johnston proposed the board award 800,000 to 1.5 million shares of Xurex stock to each director. The directors appointed Johnston as president and CEO of Xurex and Chairman of the Xurex board. At that time, Johnston was president of DuraSeal Pipe, which was Xurex's only customer and was responsible for 99% of Xurex's sales.

On October 12, 2011, Defendant Robert Olson,[18] a Kansas state senator since 2011, was appointed as a director to the Xurex board.

On November 8, 2011, Johnston sent an email to O'Brien, Hutchings, Rose, Olson, Jack Angel, and Amy Tarwater (Johnston's assistant) stating he was resigning as president and CEO of Xurex effective that same day. But, as he has admitted, Johnston continued to serve as Xurex's president and CEO through January 10, 2012. Effective January 10, 2012, Angel became CEO and president of DuraSeal Pipe, and Jim Collins, a DuraSeal Pipe employee, became CEO of Xurex.

---

[15] Before retiring in 2001, Rose was a natural resources economics professor for nearly three decades. In 2008 or 2009, Rose became an investor in Xurex. In 2009, Rose attended a shareholder meeting where Johnston gave a presentation about DuraSeal Pipe's application of Xurex products in the oil and gas industry. It appears Rose was previously elected to the Xurex board in February 2010 via a mail-in election, but due to some disagreements, he resigned. *Johnston*, 28 A.3d at 1083.
[16] O'Brien was not named as a defendant in this matter.
[17] Hutchings was not named as a defendant in this matter.
[18] In early 2011, Olson met Johnston when DuraSeal Pipe had a city water issue and needed a state legislator's assistance.

**F. Events and Communications Immediately Preceding the 1/11/12 Amendment**

According to Jensvold, DuraSeal Holdings gave him permission to negotiate an amendment to the 2010 agreements. Rose testified he was appointed by the Xurex board to negotiate the amendment to the 2010 agreements. To describe the events and communications leading up to the execution of the 1/11/12 Amendment, the Court sets forth a non-exhaustive timeline. Much of what is contained in this timeline is taken directly from written communications. While the contents of the communications are not necessarily in dispute, the parties dispute the context, completeness, accuracy, and/or admissibility of the communications.

- On December 16, 2011, Jensvold emailed Rose and Johnston proposing a conference call to discuss the licensing agreement. Doc. #372-63, at 3. Rose responded: "Joe needs to confirm and tell you and me what he can decide right now. Don't we need the BOD on this?" *Id.* Jensvold replied to the email, copying Johnston, telling Rose final BOD approval will be needed. *Id.* at 2.

- On December 21, 2011, Jensvold emailed Johnston and Rose asking them to look at "the latest version of the agreement per our discussions." *Id.* at 4. Rose forwarded the email to Johnston, noting "the royalty section is still in the latest version" and asking Johnston if that was "an oversight." *Id.*

- On December 22, 2011, Jensvold emailed Giacomo Di Mase, Johnston, and Rose, asking them "to communicate with each other as needed to move the licensing agreement execution process forward." *Id.* at 5. Rose responded to Jensvold's email, stating he tried to communicate with Johnston but had not reached him yet. *Id.*

- On December 28, 2011, Rose emailed Johnston saying he would call him later. Doc. #386-26. Johnston replied: "No problem we can talk in the morning, I will continue to work on the agreement." *Id.*

- In a letter dated December 30, 2011, O'Brien and Hutchings resigned from the Xurex board. Doc. #386-50. O'Brien and Hutchings asserted their "participation on the Xurex board was strictly contingent on the members' mutual, good faith effort to facilitate and advance the business affairs of Xurex through independent, objective and reasonable management practices…" *Id.* They claimed that they cannot fulfill their duties as directors. *Id.* With their departures, the Xurex board was comprised of Johnston, Rose, and Olson.

- On January 3, 2012, Rose emailed Johnston about comparisons among the different versions of the Xurex/DuraSeal Pipe contracts. Doc. #386-53. About the minimum purchase reduction, Rose stated, "[i]f any member of the old BOD gets wind of this we would be in potential trouble." *Id.* That same day, Rose told Jensvold he believed "Joe should be in on" a "[c]onference call re Duraseal." Doc. #372-63, at 13.

- On January 4, 2012, Rose contacted an attorney for the first time about the proposed amendment, sending the proposed amendment to a New Mexico attorney, Paul Fish.  Doc. #386-20.

- On January 5, 2012, Fish emailed Rose saying, he is "absolutely not an expert in distribution contracts, and I trust you have had advice on those type of details from someone who is."  Doc. #386-20.  But he raised some "points" and "questions" he had.  *Id.*  Johnston was copied on Fish's email.  *Id.*  Rose did not speak with Fish about his points or questions nor did he talk with another attorney.

- On January 6, 2012, Jensvold sent another draft of the amendment to Rose.  Rose forwarded it to Johnston telling him to "study this before we discuss this contract."  Doc. #386-27.

- On January 7, 2012, Rose emailed Johnston asking for the name of "our legal counsel" who will be reviewing "the revised contract before we sign the contract."  Doc. #386-19.  Rose also asked for a copy of the director's insurance policy.  *Id.*  Johnston responded, telling Rose that Fish was the attorney, and he already provided his comments.  *Id.*  Rose responded, saying he does "not understand [his] reply."  *Id.*  Rose indicated that if Fish is "Xurex counsel, then based on his comments we would not sign this contract.  This is very confusing."  *Id.*

- On January 7, 2012, Johnston met with Olson and told him Rose would contact him about the amendment.  Doc. #386-56.  That same day, Rose emailed Olson the proposed amendment.  Doc. #386-55.  Rose wrote, "Johnston wanted me to share with you documents relating to the contract negotiations between Duraseal and Xurex, Inc."  *Id.*  Johnston is copied on the email.  *Id.*  According to Olson, this email was the first time he saw the proposed amendment.

- On January 9, 2012, Johnston emailed Rose asking if he got a hold of Olson.  Doc. #386-56.  Rose stated he did not have Olson's phone number and said he would like "to discuss a few items with" Johnston before calling Olson.  *Id.*

- On January 10, 2012, Jensvold sent Rose another draft of the amendment.  Doc. #372-62.  Rose responded, saying he forwarded the amendment to Olson and Johnston and "asked for their input."  *Id.*  Jensvold responded: "I am confused.  I have not spoken with Joe [Johnston] about this agreement and you had told me that you were not speaking with Joe about this either.  As I have stated and as we have agreed, Joe is not part of this negotiation.  Please do not communicate with Joe about this deal."  *Id.*  Rose stated he included Johnston "for advice and legal interpretation" because Johnston "has considerably more experience in these contract and legal matters."  *Id.*

- On January 11, 2012, Rose, Olson, and Johnston signed a "written consent in lieu of a meeting of the board of directors of Xurex, Inc."  Doc. #386-117.  They adopted several resolutions, including: Johnston "may be deemed to have an interest in the Amended and Restated Agreement"; in light of the potential interest, "Johnson has abstained from all discussions and decisions relating to the negotiation"; and "the executive officers of [Xurex] are…authorized and

directed, in the name and on behalf of [Xurex], to execute the Amended and Restated Agreement…." *Id.* At this time, neither Rose nor Olson was an executive officer of Xurex.

### G. **The 1/11/12 Amendment**

On January 11, 2012, Rose signed the Amended and Restated Exclusive License, Marketing and Distribution Agreement (the "1/11/12 Amendment") on behalf of Xurex, and Jensvold signed the 1/11/12 Amendment on behalf of DuraSeal Holdings, writing "Vice President" below his name. Doc. #375-2, at 19. The 1/11/12 Amendment indicated the parties "intend to amend and restate the [1/13/10 Agreement] by entering into this Agreement." *Id.* at 2. Angel signed the 1/11/12 Amendment as DuraSeal Pipe's CEO, indicating "this Agreement amends and restates the Exclusive License, Marketing and Distribution agreement" between DuraSeal Pipe and Xurex dated January 13, 2010. *Id.* In the Amendment, DuraSeal Pipe is defined as an "affiliate" and "wholly owned subsidiary" of DuraSeal Holdings. *Id.* at 2, 4.

The 1/11/12 Amendment granted DuraSeal Holdings an exclusive license to market, sell, and distribute Xurex Authorized Products (including HabraCoat, PenetrAct, Oxilane, and ProGlide) in the oil and gas industry worldwide. *Id.* at 2-4. DuraSeal Holdings was to pay Xurex $175,000, make minimum monthly purchases of Xurex Authorized Products, and pay royalties. *Id.* at 5, 7-8. Effective January 11, 2012, the Amendment concluded on December 21, 2022. *Id.* at 2. The 1/11/12 Amendment automatically renewed "for one-year periods after December 31, 2022, unless either party notifies the other at least 180 days prior to December 31, 2022 or any anniversary thereafter of its intent to allow the terms of this Agreement to expire." *Id.* The 1/11/12 Amendment could be terminated before December 21, 2022, if (1) either party defaults in its performance of any duty or payment of any amount due under the Amendment and default is not cured within thirty days' notice; (2) insolvency or bankruptcy; or (3) "[i]n the unlikely event that DuraSeal [Holdings] determines that the marketing and distribution of the Authorized Products is not commercially viable, it may terminate this Agreement with at least 180 days written notice to Xurex." *Id.* at 14.

Like the 12/31/10 Agreement, the 1/11/12 Amendment granted the DuraSeal entities the "right to practice the Xurex Intellectual Property as needed in the application,

use, marketing and sale of the Authorized Products." *Id.* at 5. According to the 1/11/12 Amendment, "Xurex will use Reasonable Efforts to provide Duraseal with all information and support (technical or otherwise) reasonably necessary…for carrying out Duraseal's obligations under this Agreement." *Id.* at 5.[19]

The 1/11/12 Amendment also included a provision for "Uneconomic Condition." Uneconomic Condition was defined as (1) a decrease in monthly coating revenues during at least three of any six-month period despite reasonable efforts by DuraSeal Holdings and/or DuraSeal Pipe; (2) "Xurex has failed to provide…reasonable and timely technical support for the Authorized Products, mutually acceptable Specifications…or quality assurance standards"; or (3) "Xurex is unable to deliver the Authorized Products" outside the United States. *Id.* at 4. Notice of an Uneconomic Condition must be given by "[n]o later than 10 business days" after the Uneconomic Condition occurs. *Id.* at 14. Within ten business days of the notice, the parties had to "discuss and negotiate alternative financial and other terms of this Agreement to remedy such Uneconomic Condition." *Id.* If the parties did not reach an agreement within five business days of their initial meeting, DuraSeal Holdings had the option to reduce its minimum purchase obligations. *Id.*

### H. HDI, Xurex Stock Issuance, and Board Changes

In early 2012, Defendant Holding Development SA ("HDI"), a Luxembourg company, acquired DuraSeal Holdings. Prior to the filing of this lawsuit, the only director and only employee of HDI was Anatra, a resident of Italy. As previously mentioned, Anatra was one of the initial members of the DuraSeal Holdings board.

In March 2012, the Xurex board authorized the issuance of three million stock shares to Johnston and 1.8 million stock shares each to Olson and Rose.[20] In the summer of 2012, Giacomo Di Mase and Jensvold were appointed to the DuraSeal

---

[19] The 1/11/12 Amendment defined "reasonable efforts" as "the commercial efforts, consistent with past practices that a reasonable person in a party's position in the same industry would use so as to achieve a given goal." Doc. #375-2, at 4.
[20] Olson and Rose initially accepted the shares but later granted irrevocable proxies to DuraSeal Pipe for their shares. Doc. #386-47.

Holdings board, joining Kraus,[21] Jose Di Mase, and Anatra who remained on the board. On October 29, 2012, Johnston resigned from the Xurex board, and Giacomo Di Mase took his place. Olson was elected chairman of the Xurex board.

## I. **Another Delaware Lawsuit**

In May 2013, Defendant Leonard Kaiser,[22] Defendant Steve McKeon,[23] Giacomo Di Mase, Jensvold, and Tom Appleton[24] were nominated to the Xurex board. On June 18, 2013, DuraSeal Pipe filed an action in the Delaware Court of Chancery against Xurex, Rose, Olson, and others seeking a declaration that Appleton, Kaiser, McKeon, Giacomo Di Mase, and Jensvold were validly elected to the Xurex board.

On August 27, 2013, Lowry, Xurex's Director of Operations, informed DuraSeal Pipe that Xurex was no longer able to meet payroll, he had suspended all research and operations work, and Xurex was effectively shut down.

On August 28, 2013, Xurex, DuraSeal Pipe, and the individual defendants in the Delaware Court of Chancery action executed a settlement agreement. Pursuant thereto, Appleton, Kaiser, McKeon, Giacomo Di Mase, and Jensvold were immediately seated on the Xurex board, and Olson and Rose resigned from the board.

## J. **DuraSeal Pipe's Uneconomic Condition Notice and Xurex's Bankruptcy Filing**

On September 2, 2013, Kaiser became CEO of Xurex. On October 8, 2013, the president and CEO of DuraSeal Pipe, Angel, sent a letter to Kaiser notifying Xurex that DuraSeal Pipe entered an "Uneconomic Condition" as of September 30, 2013. Doc.

---

[21] In 2012, Kraus executed an "Advisory Agreement" with HDI to provide advisory services in support of DuraSeal Pipe. Doc. #403-32. In or about 2013, Kraus became the CEO of DuraSeal Pipe.
[22] Prior to joining the Xurex board, Kaiser had business affiliations with the Di Mases.
[23] In 2012, McKeon was introduced to Jensvold. That same year, DuraSeal Pipe executed a consulting contract with Golden Oak Consulting ("GOC"), McKeon's business. In June 2013, prior to beginning his term on the Xurex board, DuraSeal Pipe notified McKeon that it would terminate the contract with GOC effective November 1, 2013.
[24] Prior to joining the Xurex board, Appleton had business affiliations with the Di Mases.

#364-35. Angel stated DuraSeal Pipe's monthly coating revenues decreased for four of the previous six months. *Id.*

On November 20, 2013, Lowry, Xurex's Director of Operations, sent Kaiser a memorandum entitled "Development Work for Xurex by DuraSeal." Therein, Lowry summarized communications he had with DuraSeal Pipe between November 2009 to August 2012 bout technical reports, presentations, and laboratory work. Doc. #364-66. On December 5, 2013, Lowry resigned from Xurex, leaving Kaiser the only remaining Xurex employee.

In January 2014 and August 2014, DuraSeal Pipe sent demands to Xurex for Xurex to pay more than $5 million in legal fees DuraSeal Pipe incurred in connection with disputes between the companies. In May 2014, DuraSeal Pipe acquired additional shares of Xurex stock. In July 2014, Jensvold asked counsel for the DuraSeal entities what Xurex would need to be paid to use Xurex's products after a bankruptcy.

On September 25, 2014, Xurex and DuraSeal Holdings entered into an Amended and Restated Exclusive License, Marketing and Distribution Agreement (the "9/25/14 Amendment").[25] Doc. #372-86. The 9/25/14 Amendment suspended the minimum purchase and revenue sharing requirements "[g]iven the underperformance of Xurex products since the inception of the Prior Agreements."[26] *Id.* at 6. It granted DuraSeal Pipe the right to manufacture the products and pay Xurex or its successor or trustees $12,000 per barrel, less DuraSeal Pipe's costs incurred in manufacturing the product. *Id.* at 9.

On October 17, 2014, Xurex filed for Chapter 7 bankruptcy protection. DuraSeal Pipe, according to Kaiser, ceased operations in late 2015, but continued to sell Xurex coatings in early 2016. DuraSeal Pipe was administratively dissolved by the Missouri Secretary of State in December 2016.

---

[25] Some Defendants refer to this amendment as the 9/14/14 Amendment, the 9/24/14 Amendment, and the 9/25/14 Amendment. Doc. #364, at 36-37. The Court refers to the Amendment by its effective date, September 25, 2014.
[26] "Prior Agreements" referred to the 1/13/10 Agreement, the 12/31/10 Agreement, and the 1/11/12 Amendment. Doc. #372-86, at 2.

### K. __This Lawsuit__

In August 2016, Plaintiff Jerald Enslein, acting as bankruptcy trustee for Xurex, filed an adversary proceeding in the underlying bankruptcy proceeding.  The reference to the bankruptcy court was withdrawn, and the above-captioned matter was filed with this Court.  Docs. #1, 5.  Plaintiff alleges Jose Di Mase used his control of the DuraSeal entities and interest in Xurex to gain control of the Xurex board.  According to Plaintiff, in January 2012, the new Xurex board directors, including Johnston, Rose, and Olson, amended prior Xurex agreements with DuraSeal entities that financially disadvantaged Xurex and curtailed its ability to protect trade secret information from the DuraSeal entities.  Plaintiff contends the boards of Xurex and the DuraSeal entities conspired to declare Xurex's technology ineffective, shut down Xurex's production lab, cause Xurex to assume liabilities for legal fees and judgments unrelated to its operations, and obtain Xurex's lab book, source code, and trade secrets.

In the First Amended Complaint, Plaintiff alleges claims of breach of contract (Counts I, II, and III), breach of the covenant of good faith and fair dealing (Count IV), misappropriation of trade secrets (Count V), civil conspiracy (Count VI), breach of fiduciary duty (Count VII), aiding and abetting breach of fiduciary duty (Count VIII), avoidance and recovery of constructive fraudulent transfers (Counts IX and X), objection to bankruptcy claims (Count XI), and equitable subordination (XII).  Doc. #244.  Plaintiff brings these claims against DuraSeal Pipe, DuraSeal Holdings, HDI, Giacomo Di Mase, Jose Di Mase, Kaiser, Jensvold, McKeon, Kraus, Johnston, Rose, and Olson.  He also seeks declaratory judgments (Counts XIII and XIV).  Doc. #244.

Except for three individuals, Defendants are represented by counsel.  Rose and Kaiser are proceeding pro se in this matter.  Beginning in June 2017, Jensvold was represented by counsel to oppose Plaintiff's request for a clerk's entry of default.  Doc. #23.  But, six months later, his counsel was granted leave to withdraw.  Doc. #125-26.  Since that time, Jensvold has been proceeding pro se.  Jensvold is the only Defendant who has not responded to the First Amended Complaint, which was filed in August 2018.  Generally, "a pleading filed after the original complaint" "must be served on every party."  Fed. R. Civ. P. 5(a)(1)(B).  It is unclear if Jensvold was properly served with the

First Amended Complaint, and if so, why the Court should not find him in default, which Plaintiff has not requested.  That issue, however, is not currently before the Court.

Now pending and fully briefed are two motions to strike, exclude, or limit exerts' opinion testimony and eleven motions for summary judgment.  Docs. #347-48, 350, 356, 358-63, 365-67.  The Court first addresses the parties' motions related to experts, and then turns to the parties' summary judgment motions.

## II.  MOTIONS TO STRIKE, EXCLUDE, OR LIMIT EXPERT OPINION TESTIMONY

Plaintiff moves to strike, exclude, or limit the expert opinion testimony of Michele Pavone (Doc. #348), and Defendants[27] Jose Di Mase, Giacomo Di Mase, Kraus, DuraSeal Pipe, DuraSeal Holdings, and HDI move to exclude the expert opinion testimony of Robert F. Reilly (Doc. #356).

### A.  Standard

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts in issue."  *Daubert v.*

---

[27] Within each subsection of this Order, the Court identifies which Defendants are bringing the particular motion discussed therein.  But throughout the remainder of the applicable section, the Court refers to "Defendants" instead of repeating the specific Defendants bringing the motion.

*Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993).  The Court uses a three-part test when determining the admissibility of expert testimony:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact.  This is the basic rule of relevancy.  Second, the proposed witness must be qualified to assist the finder of fact.  Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (internal quotations and citations omitted).  "Courts should resolve doubts regarding usefulness of an expert's testimony in favor of admissibility."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) (citations omitted).

## B.  Michele Pavone, Ph.D.

Plaintiff argues the expert testimony of Michele Pavone, Ph.D., should be stricken, excluded, or limited because it is not relevant and not reliable.  Defendants may call Michele Pavone, Ph.D., a non-retained expert who was engaged by the DuraSeal entities from February 2014 through July 2015.  According to Defendants, Dr. Pavone was engaged by the DuraSeal entities as "a last gasp effort by Xurex and DuraSeal Pipe to find a viable, marketable product."  Doc. #374, at 4.  Dr. Pavone's studies and analysis of products Xurex sold to DuraSeal "was part of Xurex and [DuraSeal Pipe]'s collaborative research and development ("R&D") effort to investigate…and find a solution to…ongoing problems plaguing the Xurex coating…."  *Id.*; *see also* Doc. #371-1.  Dr. Pavone will testify as "a fact witness with technical knowledge that will assist the jury…"  *Id.* at 6-7.

### (1) Relevance

Plaintiff contends Dr. Pavone's opinions are not relevant to "any issue in the case."  He argues Dr. Pavone's opinions are not tied to any issue in this case, his opinions are not based upon a standard governing performance of Xurex's products, the parties contractually agreed Xurex was not providing product warranties or was

providing limited product warranties, and no party alleges Xurex's products failed to comply with any warranty.

Defendants argue Dr. Pavone's opinions are relevant to issues in this case because "[t]he entire business relationship between Xurex and [the DuraSeal entities] – and thus this entire case – centers on the viability of Xurex coatings in the oil and gas industry. Doc. #374, at 5, 12. The product's failure and underperformance (and Dr. Pavone's opinions regarding same) "underlie every single decision made by the fiduciary defendants….," and are relevant to all breach of contract and breach of fiduciary duty claims. *Id.* The Court agrees Dr. Pavone's opinions are relevant to this case because his opinions have a "tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action. Fed. R. Evid. 401.

Defendants maintain Dr. Pavone's opinions are "aimed at meeting the industry performance and testing standards he was provided by DuraSeal." Doc. #374, at 11. Plaintiff counters the "standards" provided to Dr. Pavone are "DuraSeal['s] wish list for an ideal product," not industry standards. Doc. #388, at 1. But the DuraSeal "list" included twenty-four parameters, targets for each parameter, and "test standards." Doc. #371-1, at 121. According to Defendants, the testing standards on the list – i.e., ASTM and ISO – refer to standards developed by the American Society for Testing Materials and the International Organization for Standardization. Doc. #371, at 11.

Plaintiff's dispute as to what standards were or were not used by Dr. Pavone relates to the factual basis of his opinions. The Eighth Circuit has routinely held an expert's opinion should not be excluded when there is a disagreement with or challenge to the factual basis, methodology, and/or assumptions supporting the expert's opinion. *See S.E.C. v. Das*, 723 F.3d 943, 950 (8th Cir. 2013) (citation omitted); *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1014 (8th Cir. 2012) (citation omitted); *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007). The foundation of an expert's opinion goes to credibility, not admissibility. *David E. Watson, P.C.*, 668 F.3d at 1014; *Wash. Sols., Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888, 895 (8th Cir. 2005) (citation omitted). Plaintiff will have the opportunity to cross-examine Dr. Pavone about the standards he used or did not use. And the jury will be tasked with assessing Dr.

Pavone's credibility. Accordingly, the Court denies Plaintiff's request to exclude Dr. Pavone's testimony due to the standards on which he did or did not rely.

Finally, Plaintiff argues the parties contractually agreed Xurex was not providing product warranties and no party alleges Xurex's products failed to comply with a warranty; thus, Dr. Pavone's opinions about the performance of Xurex's products is irrelevant. However, in each agreement, Xurex warranted its products would be free from defects in materials and workmanship and would conform with published specifications or other specifications accepted in writing by Xurex. Doc. #364-29, at 13; Doc. #375-1, at 18; Doc. #375-2, at 21. Disregarding the parties' dispute about contractual language and possible waiver of the contractual disclaimer of warranties, the question of relevance boils down to whether Dr. Pavone's opinions have a "tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action. Fed. R. Evid. 401.

As noted *supra*, this Court must resolve doubts regarding admissibility of an expert's testimony in favor of admissibility. The Court finds Dr. Pavone's opinions are relevant to the issues in this matter and will aid the jury, regardless of whether the parties agreed to no warranties or whether Xurex waived a contractual disclaimer of warranties. Thus, Plaintiff's motion to exclude Dr. Pavone's testimony based upon contractual agreements and/or lack of a claim for failure to comply with a warranty is denied.

### (2) Reliability

Plaintiff also moves to exclude or limit Dr. Pavone's testimony because his opinions are not reliable. More specifically, Plaintiff contends Dr. Pavone did not test particular failures, his tests did not mimic any well environment at issue in this case, and he did not consider other potential causes of failure (e.g., incorrect application of the product). Doc. #348, at 7-8. Defendants argue Dr. Pavone tested to industry standards, and the results "revealed the coating had insufficient thermal resistance and cracked at high temperatures during and after the curing process." Doc. #374, at 16. Dr. Pavone also studied product formulation and product application, thereby

addressing incorrect application as a potential cause of failure.  *Id.*  In his reply, Plaintiff does not raise further argument as to the reliability.  Doc. #388, at 10.

To aid district courts in determining whether an expert's opinions are reliable, the Supreme Court has provided four potentially valid but non-exhaustive factors: (1) whether the theory or technique can be or has been tested, (2) whether the theory or technique was subjected to peer review and publication, (3) the known or potential rate of error, and (4) whether the theory or technique has gained general acceptance in the scientific community.  *Daubert*, 509 U.S. at 593-95.  The Supreme Court also noted "[a] reliability assessment does not require…explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community."  *Id.* at 594 (citation and internal quotations omitted).  District courts have broad latitude when deciding how to test an expert's reliability.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152-53 (1999).

Although he claims Dr. Pavone's opinions are not reliable, Plaintiff's attack does not focus on the reliability factors in *Daubert.*  Instead, he concentrates on Dr. Pavone's methodology, assumptions, and factual basis.  As noted above, an expert's opinion should not be excluded when a party disagrees with or challenges the methodology, assumptions, or factual basis underlying the expert's opinions.  *See S.E.C.*, 723 F.3d at 950; *David E. Watson, P.C.*, 668 F.3d at 1014; *Synergetics*, 477 F.3d at 956.  At trial, Plaintiff will have the opportunity cross-examine Dr. Pavone on his methods and assumptions and the facts supporting his opinions.  Accordingly, the Court denies Plaintiff's request to exclude Dr. Pavone's testimony based upon Plaintiff's disagreement with his methodology, assumptions, and factual basis of his opinions.

## C.  Robert F. Reilly

Defendants move to exclude Robert Reilly's testimony because he ignores controlling law, he changes the terms of the contracts, and his opinions are speculative and unreliable.  Plaintiff retained Reilly, a CPA and valuation expert, to estimate Xurex's lost profits from the alleged breaches of the 1/13/10 Agreement (Doc. #364-29), the 12/31/10 Agreement (Doc. #375-1), and the 1/11/12 Amendment (Doc. #375-2).  Doc. #356-1.

### *(1) Limits on Lost Profits*

Defendants contend Reilly ignores DuraSeal Holdings's alleged "unilateral 180-day termination right" under the 12/31/10 Agreement and the 1/11/12 Amendment.[28] Doc. #356, at 5, 9. By ignoring this supposed right, Defendants argue Reilly failed to limit the alleged lost profits to the 180-day period, and therefore, his opinions on lost profits and income should be excluded. *Id.* at 9-12. Plaintiff disagrees, arguing the 12/31/10 Agreement and the 1/11/12 Amendment contain conditional for-cause (as opposed to unconditional absolute) termination provisions. Doc. #375, at 7-12. Thus, according to Plaintiff, his damages are not limited to the 180-day period. *Id.*

The 12/31/10 Agreement and 1/11/12 Amendment concluded on December 31, 2022. Doc. #375-1, at 2; Doc. #375-2, at 2. Each agreement would "be automatically extended and renewed for one-year periods after December 31, 2022, unless either party notifies the other at least 180 days prior to December 31, 2022 or any anniversary thereafter of its intent to allow the term of this Agreement to expire." *Id.* Relevant to Defendants' motion, both agreements include the following provision: "In the unlikely event that Duraseal determines that the marketing and distribution of the Authorized Products is not commercially viable, it may terminate this Agreement with at least 180 days written notice to Xurex." Doc. #375-2, at 14; *see also* Doc. #375-1, at 11.[29]

Reilly calculated Xurex's economic damages with the assumption that neither party terminated the agreement before December 31, 2022. Doc. #356-1; Doc. #375, at 10 n.6 (indicating Plaintiff is not seeking damages beyond 2022). Defendants argue Reilly's calculations are incorrect, and Plaintiff's lost profit damages should be limited to those that would have accrued during the 180-day notice period. In support of their argument, Defendants cite cases interpreting Missouri and New York law. Doc. #356, at 9-12. But, as Plaintiff points out, the parties agreed both contracts are "governed by

---

[28] Defendants do not argue Reilly's calculation of Xurex's lost profits under the 1/13/10 Agreement are improper.

[29] There are some insubstantial differences in this provision when comparing the 1/11/12 Amendment with the 12/31/10 Agreement. For example, the 1/11/12 Amendment refers to "Authorized Products," and the 12/31/10 Agreement refers to "Products." *Compare* Doc. #375-2, at 14 *with* Doc. #375-1, at 11. Neither party argues the provision should be construed differently in one agreement than in the other one.

and interpreted in accordance with the law of the United States and State of New York."
Doc. #375-1, at 13; Doc. #375-2, at 17.  In their reply, Defendants do not contest that
New York law applies, and seemingly concede it applies because they rely almost
solely on cases interpreting New York law.  Doc. #387, at 1-5.  Given there is no
argument, authority, or evidence to the contrary, the Court will apply New York law
when interpreting these two contracts.

 "Under New York law, damages for breach of contract should put the plaintiff in
the same economic position he would have occupied had the breaching party
performed the contract."  *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d
Cir. 2003) (citation omitted).  A party may recover lost profits from a breach of contract
"only if (1) it is demonstrated with certainty that the damages have been caused by the
breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it
is established that the damages were fairly within the contemplation of the parties."
*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007)
(citation omitted); *see also Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000)
(stating a plaintiff asserting breach of contract is entitled to recover lost profits only if the
plaintiff "can establish both the existence and amount of such damages with reasonable
certainty," and noting "damages may not be merely speculative, possible or imaginary.")
(citations omitted).

 In their motion, Defendants cite one case interpreting New York law: *TNT USA,
Inc. v. DHL Exp. (USA), Inc.*, No. 09-CV-481, 2012 WL 601452 (E.D.N.Y. Feb. 23,
2012).  But that case is distinguishable.  Unlike the agreements before this Court, a
contract amendment in *TNT USA, Inc.* allowed either party to "terminate this Agreement
without cause upon two (2) years prior written notice to the other party."  *Id.* at *2.
Because "DHL had an ***unconditional right to terminate*** the Agreement ***without cause***
on two years' notice," the district court concluded TNT's damages were limited to the
two-year notice period.  *Id.* at *7 (emphasis added).  In their reply, Defendants cite
additional cases interpreting New York, but none involves analogous facts.  Doc. #387,
at 2-3.[30]

---

[30] *See Watermelons Plus, Inc. v. N.Y. City Dep't of Educ.*, 76 A.D.3d 973, 975-75 (N.Y.
App. Div. 2010) (finding the contract contained an **unconditional** termination clause,

Defendants point out DuraSeal Holdings could unilaterally determine "the marketing and distribution of the Authorized Products [was] not commercially viable," thereby triggering its right to terminate the contracts. Doc. #387, at 4. Because DuraSeal Holdings alone could make this decision and did not need Xurex's consent or agreement to do make such a decision, Defendants argue the termination provisions in the 12/31/10 Agreement and the 1/11/12 Amendment are similar to those contracts where a party had an unconditional right to terminate. Plaintiff counters that DuraSeal Holdings's determination that the "marketing and distribution" of Xurex's products were "not commercially viable" had to occur before DuraSeal Holdings could terminate the agreement. Plaintiff argues DuraSeal Holdings had a conditional termination right, and the condition triggering the right to terminate did not occur.

According to the 12/31/10 Agreement and the 1/11/12 Amendment, DuraSeal Holdings did not have the right to terminate the agreements until it determined "the marketing and distribution" of the products at issue were "not commercially viable" and then provided Xurex with 180 days' notice. Doc. #375-1, at 11; Doc. #375-2, at 14. Unlike the cases cited by Defendants, a condition precedent had to be satisfied before its right to terminate arose. *See e.g.*, *Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885, 892-93 (4th Cir. 1992) (applying New York law and finding lost profits and consequential damages suffered from the contract breach were limited to six months following the breach because the contract contained a provision allowing a party to terminate the contract "on six months' notice without cause."). The record does not demonstrate the condition precedent occurred.[31]

Defendants' arguments raise concerns with Reilly's methodology and assumptions. As the Court noted above, an expert opinion should not be excluded simply because a party disagrees with the methodology or assumptions underlying the

---

which limited damages); *Bitterman v. Gluck*, 256 A.D. 336, 337 (N.Y. App. Div. 1939) (concluding the contract allowed the defendants "an **absolute right** on thirty days' notice to discharge plaintiff '**without any reason or specific cause**," and thus, damages were limited to the thirty-day time period following notice) (emphasis added); *Chatham Plan, Inc. v. Clinton Tr. Co.*, 246 A.D. 498, 499 (N.Y. App. Div. 1936) (noting the contract "was **terminable at will by either party**") (emphasis added).

[31] Even if the condition precedent had occurred (or did not have to occur as Defendants suggest), it is unclear as to when the 180 days would begin to run.

expert's opinion.  *See S.E.C.*, 723 F.3d at 950; *David E. Watson, P.C.*, 668 F.3d at 1014; *Synergetics*, 477 F.3d at 956.  Defendants will have the opportunity to cross-examine Reilly on his methodology and assumptions.  For these reasons and resolving any doubts as to the usefulness of Reilly's testimony in favor of admissibility, the Court denies Defendants' motion to exclude or limit Reilly's testimony because he did not limit the alleged lost profits to 180 days.

### *(2) Additional Minimum Purchase Obligations*

Defendants move to prohibit Reilly's opinions about minimum purchase obligations.  For the 12/31/10 Agreement, Defendants move to exclude Reilly's opinions as to losses incurred in 2022 because the exhibit to the Agreement outlining minimum purchase obligations did not list minimum purchase requirements beyond December 2021.  Doc. #375-1, at 21.  For the 1/11/12 Amendment, Defendants move to exclude Reilly's opinions about Xurex's losses beyond 2015 because the exhibit to the Amendment outlining minimum purchase obligations did not list minimum purchase obligations beyond 2015.  Doc. #375-2, at 24.

For the 12/31/10 Agreement, Reilly indicates he included Xurex's losses due to minimum purchase requirements in 2022 because the contract did not conclude until 2022.   Doc. #356-1, at 14.  He set the minimum purchase obligation in 2022 at the same level set for 2021.  *Id.*   Regarding the 1/11/12 Amendment, Reilly states he included Xurex's losses due to minimum purchase requirements from 2016 through 2022 because the contract did not conclude until 2022.  *Id.* at 17.  He included a minimum purchase obligation for 2016 through 2022 that was equivalent to the minimum purchase obligation in 2015.  *Id.*

The 12/31/10 Agreement and the 1/11/12 Amendment concluded on December 31, 2022.  Both Agreements specified the DuraSeal entities would purchase the "minimum number of barrels" of products set forth in "Exhibit B" to each Agreement.  But the parties fail to delve further into the Agreements to ascertain why "Exhibit B" did not list minimum purchase requirements beyond December 2015 for the 1/11/12 Amendment and beyond December 2021 for the 12/31/10 Agreement.

The minimum purchases provision in the 1/11/12 Amendment indicated "quarterly purchase minimums set forth on attached Exhibit B are to be adjusted by mutual agreement beginning with January of 2016, consistent with the Final Global Plan."[32]  Doc. #375-2, at 8 (emphasis in original).  Exhibit B to the 1/11/12 Amendment contained minimum purchase obligations through 2015 because the parties agreed the minimum purchase obligations would be adjusted beginning in January 2016.  *Id.* Accordingly, Exhibit B does not include the minimum monthly purchase requirements beyond December 2015.

The minimum purchase provision in the 12/31/10 Agreement is not as clear as the provision in the 1/11/12 Amendment.  But it contains language indicating the parties intended to revisit the minimum purchase requirement.  According to the 12/31/10 Agreement, if DuraSeal Holdings acquired DuraSeal Pipe within six months of the effective date of the Agreement (which it did), "[t]he lower monthly purchase minimums per Exhibit B of the current Xurex-[DuraSeal Pipe] agreement remain the same for 2011, but are to be adjusted by mutual agreement beginning with January of 2012, consistent with the reasonable timing of [DuraSeal Holdings]'s plans for expanded usage in North America."  Doc. #375-1, at 6.  Thus, the minimum purchase requirements would be revisited in 2012.  Further, there is no indication that the minimum purchase requirements would conclude in 2021 or 2022.

As set forth above, Plaintiff may only recover lost profit damages if he can demonstrate with certainty his damages were caused by the breach, the extent of his loss is capable of proof with reasonable certainty, and the damages were fairly within the parties' contemplation.  *Tractebel*, 487 F.3d at 109.  To the extent Plaintiff can establish entitlement to lost profits for minimum purchase obligations after December 2011 for the 12/31/10 Agreement and/or lost profits for minimum purchase obligations after December 2015 for the 1/11/12 Amendment, Reilly's testimony could assist the jury in determining Plaintiff's damages.  To the extent there are any doubts regarding usefulness of an expert's testimony, this Court must resolve any doubts in favor of

---

[32] "Final Global Plan" was described as "a reasonably detailed version of a business plan for the commercialization and distribution of the Authorized Products in the Field in the Territory."  Doc. #375-2, at 6.

admissibility.  Accordingly, the Court denies Defendants' motion to exclude Reilly's calculations and opinions related to minimum purchase requirements beyond December 2011 for the 12/31/10 Agreement and beyond December 2015 for the 1/11/12 Amendment.

### (3) Purchases and Penalties

The parties agree that, pursuant to the 1/11/12 Amendment, DuraSeal Holdings was required to purchase a minimum number of barrels, and if it did not, it was required to pay a $10,000 penalty.  Defendants argue Reilly's damages analysis is unreliable because he included income from the sale of barrels <u>and</u> penalties for not purchasing the same barrels.  Defendants contend "[t]here is no scenario under the contract where Xurex would have received both profits and royalties from the sale of a barrel, while at the same time receiving a $10,000 penalty…for…failing to purchase that same barrel."  Doc. #356, at 14.  Defendants allege Reilly misinterpreted the contract language "to artificially inflate the claimed damages."  Doc. #387, at 7.

Plaintiff argues Reilly provided calculations for lost profits, penalties, and both figures combined.  Doc. #375, at 15.  He represents Reilly combined the figures assuming the two types of damages – lost profits and penalties – are not duplicative. *Id.* at 14-15.  If the Court determines both types of damages are recoverable, Plaintiff contends Reilly provides the correct measure of damages.  *Id.* at 15.  If the Court finds the "penalty" clause is a liquidated damages provision eliminating Plaintiff's ability to seek lost profits, Reilly has provided separate calculations.  *Id.*

The parties agree Reilly failed to account for purchases in excess of the minimum purchase requirements being rolled forward to offset shortfalls in later quarters.  Doc. #356, at 14-15; Doc. #375, at 15-16.  Defendants contend Reilly's failure demonstrates his misrepresentation of the contract language.  Doc. #387, at 7.  Plaintiff argues Reilly's "oversight" accounts for a "downward adjustment in [Plaintiff]'s damages of $712,746 which is non-material when compared to [Plaintiff]'s total damages," and does not merit exclusion of Reilly's opinion.  Doc. #375, at 16.[33]

---

[33] In response to Defendants' motion and because the motion was the first time the issue was brought to his attention, Plaintiff "would respectfully seek leave of court to

These disputes with Reilly's opinion arise from Reilly's assumptions. Again, the Court will not exclude an expert's opinion simply because the parties disagree about the assumptions underlying the expert's opinion. *See S.E.C.*, 723 F.3d at 950; *David E. Watson, P.C.*, 668 F.3d at 1014; *Synergetics*, 477 F.3d at 956. Reilly will explain the reasoning behind his calculations, and Defendants will have the opportunity to cross-examine Reilly on his assumptions about the contract. Therefore, the Court denies Defendants' motion to exclude or testimony because his calculations include damages for lost profits and penalties.

### (4) Xurex's Business Reality

Defendants argue Reilly's opinions are speculative because he did not consider Xurex's business reality. They contend Reilly relied solely on the contracts and ignored the minimum purchase requirements, which, according to Defendants, were not sustainable. Plaintiff argues Reilly's opinions are properly based upon the minimum purchase requirements.

Defendants' argument is directed to the factual (or lack of factual) basis of Reilly's opinions. Once more, an expert's opinion should not be excluded when there is a disagreement with or challenge to the factual basis, methodology, and/or assumptions supporting the expert's opinion. *See S.E.C.*, 723 F.3d at 950; *David E. Watson, P.C.*, 668 F.3d at 1014; *Synergetics*, 477 F.3d at 956. The factual basis of an expert's opinion goes to his credibility, not admissibility of his opinion. *David E. Watson, P.C.*, 668 F.3d at 1014; *Wash. Sols., Inc.*, 395 F.3d at 895. The Court finds Reilly's opinion is not so fundamentally unsupported that it cannot assist the jury. *Marmo*, 457 F.3d at 758 (citation omitted). Additionally, the factual basis of Reilly's opinions and the facts Defendants believe Reilly should have considered can be addressed during cross-

---

allow Mr. Reilly to make this non-material downward adjustment for trial or otherwise testify to the downward adjustment." Doc. #375, at 16. In their reply, Defendants do not address Plaintiff's request. **The Court grants Plaintiff's request in that Reilly is permitted to make the downward adjustment during his trial testimony. However, Defendants will have the opportunity to cross-examine Reilly on his original report and his downward adjustment.**

examination.  For these reasons, the Court denies Defendants' motion to strike Reilly's opinions on the basis that he allegedly ignored Xurex's business reality.

### (5) Tort Claim Damages

Finally, Defendants argue Reilly should be prohibited from testifying about Xurex's economic losses resulting from Defendants' alleged tortious acts because Reilly's report pertaining to said damages does not include any analysis, reasoning, facts, data, or explanation regarding the estimated damages resulting from Defendants' tortious acts.  Doc. #356, at 16-17.  Defendants also point to Reilly's failure to identify what damages were caused by each tortfeasor's acts.  According to Defendants, Reilly improperly opines a tort committed by one defendant in 2014 and a different tort committed by another defendant in 2012 would result in the same damages – to wit, $161,170.00.  Doc. #356-1, at 63.

In his report, Reilly states he analyzed economic damages for twelve of the fourteen counts alleged in the operative complaint, specifically identifying, among others, the tort claims.  Doc. #356-1, at 5-6.  In section III of his report, Reilly identifies the "wrongful acts" related to his analysis, which include Plaintiff's tort claims.  *Id.* at 21.  Thereafter, Reilly explains his analysis of economic damages resulting from Plaintiff's breach of contract claims.  *Id.* at 21-38.  Reilly states he performed the same analyses for the tort claims as he did for the breach of contract claims, his "estimated damages" for the tort claims "are the same as my estimated economic damages for counts 1 through 3," and he provides tables summarizing those damages.  Doc. #356-1, at 38-44.  Plaintiff argues the tort claims are premised on Xurex's directors, officers, and controlling shareholders wrongfully entering into agreements and wrongfully failing to enforce Xurex's rights under the agreements.  Doc. #375, at 18.

Based on his report, Reilly's opinions about Plaintiff's damages emanating from Defendants' alleged tortious conduct are based upon the same methodology, calculations, and assumptions as his opinions about damages arising from breach(es) of contract.  Doc. #356-1, at 38-44.  What seems to be in dispute is Reilly's failure to restate his methodology, calculations, and assumptions in the section of his report

pertaining to tort claim damages, and his lack of explanation about the damages breakdown by tort claim and/or tortfeasor.

As set forth *supra*, the Court should not exclude an expert's opinion when there is disagreement with the factual basis, methodology, and/or assumptions supporting the expert's opinion. *See S.E.C.*, 723 F.3d at 950 (citation omitted); *David E. Watson, P.C.*, 668 F.3d at 1014 (citation omitted); *Synergetics*, 477 F.3d at 956. As it did above, the Court finds Reilly's opinion is not so fundamentally unsupported that it cannot assist the jury. *Marmo*, 457 F.3d at 758 (citation omitted). During cross-examination, Defendants may challenge Reilly's methodology and assumptions. For these reasons, the Court denies Defendants' motion to strike Reilly's opinions as to Plaintiff's tort claim damages.

### III. MOTIONS FOR SUMMARY JUDGMENT

Eleven motions for summary judgment are pending:

- Defendant McKeon's Motion for Summary Judgment (Doc. #347);

- Plaintiff's Motion for Partial Summary Judgment (Doc. #350);

- Defendants Jose Di Mase, Giacomo Di Mase, Kraus, DuraSeal Pipe, DuraSeal Holdings, and HDI's Motion for Summary Judgment on Claim for Aiding and Abetting Breach of Fiduciary Duty (Doc. #358);

- Defendants Jose Di Mase, Giacomo Di Mase, Kraus, and HDI's Motion for Summary Judgment on Claim for Civil Conspiracy (Doc. #359);

- Defendants DuraSeal Holdings and DuraSeal Pipe's Motion for Summary Judgment on Counts II, III, and IV (Doc. #360);

- Defendants Jose Di Mase and HDI's Motion for Summary Judgment on Claim for Breach of Fiduciary Duty (Doc. #361);

- Defendant HDI's Motion for Summary Judgment (Doc. #362);

- Defendants Jose Di Mase, Giacomo Di Mase, Kraus, DuraSeal Pipe, DuraSeal Holdings, and HDI's Motion for Summary Judgment on Claim for Misappropriation of Trade Secrets (Doc. #363);

- Defendant Olson's Motion for Summary Judgment (Doc. #365);

- Defendant Johnston's Motion for Summary Judgment (Doc. #366); and

- Defendant Rose's Motion for Summary Judgment (Doc. #367).

## A. <u>Standard</u>

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011) (quotation omitted). The Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588-89 (1986); *Tyler v. Harper*, 744 F.2d 653, 655 (8th Cir. 1984). "[A] nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Nationwide Prop. & Cas. Ins. Co. v. Faircloth*, 845 F.3d 378, 382 (8th Cir. 2016) (citations omitted).

## B. <u>Motions for Summary Judgment on Plaintiff's Claims</u>
### (1) *Breach of Contract (Counts II and III)*[34]

In Count II, Plaintiff alleges DuraSeal Holdings breached the 12/31/10 Agreement by failing to meet the contractual requirements. Doc. #244, ¶¶ 206-11. In Count III, Plaintiff alleges if the 1/11/12 Amendment is found to be valid and enforceable, DuraSeal Pipe and DuraSeal Holdings breached the 1/11/12 Amendment by failing to meet contractual requirements. Doc. #244, ¶¶ 212-18.

DuraSeal Holdings and DuraSeal Pipe maintain "the 1/13/10 Agreement and 12/31/10 Agreement were expressly superseded by the 1/11/12 Amendment." Doc. #360, at 5. However, they do not seek summary judgment on whether Plaintiff may bring a claim for breach of a superseded contract. Plaintiff's response does not address

---

[34] In Count I, Plaintiff alleges a breach of contract claim against DuraSeal Pipe only. Doc. #244, ¶¶ 199-205. DuraSeal Pipe did not seek summary judgment on this claim.

this issue either. *See* Doc. #399. Instead, the parties concentrate on whether Plaintiff's lost profits arising from the alleged breaches of the 12/31/10 Agreement and the 1/11/12 Amendment are limited to the 180-day notice period DuraSeal Holdings and/or DuraSeal Pipe had to give Xurex when terminating the Agreement or Amendment.

DuraSeal Holdings and DuraSeal Pipe argue they are "entitled to partial summary judgment because [DuraSeal Holdings] had a unilateral right to terminate the 12/31/10 Agreement upon 180 days' notice." *Id.* As set forth *supra*, section II(C)(1), Plaintiff's lost profit damages are not limited to the 180-day notice period. As explained more fully above, the termination provisions in the 12/31/10 Agreement and the 1/11/12 Amendment, contrary to the cases cited by DuraSeal Holdings and DuraSeal Pipe, were not unconditional, were not absolute, and/or were not without cause. Instead, the applicable termination provisions require an "unlikely event" to occur – to wit, DuraSeal Holdings "determine[d] that the marketing and distribution" of Xurex's products was "not commercially viable" – followed by DuraSeal Holdings providing 180 days' written notice to Xurex. Doc. #375-1, at 11; Doc. #375-2, at 14.

For breach of contract claims, lost profit damages may be recovered "only if (1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties." *Tractebel*, 487 F.3d at 109; *see also Schonfeld*, 218 F.3d at 172. For these reasons and the reasons set forth *supra*, section II(C)(1), DuraSeal Holdings and DuraSeal Pipe's motion for summary judgment on Counts II and III is denied.

### (2) Breach of Implied Covenant of Good Faith and Fair Dealing (Count IV)

In Count IV, Plaintiff alleges DuraSeal Pipe and DuraSeal Holdings breached the implied covenant of good faith and fair dealing (hereinafter, "implied covenant"). DuraSeal Pipe and DuraSeal Holdings move for summary judgment on this claim because they contend it is duplicative of Plaintiff's breach of contract claims. Plaintiff argues he is permitted to bring a stand-alone claim for breach of the implied covenant because Defendants attempted to subvert the contracts.

The parties seem to agree the 1/13/10 Agreement is governed by Delaware law, and the 12/31/10 Agreement and the 1/11/12 Amendment are governed by New York law.  Doc. #360, at 11; Doc. #399, at 14-20 (citing New York and Delaware law).  Under New York and Delaware law, "a covenant of good faith and fair dealing is implicit in all contracts during the course of contract performance."  *Tractebel*, 487 F.3d at 98 (citation omitted); *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441-42 (Del. 2005).  In both jurisdictions, the implied covenant requires a contracting party refrain from conduct that is "arbitrary and unreasonable" or "destroy[s] or injur[es] the right of the other party to receive the fruits of the contract."  *Tractebel*, 487 F.3d at 98 (citation and internal quotations omitted); *Dunlap*, 858 A.2d at 442.

In New York, the elements of a claim for breach of the implied covenant "are similar to causes of action for breaches of duties of care, in that the tort requires the existence of a duty, breach of that duty, causation, and damages."  *Benihana of Tokyo, LLC v. Angelo, Gordon & Co.*, 259 F. Supp. 3d 16, 37 (S.D.N.Y. 2017) (citation omitted), *aff'd*, 712 F. App'x 85 (2d Cir. 2018).  New York "does not recognize a separate cause of action for breach of the implied covenant…when a breach of contract claim, based upon the same facts, is also pled."  *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *see also RST (2005) Inc. v. Research in Motion Ltd.*, 597 F. Supp. 2d 362, 367-68 (S.D.N.Y. 2009) (finding a claim for breach of the implied covenant was based upon the same facts as the breach of contract claim, and therefore, could not brought).  If a breach of contract claim and a breach of the implied covenant claim arise from the same facts and seek identical damages, the claims are considered duplicative, and both cannot be brought.  *Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 70 A.D.3d 423, 426 (N.Y. App. Div. 2010 (citations omitted).

For a breach of the implied covenant claim under Delaware law, the plaintiff "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."  *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (citation and internal quotations omitted).  A plaintiff cannot generally allege "bad faith" conduct; he "must allege a specific implied contractual obligation and allege how the violation of that obligation denied the plaintiff

the fruits of the contract." *Id.* (noting the implied covenant "is only rarely invoked successfully"). Similar to New York, Delaware courts do not permit a plaintiff to bring a breach of implied covenant claim along with a breach of contract claim when both claims are based on the same facts. *Id.* And they do not allow a breach of implied covenant claim based on alleged breach of a contract term. *Id.*; *see also Stewart v. BF Bolthouse Holdco, LLC*, No. 8119-VCP, 2013 WL 521220, at *16 (Del. Ch. Aug. 30, 2013). Notably, the implied covenant "comes into play…only where a contract is silent as to the issue in dispute." *Narrowstep, Inc. v. Onstream Media Corp.*, No. 5114-VCP, 2010 WL 5422405, at *10 (Del. Ch. Dec. 22, 2010) (citation omitted).

Plaintiff argues his breach of implied covenant claim differs from his breach of contract claims because he alleges DuraSeal Holdings and DuraSeal Pipe "failed to exercise discretion afforded to them under the parties' contract reasonably and in good faith and/or prevented Xurex from receiving the expected fruits of its contract…." Doc. #244, ¶ 225. According to Plaintiff, these allegations are based on the "extensive and detailed general allegations" in the First Amended Complaint describing DuraSeal Holdings and DuraSeal Pipe's "extensive efforts to subvert the very contracts themselves." Doc. #399, at 16. But Plaintiff does not identify which of the "extensive and detailed general allegations" support his argument.

Nonetheless, upon review of the allegations in Counts I through IV, the Court notes the Count I breach of contract claim is based on DuraSeal Pipe agreeing to certain terms and allegedly "failing to make the minimum purchases required of it" and "failing to pay Xurex the required 5% license fee." Doc. #244, ¶¶ 200, 203-04. The breach of contract claims in Counts II and III are based on DuraSeal Holdings and/or DuraSeal Pipe agreeing to certain contractual requirements and allegedly failing to meet those requirements (i.e., required minimum purchases, payment of license fees, developing and commercializing Xurex products, not competing with Xurex products and/or attempting to reverse engineer the products, and not hiring or retaining Xurex employees or contractors for two years). *Id.* ¶¶ 207, 210, 214, 217.

For this breach of the implied covenant claim (Count IV), Plaintiff asserts "DuraSeal Pipe and DuraSeal Holdings failed to exercise discretion afforded to them under the parties' contract reasonably and in good faith…." Doc. #244, ¶ 225; Doc.

#399, at 16. The phrase "afforded to them under the parties' contract" when describing DuraSeal Holdings and DuraSeal Pipe's discretion suggests Plaintiff's claim for breach of the implied covenant sounds in contract. *See Amcan, Inc.*, 70 A.D.3d at 426; *Kuroda*, 971 A.2d at 888. Further, because the covenant is implied in all contracts, Plaintiff's allegation that Defendants did not act "reasonably" or "in good faith," without more, does not indicate anything more than possibly a breach of contract. Unfortunately, Plaintiff does not clarify the issue. He points to contractual provisions with which DuraSeal Holdings and DuraSeal Pipe failed to comply, Defendants' failure to exercise discretion and good faith when invoking a contractual provision, and an alleged but unidentified pretext for invoking a contractual provision. Doc. #399, at 17-19.

Plaintiff's other allegation supporting his breach of implied covenant claim is DuraSeal Holdings and DuraSeal Pipe "prevented Xurex from receiving the expected fruits of its contract." Doc. #244, ¶ 225. In response to Defendants' summary judgment, Plaintiff did not identify allegations in his First Amended Complaint to shed light on what exactly these entities did to prevent Xurex from "receiving the expected fruits of its contract." This is nothing more than a bare assertion. As a result, it is unknown what DuraSeal Holdings and DuraSeal Pipe did (beyond allegedly breaching contracts) to support a breach of implied covenant claim. When claims for breach of the implied covenant and breach of contract are based on the same facts, as is the case here, a party is not permitted to bring a stand-alone claim for breach of the implied covenant. *See Harris*, 310 F.3d at 81; *RST (2005) Inc.*, 597 F. Supp. 2d at 367-68; *Amcan*, 70 A.D.3d at 426; *Kuroda*, 971 A.2d at 888. Further, Delaware law does not permit a plaintiff to generally allege bad faith conduct, as Plaintiff does here. *See Kuroda*, 971 A.2d at 888. Finally, it remains unclear what damages Plaintiff seeks for his breach of the implied covenant claim, and whether those damages are identical to the damages sought for his breach of contract claims. As best the Court can discern, Plaintiff seeks the same damages for both claims.

To summarize, Plaintiff's breach of implied covenant claim arises, at least in part, from an alleged breach of contractual obligations. The claim is also based on the same facts that support his breach of contract claims. Plaintiff's vague assertions do not indicate what conduct by DuraSeal Pipe and/or DuraSeal Holdings resulted in Xurex

being denied the fruits of its contract.  And the damages sought for both claims appear to be identical.  For these reasons, Defendants' motion for summary judgment on Plaintiff's claim for breach of the implied covenant is granted.

### (3) Misappropriation of Trade Secrets (Count V)

In his First Amended Complaint, Plaintiff alleges a claim of misappropriation of trade secrets against HDI, Kraus, Jose Mi Mase, Giacomo Di Mase, Kaiser, Jensvold, McKeon, DuraSeal Pipe, and DuraSeal Holdings.  Doc. #244, ¶¶ 22-23, 227-32.  HDI, Kraus, Jose Di Mase, Giacomo Di Mase, DuraSeal Pipe, and DuraSeal Holdings move for summary judgment on this claim, and in a separate motion, McKeon moves for summary judgment on this claim.  Docs. #347, 363.

In response to both motions, Plaintiff concedes he no longer intends to submit Count V.  Doc. #382, at 54 (conceding he is not pursuing a claim of misappropriation of trade secrets against McKeon); Doc. #402, at 1 (stating "[t]he Court should grant the Motion as to the Trustee's standalone claim for misappropriate of trade secrets…as the Trustee no longer intends to submit Count V.").  Pursuant to Plaintiff's concession, the Court enters summary judgment in favor of Defendants HDI, Kraus, Jose Mi Mase, Giacomo Di Mase, Kaiser, Jensvold, DuraSeal Pipe, and DuraSeal Holdings on Plaintiff's misappropriation of trade secrets.

The Court notes Kaiser and Jensvold, against whom Count V is also brought, did not seek summary judgment on this claim.  Plaintiff's responses to the other parties' summary judgment motions indicate he does not intend to submit Count V, but it is not clear if his intention is directed at those who filed motions or all Defendants against whom the claim is brought.  Unless and until Plaintiff seeks to dismiss Count V against Kaiser and Jensvold, those claims will remain pending.

### (4) Breach of Fiduciary Duty (Count VII)

Plaintiff alleges all Defendants (except Kraus), as officers, directors, and/or shareholders of Xurex, owed fiduciary duties to Xurex.  According to Plaintiff, Defendants allegedly breached their fiduciary duties by "authorizing, approving, ratifying, acquiescing, inducing or causing" Xurex to (1) enter into the 1/11/12

Amendment and the 9/25/14 Amendment; (2) not enforce its rights under the 1/13/10 Agreement and the 12/31/10 Agreement (or alternatively, the 1/11/12 Amendment); (3) purportedly enter into amendments to the 1/13/10 Agreement and the 12/31/10 Agreement (or alternatively, the 1/11/12 Amendment); (4) disclose trade secrets to DuraSeal Pipe, DuraSeal Holdings, and other third parties; (5) not defend or permit Richard Polley to take a $3 million default judgment against Xurex; and (6) purportedly assume several million dollars of legal fees incurred by DuraSeal in shareholder litigation.[35]  Doc. #244, ¶¶ 242-43.  In addition, these Defendants allegedly breached their fiduciary duties to Xurex by "authorizing, approving, ratifying, acquiescing, inducing or causing" Xurex's operations to be transferred to DuraSeal Pipe and/or DuraSeal Holdings; and Xurex's corporate opportunities to be usurped by DuraSeal Pipe, DuraSeal Holdings, and their shareholders, directors, officers, employees, and representatives, including for their own benefit.  Finally, Plaintiff contends these Defendants breached their fiduciary duties by failing to disclose to Xurex's shareholders that the directors and/or officers had disclosed Xurex's trade secrets to DuraSeal Pipe, DuraSeal Holdings, and other third parties; and "otherwise breach[ed] their duties of loyalty, good faith, and care in the management of Xurex."  *Id.* ¶ 242.  Plaintiff contends these Defendants "lacked independence, were not disinterested, and had conflicts of interest.  *Id.* ¶ 243.

### (a) Standard of Review

Plaintiff seeks summary judgment on the standard of review to be applied to his breach of fiduciary duty claims.  Doc. #351, at 55-61.  Defendants Jose Di Mase and HDI move for summary judgment motion on Plaintiff's breach of fiduciary duty claims in their favor.  Doc. #361.  McKeon, Johnston, Olson, and Rose filed individual motions seeking summary judgment in their favor on Plaintiff's breach of fiduciary duty claims.  Docs. #357, 365-67.  Also, Defendants Johnston, Olson, McKeon, Jose Di Mase,

---

[35] The First Amended Complaint refers to the 1/13/10 Agreement and the 12/31/10 Agreement when setting forth Plaintiff's breach of fiduciary duty claims.  However, in his summary judgment motion, Plaintiff represents his breach of fiduciary duty claims arise from two transactions – i.e., the 1/11/12 Amendment and the 9/25/14 Amendment – with "Xurex's controlling shareholder."  Doc. #351, at 55.

Giacomo Di Mase, Kraus, DuraSeal Pipe, DuraSeal Holdings and HDI filed a collective response to Plaintiff's motion. Doc. #395. Defendant Rose filed a separate response to Plaintiff's motion. Doc. #378.[36]

The parties cite Delaware law in their briefing of this claim, tacitly conceding Delaware law applies to this claim. It is "[a] cardinal precept…that directors, rather than shareholders, manage the business and affairs of the corporation. The business judgment rule is a recognition of that statutory precept." *Orman v. Cullman*, 794 A.2d 5, 19 (Del. Ch. 2002) (citations omitted). The business judgment rule presumes a corporation's directors "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Id.* at 19-20 (citation omitted). "Absent an abuse of discretion," the directors' judgment "will not be second-guessed" and "will be respected by the courts." *Id.* at 20 (citations omitted). The party challenging the directors' judgment bears the burden of establishing facts to rebut the presumption that the directors acted properly. *Id.* (citation omitted).

A plaintiff may overcome this burden and rebut the presumption that the business judgment rule applies by, for example, "demonstrating…a merger between two corporations under the control of a controlling shareholder," or establishing "the board was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of its company and all of its shareholders." *Id.* at 20, 22 (citations omitted). If the plaintiff overcomes the burden, "the business judgment presumption is rebutted and entire fairness is the standard of review." *Id.* at 20. In such an instance, "[a] controlling or dominating shareholder standing on both sides of a transaction…bears the burden of proving [the transaction's] entire fairness." *Id.* (quoting *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994)).

Plaintiff alleges Jose Di Mase (through various entities and affiliates) was the controlling shareholder of Xurex, and he was on both sides of the transactions at issue.

---

[36] After Plaintiff filed replies to the two opposition briefs (Docs. #419-20), Rose filed a "response to Trustee's reply," which the Court construes as a sur-reply. Doc. #423. The rules do not allow sur-replies, and Rose did not seek leave to file one. Thus, the Court did not consider Rose's sur-reply when deciding Plaintiff's motion.

Therefore, Plaintiff asks the Court to decide that the entire fairness doctrine will apply at trial. Regarding both the 1/11/12 Amendment and the 9/25/14 Amendment, the Court finds genuine issues of material fact preclude it from determining whether a controlling shareholder was involved in either or both transactions. Accordingly, the Court denies Plaintiff's motion for summary judgment on this issue.

### (b) Substantive Claims

Also pending are motions filed by Johnson, Rose, McKeon, and Olson seeking summary judgment in their favor on Plaintiff's breach of fiduciary duty claims. However, the Court finds genuine issues of material fact preclude entry of summary judgment in their favor on Plaintiff's claims of breach of fiduciary duty. Therefore, their motions for summary judgment on Plaintiff's breach of fiduciary duty claims are denied.

### (c) Immunity from Damages

Olson, Rose, Johnston, and McKeon contend they are insulated from damages for any breach of fiduciary duty under section 102(b)(7) of the Delaware Corporate Code. Doc. #357, at 20-22; Doc. #365, at 19-21; Doc. #367, at 9-10; Doc. #421, at 44. As set forth in section 102(b)(7), the certificate of incorporation may include the following:

> A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

Del. Code Ann. tit. 8, § 102 (West 2019). The parties agree Xurex's articles of incorporation contained such a provision.

Section 102(b)(7) immunity is treated in the "nature of an affirmative defense," and therefore, the burden of establishing entitlement to immunity rests with the party seeking protection. *Emerald Partners v. Berlin*, 787 A.2d 85, 91 (Del. 2001); *Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (citation omitted). Upon review of the record before it, the Court finds genuine issues of material fact exist regarding

Defendants' entitlement to immunity under section 102(b)(7).  Thus, Olson's, Rose's, Johnston's, and McKeon's motions for summary judgment on the issue of section 102(b)(7) immunity are denied.

Related to the 1/11/12 Amendment, Johnston also argues he is protected by section 144 of the Delaware Corporate Code and the business judgment rule.  Doc. #366, at 17-18.  "[S]ection 144(a)(1) provides that a covered transaction will not be void or voidable solely as a result of the offending interest if it is approved by an informed 'majority of the disinterested directors, even though the disinterested directors be less than a quorum.'"  Blake Rohrbacher, et al., *Finding Safe Harbor: Clarifying the Limited Application of Section 144*, 33 Del. J. Corp. L. 719, 737 (2008) (citing Del Code Ann. tit. 8, § 144(a)).  "[S]o long as there is one informed, disinterested director on the board, and so long as he or she approves the transaction in good faith, the transaction will not be presumptively voidable due to the offending interest.  In other words, a nine-member board with a single disinterested director may approve a covered transaction and reap the benefits of the section 144 safe harbor."  *Id.*

The Court finds genuine issues of material fact exist regarding application of section 144 and/or the business judgment rule related to the 1/11/12 Amendment.  Accordingly, Johnston's motion for summary judgment on the issue of immunity under section 144 and/or the business judgment rule is denied.


### *(5) Civil Conspiracy (Count VI)*

Plaintiff alleges a claim of civil conspiracy against all Defendants.  Doc. #244, ¶¶ 233-40.  He contends Defendants had an agreement or a meeting of the minds to commit unlawful acts, and in furtherance of their conspiracy, Defendants committed unlawful acts of breach of contract, fraudulent transfer, aiding and abetting breach of contract, breach of fiduciary duty, and aiding and abetting breach of fiduciary duties owed to Xurex.  *Id.* ¶¶ 237-239.  Plaintiff claims Xurex (and/or its estate) sustained damages as a result of Defendants' alleged conspiracy.  *Id.* ¶ 240.  Defendants Jose Di Mase, Giacomo Di Mase, Kraus, HDI, Johnston, Rose, Olson, and McKeon move for

summary judgment on this claim.  Docs. #357, 359, 365-67.[37]  For this claim, the parties focus on Missouri law, although they do not explain why Missouri law applies to the civil conspiracy claims.  Given the parties' implicit concession that Missouri law applies, the Court will apply Missouri law.

In Missouri, civil conspiracy "is not a separate and distinct action."  *W. Blue Print Co. v. Roberts*, 367 S.W.3d 7, 22 (Mo. banc 2012) (citation omitted).  Instead, a civil conspiracy claim "acts to hold the conspirators jointly and severally liable for the underlying act."  *Id.* (quoting *8000 Md., LLC v. Huntleigh Fin. Servs. Inc.,* 292 S.W.3d 439, 451 (Mo. Ct. App. 2009)).  "The gist of the action is not the conspiracy, but the wrong done by acts in furtherance of the conspiracy or concerted design resulting in damage to plaintiff."  *Id.* (citation omitted).  To demonstrate the existence of a civil conspiracy, a plaintiff must establish "(1) two or more persons; (2) with an unlawful[38] objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) [the plaintiff] was thereby damaged."  *Id.* (quoting *Oak Bluff Partners, Inc. v. Meyer,* 3 S.W.3d 777, 781 (Mo. banc 1999)).  A plaintiff must prove the conspiracy by clear and convincing evidence.  *Higgins v. Ferrari*, 474 S.W.3d 630, 642 (Mo. Ct. App. 2015) (internal quotations and citation omitted).

Potentially relevant in this matter, "there can be no conspiracy between an agent and a principal," and "[t]wo entities that are not legally distinct cannot conspire with one another."  *8000 Md., LLC*, 292 S.W.3d at 452 (quoting *Mika v. Cent. Bank of Kan. City,* 112 S.W.3d 82, 94 (Mo. Ct. App. 2003)).  "[A] corporation cannot conspire with its own employees."  *Id.*  But one exception to this general rule is "when an agent has an independent personal stake in achieving the object of the conspiracy."  *Id.* (citation and internal quotations omitted).  That is, "the agent's independent personal stake must be in a legally distinct organization."  *Id.* (citation omitted).

---

[37] Kaiser and Jensvold, against whom this claim is also brought, do not seek summary judgment on this claim.

[38] In the context of a civil conspiracy claim, "unlawful…is not limited to conduct that is criminally liable, but rather may include individuals associating for the purpose of causing or inducing a breach of contract or business expectancy."  *W. Blue Print Co.*, 367 S.W.3d at 22 (quoting *Lyn–Flex W., Inc. v. Dieckhaus,* 24 S.W.3d 693, 700-01 (Mo. Ct. App. 1999)).

Based upon the record and the applicable law, the Court finds genuine issues of material fact prevent entry of judgment in favor of Defendants Jose Di Mase, Giacomo Di Mase, Kraus, HDI, Johnston, Rose, Olson, and McKeon on Plaintiff's claims of civil conspiracy. At a minimum, there are genuine issues of material fact as to whether there was a meeting of the minds, a third party was involved, and a concerted action occurred. Accordingly, Defendants' motions for summary judgment on the civil conspiracy claims are denied.

### (6) Aiding and Abetting Breach of Fiduciary Duty (Count VIII)

Plaintiff asserts claims of aiding and abetting breach of fiduciary duty against Kraus, Jensvold, and Giacomo Di Mase, or alternatively, against Kraus, DuraSeal Pipe, DuraSeal Holdings, HDI, Jensvold, Jose Di Mase, and Giacomo Di Mase. Doc. #244, ¶¶ 23, 247-253. Defendants Jose Di Mase, Giacomo Di Mase, Kraus, DuraSeal Pipe, DuraSeal Holdings, and HDI move for summary judgment on Count VIII. Doc. #358.[39] They argue entitlement to summary judgment because aiding and abetting a breach of fiduciary duty is not a recognized theory of liability in Missouri. In response, Plaintiff "concedes that HDI did not aid and abet breaches of duty before its existence, and further concedes that Giacomo Di Mase is not liable on Count VIII." Doc. #397, at 13 n.8. However, Plaintiff argues Delaware law governs this claim, and the other Defendants are not entitled to summary judgment.

### (a) Choice of Law

Before beginning a choice-of-law analysis, this Court must first determine whether a conflict exists between potentially applicable state laws. *Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007). Defendants argue Missouri law applies; Plaintiff contends Delaware law applies.[40] Missouri does not recognize a claim

---

[39] Jensvold does not seek summary judgment on this claim.

[40] Although he does not contend the laws of New Mexico or Kansas apply to his breach of fiduciary duty or civil conspiracy claims, Plaintiff argues New Mexico or Kansas law could apply to his aiding and abetting breach of fiduciary duty claims. Doc. #397, at 13. Both states recognize a claim for aiding and abetting breach of fiduciary duty. *See Miller v. Staab*, 113 P.3d 274 (Kan. Ct. App. 2005) (citations omitted); *GCM, Inc. v. Ky.*

for aiding and abetting a breach of fiduciary duty,[41] but Delaware recognizes such a claim.[42]  Thus, there is a conflict between the two states' laws.

In determining which state's substantive law governs, this Court must apply the forum state's choice-of-law rules.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Missouri has adopted the principles set forth in the Restatement (Second) of Conflict of Laws to determine which state's law applies.  *Kennedy v. Dixon*, 439 S.W.2d 173, 184 (Mo. banc 1969).  For tort claims, the Restatement requires application of the state's law with the "most significant relationship" to the claim.  *See Goede v. Aerojet Gen. Corp.*, 143 S.W.3d 14, 24-25, n.6 (Mo. Ct. App. 2004); Restatement (Second) of Conflict of Laws § 145.

### (b) Internal Affairs Doctrine

Instead of the Restatement (Second) of Conflicts of Law, Plaintiff argues the Court should employ the "internal affairs doctrine" when determining which state's law applies.  Plaintiff contends Missouri federal courts have applied the doctrine, and thus, applied the law of the state of incorporation when considering claims for abetting and abetting breaches of fiduciary duty.  Doc. #397, at 8.  In support, Plaintiff cites two decisions – one from a district court, and the other from a bankruptcy court.

---

*Cent. Life Ins. Co.*, 947 P.2d 143, 147 (N.M. 1997).  Even if New Mexico and Kansas were included in the analysis of which state has the most significant contacts, the Court's conclusion would remain unchanged.  There are far fewer connections with either state than there are connections with Missouri.

[41] The Eighth Circuit recently concluded the Missouri Supreme Court would not recognize a claim for aiding and abetting breach of fiduciary duty under the Restatement (Second) of Torts.  *Jo Ann Howard & Assocs., P.C. v. Cassity*, 868 F.3d 637, 650-51 (8th Cir. 2017); *see also Cardinal Health 110, LLC v. Premiere Healthcare, LLC*, No. 18-CV-165, 2019 WL 108837, at *7 (E.D. Mo. Jan. 4, 2019) (following the Eighth Circuit's decision, and finding the Missouri Supreme Court would not recognize a cause of action for aiding and abetting breach of fiduciary duty); *In re Patriot Nat'l Inc.*, 592 B.R. 560, 581-82 (D. Del. 2018) (same).

[42] In Delaware, a claim for aiding and abetting breach of fiduciary duty requires proof of the following: "(1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary."  *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1125 (Del. Ch. 2008) (citation omitted).

First, Plaintiff cites *In re Bridge Info. Sys., Inc.*, 325 B.R. 824 (E.D. Mo. 2005), and represents the bankruptcy court applied the internal affairs doctrine to a veil piercing claim. Plaintiff contends the court then "incorporated this analysis in choosing the law applicable to plaintiff's common law tort claims, including its aiding and abetting claims, and determined that the law of the state of incorporation should apply to such claims." Doc. #397, at 8. Plaintiff's description of this decision is not entirely accurate.

Plaintiff correctly points out the court determined the internal affairs doctrine should be used when ascertaining what state's law applies to a veil piercing claim. *In re Bridge Info Sys.*, 325 B.R. at 830. The court made that determination because "[a] request to pierce a corporation's veil necessarily involves an analysis of how the controlling shareholders administered and governed the corporation." *Id.* at 830-31 (citations omitted). However, regarding the alleged tort claims, including a claim for "aiding and abetting fraud," the court concluded the most significant relationship test applied because Missouri adopted that test "in analyzing conflict of law issues involving tort claims. *Id.* at 830 (citations omitted). Accordingly, this case does not support Plaintiff's position that the internal affairs doctrine should be applied.

Second, Plaintiff cites a decision by the United States District Court for the Eastern District of Missouri: *Burt ex rel. McDonnell Douglas Corp. v. Danforth*, 742 F. Supp. 1043 (E.D. Mo. 1990). He represents the court determined the law of the state of incorporation applied to claims alleging the defendants acted in concert with one another. Doc. #397, at 8. Plaintiff's representation of this decision is incomplete.

Plaintiff does not mention Burt was a minority shareholder in McDonnell Douglas bringing a stockholder derivate action, alleging, among other things, the directors and officers of McDonnell Douglas breached their fiduciary duties. *Burt*, 742 F. Supp. at 1045-46. Because he asserted a derivative action, Burt was required to allege with particularity "any effort by [him] to obtain the desired action from the directors…and if necessary, from the shareholders or members." *Id.* at 1046 (citing Fed. R. Civ. P. 23.1). The defendants moved to dismiss because, in part, Burt did not comply with this requirement. *Id.* When applying Missouri's choice of law rules, the court concluded the law of the state of incorporation applied because the issue before it was "whether plaintiff offers sufficient reasons to excuse his failure to make a prior demand." *Id.* at

1047 (citations omitted).  The district court also applied the law of the state of incorporation when considering dismissal of the plaintiff's common law claims, but notably, the plaintiff did not allege a claim of aiding and abetting.  *Id.* at 1049-51.  *Burt* is not analogous to the case before this Court.

Based upon decisions issued by this Court, the Missouri Court of Appeals, and more recent decisions issued by the United States District Court for the Eastern District of Missouri, the Court concludes the "internal affairs doctrine" should not be utilized when determining which state's law applies.  The "internal affairs doctrine is a conflict of laws principle" that provides the "law of the state of incorporation should be applied to settle disputes affecting the organic structure or internal administration of a corporation." *J.Y.C.C. v. Doe Run Res., Corp.*, No. 15-CV-1704, 2019 WL 2211109, at *8 (E.D. Mo. May 21, 2019) (declining to apply the internal affairs doctrine because the matter did not involve any disputes about internal affairs); *Yates v. Bridge Trading Co.*, 844 S.W.2d 56, 61 (Mo. Ct. App. 1992) (noting the issuance of stock is considered a corporation's internal affairs and requires the application of the laws of the state of incorporation) (citation omitted); *see also Shaffer v. Health Acquisition Co.*, No. 18-CV-601-NKL, 2019 WL 104932, at *6 (W.D. Mo. Mar. 5, 2019) (noting the internal affairs doctrine applies to "matters having to do with the internal regulation of a corporation" and does not apply to an action by shareholders on behalf of a corporation seeking to vindicate its rights against third parties); *A.O.A. v. Rennert*, 350 F. Supp. 3d 818, 835-36 (E.D. Mo. 2018); *Aguilar v. PNC Bank, N.A.*, No. 14-CV-985, 2014 WL 12700618, at *3 n.2 (E.D. Mo. Nov. 19, 2014) (noting Missouri applied the "most significant relationship test" for resolving choice-of-law questions in tort actions and analyzing a claim of aiding and abetting breach of fiduciary duty under this test).

Plaintiff's claim of aiding and abetting breach of fiduciary duty does not affect the "organic structure or internal administration of a corporation," does not having anything to do with internal regulation of a corporation, does not involve disputes about internal affairs, and does not involve the issuance of stock.  Accordingly, the internal affairs doctrine is not applicable, and the Court will apply the state's law with the most significant relationship to the claim.

### (c) Most Significant Relationship

Under the most significant relationship test, "the identity of the state having the most significant relationship will depend upon the nature of the cause of action and upon the particular legal issue in dispute." *Dorman v. Emerson Elec. Co.*, 23 F.3d 1354, 1358 (8th Cir. 1994). The court should take consider the following contacts: (1) place where the injury occurred, (2) place where the conduct causing the injury occurred, (3) domicile, residence, nationality, place of incorporate, and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered. Restatement (Second) of Conflict of Laws § 145.

There are several contacts with Missouri. As early as 2005, Xurex's principal place of business was in Missouri. It was Xurex who, according to Plaintiff, was harmed by Defendants' actions, and that harm was felt in Missouri. DuraSeal Pipe, against whom Plaintiff brings a claim of aiding and abetting breach of fiduciary duty, was a Missouri limited liability company with its principal place of business in Missouri. Not only was DuraSeal Pipe Xurex's largest customer (and its only customer in 2011), DuraSeal Pipe, according to Plaintiff, was the controlling shareholder of Xurex. Xurex and DuraSeal Pipe – both with significant ties to Missouri – executed the 1/13/10 Agreement. The 12/31/10 Agreement was executed by Xurex and DuraSeal Holdings, which, shortly thereafter, purchased DuraSeal Pipe. In 2011, DuraSeal Pipe and/or DuraSeal Holdings solicited proxies to successfully unseat the Xurex board. Johnston, a Missouri resident, served in leadership capacities in Xurex, DuraSeal Pipe, and DuraSeal Holdings. On the other hand, Xurex's sole connection to Delaware is that it is incorporated there. Not one Defendant who is alleged to have aided and abetted breach of fiduciary duty resides in Delaware.[43]

Based upon the foregoing, the Court finds Missouri has the most significant relationship to the claims asserted in this matter. As noted above, Missouri does not recognize a claim for aiding and abetting breach of fiduciary duty. Thus, in addition to

---

[43] Xurex's contacts with New Mexico are limited to having a facility there until early 2012, and Rose, who served on the board, resides in New Mexico. Xurex's contacts with Kansas are similar: it had a facility in Kansas, and one of its board members, Olson, is a resident of Kansas. Plaintiff does not assert a claim of aiding and abetting breach of fiduciary duty against Rose or Olson.

Plaintiff's concession that Giacomo Di Mase is entitled to summary judgment on this claim, the Court grants summary judgment on this claim in favor of Kraus, Jensvold, DuraSeal Pipe, DuraSeal Holdings, HDI, and Jose Di Mase.

### (7) Declaratory Judgments (Counts XIII and XIV)

Pursuant to 28 U.S.C. § 2201(a) and Federal Rule of Civil Procedure 57, Plaintiff seeks declaratory judgments against all Defendants.  In Count XIII, Plaintiff requests a judgment declaring the 1/11/12 and 9/25/14 Amendments are invalid and unenforceable, and the parties' rights are governed by the 1/13/10 and 12/31/10 Agreements.  Doc. #244, ¶¶ 278-82.  In Count XIV, Plaintiff seeks declarations that the "Amended Agreement" is not an executory contract subject to assumption or rejection, and "upon DuraSeal's pre-petition material breach of the original 2010 Agreements, the damages accruing from said breach, including future damages arising under the long-term minimum purchase requirements of the 1/13/10 and 12/31/10 Agreements, became an asset of Xurex and later an asset of the bankruptcy estate at the petition date."  *Id.* ¶¶ 283-88.

Plaintiff did not move for summary judgment on these claims.  And most Defendants did not seek summary judgment on these claims.  However, Rose, Olson, Johnston, and McKeon move for summary judgment on these claims.  The Court denies their motions for summary judgment on Plaintiff's declaratory judgment claims because genuine issues of material fact preclude entry of summary judgment in their favor.  At a minimum, the factual allegations supporting Plaintiff's requests for declaratory judgment are disputed.

### C. Plaintiff's Motion for Summary Judgment on Defendants' Affirmative Defenses

Plaintiff also moves for summary judgment on certain affirmative defenses asserted by Defendants DuraSeal Pipe, DuraSeal Holdings, Kraus, Giacomo Di Mase, Jose Di Mase, HDI, Kaiser, and McKeon.  Doc. #350.  Defendants DuraSeal Pipe, DuraSeal Holdings, Kraus, Giacomo Di Mase, Jose Di Mase, HDI, McKeon, Olson, and Johnston filed a combined response to Plaintiff's motion.  Doc. #395.  Kaiser did not respond to the motion.

### (1) Prior Material Breach by Xurex

Plaintiff argues he is entitled to summary judgment on Defendants' affirmative defense of prior material breach by Xurex because Defendants do not identify a contractual obligation breached by Xurex and do not show the alleged breach was material. The Court finds genuine issues of material fact preclude entry of summary judgment in Plaintiff's favor on this affirmative defense. Accordingly, Plaintiff's motion for summary judgment is denied in this regard.

### (2) Commercial Frustration or Impossibility of Performance

Plaintiff moves for summary judgment on Defendants' affirmative defense of commercial frustration or impossibility of performance. Defendants do not respond to Plaintiff's motion for summary judgment on this affirmative defense. *See* Doc. #395. Defendants are responsible for demonstrating there are "genuine issues of material fact in the record that preclude[s]" entry of summary judgment in Plaintiff's favor. *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 734 (8th Cir. 2009) (citation omitted). The "failure to oppose a basis for summary judgment constitutes waiver of that argument." *Id.* at 735. By not responding, Defendants have waived any argument in opposition to Plaintiff's summary judgment motion on Defendants' affirmative defense of commercial frustration or impossibility of performance. Plaintiff's summary judgment motion is granted.

### (3) Ratification

Plaintiff moves for summary judgment on Defendants' affirmative defense of ratification because the shareholders were never asked to and did not approve the 1/11/12 Amendment or the 9/25/14 Amendment, and therefore, the shareholders could not have ratified either agreement. In response, Defendants assert a genuine issue of material fact exists regarding whether Xurex accepted benefits from the 1/11/12 Amendment and acquiesced to the contract for a considerable period of time, potentially barring Xurex's claim arising from the Amendment. In his reply, Plaintiff returns to his analysis of whether shareholders ratified the agreements. Simply, the parties seem to be talking past one another. For these reasons, the Court enters summary judgment in

Plaintiff's favor on Defendants' affirmative defense of ratification related to the 9/25/14 Amendment. But the Court denies Plaintiff's motion for summary judgment on Defendants' affirmative defense of ratification related to the 1/11/12 Amendment.

### *(4) Lack of Consideration and/or Failure of Consideration*

Plaintiff moves for summary judgment on Defendants' affirmative defenses of lack of consideration, and failure of consideration. In response, Defendants withdrew their lack of consideration affirmative defense. But Defendants argue there are questions of fact as to "whether the consideration that may supported the agreements initially became worthless or non-existent." Doc. #395, at 120. The Court agrees with Defendants, and denies Plaintiff's motion for summary judgment on Defendants' affirmative defense of failure of consideration.

### *(5) Failure to Mitigate Damages*

Plaintiff moves for summary judgment on Defendants' affirmative defense of failure to mitigate damages. In response to Plaintiff's motion, Defendants, in a footnote, state they are withdrawing the affirmative defense of failure to mitigate damages. Doc. #395, at 123 n.49. Pursuant to Defendants' concession, the Court grants Plaintiff's motion for summary judgment on Defendants' affirmative defense of failure to mitigate damages.

### *(6) Fraud in the Inducement*

Plaintiff moves for summary judgment on Defendants' affirmative defense of fraud in the inducement. Defendants do not address Plaintiff's motion for summary judgment on the defense of fraud in the inducement related to the 1/11/12 Amendment. By failing to oppose this aspect of Plaintiff's motion for summary judgment, Defendants have waived any argument in opposition thereto. *Satcher*, 558 F.3d at 74-75. Accordingly, the Court grants Plaintiff's motion for summary judgment on Defendants' affirmative defense of fraud in the inducement as it relates to the 1/11/12 Amendment.

Defendants argue, to the extent the 1/13/10 and 12/31/10 Agreements were not superseded by the 1/11/12 Amendment, Plaintiff is not entitled to summary judgment on

their defense of fraud in the inducement.  Regarding Defendants' affirmative defense of fraud in the inducement related to the 1/13/10 Agreement and 12/31/10 Agreement, the Court finds genuine issues of material fact prevent entry of judgment in Plaintiff's favor on this affirmative defense.  Accordingly, the Court denies Plaintiff's motion for summary judgment on Defendants' affirmative defense of fraud in the inducement as it relates to the 1/13/10 Agreement and the 12/31/10 Agreement.

### D.  Plaintiff's Request for Ruling as a Matter of Law

Plaintiff asks the Court to "rule as a matter of law" that DuraSeal Holdings and DuraSeal Pipe's "duties to make purchases under the 1/11/12 Amendment were not eliminated on the basis of the purported Uneconomic Condition."  Doc. #351, at 84. Plaintiff contends any modification to the agreement, particularly after receipt of the notice of Uneconomic Condition, was required to be in writing and signed by both parties.  But the parties' decision to suspend purchases was not in writing.  Defendants argue the parties' agreement to suspend purchases did not have to be in writing, the contractual prohibition against oral modification may be made, and the parties honored the agreement, which was accepted by Xurex.  Because there are genuine issues of material fact related to this particular issue, the Court denies Plaintiff's request for entry of a ruling as a matter of law.

### E.  Plaintiff's Statement of Facts in Support of His Motion for Summary Judgment
#### (1) Failure to Cite Materials in the Record

The Federal Rules of Civil Procedure and the Court's Local Rules require a party "cite[] to particular parts of materials in the record" to support an assertion of fact.  Fed. R. Civ. P. 56(c); L.R. 56.1(b).  Contrary to that requirement, Plaintiff sets forth several facts for which he cites nothing in the record – to wit, Facts 122, 178, 179, 180, 189, 190, 191, and 209.  Doc. #351, at 33, 41, 43, 46.  Because Plaintiff failed to cite anything in the record to support Facts 122, 178, 179, 180, 189, 190, 191, and 209, those facts were not considered by the Court.

## (2) Reliance on Inadmissible Evidence

In support of five of his purported facts, Plaintiff relies in whole or in part on Rose's Memorandum in Support of his Motion to Dismiss and exhibits thereto filed in October 2016 in the Bankruptcy Court (hereinafter, "Rose's Memorandum"). Doc. #351, at 37-40. A party claiming a genuine issue of material fact exists may not rely upon denials or allegations but must support his assertion by showing "admissible evidence will be available at trial to establish a genuine issue of material fact." *Brooks*, 425 F.3d at 1109; *Fin. Timing Publ'ns, Inc. v. Compugraphic Corp.*, 893 F.2d 936, 942 (8th Cir. 1990) (citations omitted); Fed. R. Civ. P. 56(c)(1). When faced with a summary judgment motion, this Court must only consider admissible evidence. *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004) (citation omitted). Hearsay evidence, which is inadmissible, "alone may not defeat a summary judgment motion." *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993) (citation omitted).

Rose's Memorandum contain legal arguments, a letter to the Bankruptcy Court, his thoughts and opinions, supposed emails cut and pasted into a document, and statements made by and to Rose. The document does not contain depositions, affidavits, declarations, stipulations, admissions, discovery responses, or other admissible evidence. The document is also rife with hearsay, which the Court cannot consider. Plaintiff proffers no argument as to how this Court may consider this document in support of his opposition to Rose's summary judgment motion. Therefore, Plaintiff's facts or the portions of his facts that are supported solely by Rose's Memorandum – i.e., Facts 150, 162, 165, 166, and 167 – were not considered by the Court.

## (3) References to Exhibits

In his Statement of Uncontroverted Material Facts, Plaintiff, in numerous instances, refers to several exhibits generally but does not specify the exhibit number. *See* Doc. #351, at 12-54. It appears Plaintiff identifies each exhibit by its number only the first time each exhibit is cited by Plaintiff. Throughout the remainder of his more than 250 facts, Plaintiff's references to exhibits are general (i.e., "Johnston Aff.," "2011 Brief," "J. Mase Dep.") but he does not identify the exhibit number where the cited

portion of the record may be located.  Thus, the Court (and other parties) are forced to search the facts for the exhibit number, go through each exhibit to locate the cited portion, or create its own exhibit index.  While this practice may work in cases with less voluminous briefs, fewer facts, or fewer exhibits, or when a party files an exhibit index, the practice does not work in this situation.  In instances where portions of the record are cited in future filings, Plaintiff shall identify the exhibit number (and if the exhibit was previously filed, its ECF Document Number) where the Court may locate the cited portion of the record.[44]

### (4) Rose's Responses to Plaintiff's Statement of Uncontroverted Facts

In his opposition to Plaintiff's motion for summary judgment, Rose does not respond to most of the facts set forth in Plaintiff's Statement of Uncontroverted Facts. With regard to those facts to which he lodged a response, Rose does not cite anything in the record to controvert the facts.  *See* Doc. #378, at 1-13.  Because Rose fails to respond to most facts and he does not cite to anything in the record to controvert the remainder of the facts, Plaintiff's Statement of Uncontroverted Facts (with the exception of those facts not being considered by the Court as outlined above) are deemed uncontroverted by Rose for purposes of summary judgment.  L.R. 56.1(b); Fed. R. Civ. P. 56(c).

---

[44] Unfortunately, Plaintiff utilizes the same practice when responding to McKeon's, Olson's, Johnston's, Rose's, and HDI's motions for summary judgment and asserting additional facts in response to those summary judgment motions.  Doc. #380, at 52-72; Doc. #381, at 30-50; Doc. #382, at 30-40; Doc. #383, at 5-25; Doc. #403, at 12-29.  In future filings, Plaintiff could refer to the specific exhibit along with his record cite as follows: "Johnston Dep. 31:17-20, attached as Ex. 3," or "Johnston Dep. 31:17-20 (Ex. 3)."  Also, the Court appreciates the parties providing a brief description of each exhibit (e.g., McKeon Deposition) along with the exhibit number when filing exhibits on ECF or filing an exhibit index.

**F.  McKeon's Motion for Summary Judgment**

McKeon's arguments related to Plaintiff's claims and Plaintiff's responses thereto are addressed *supra*, section III(B).  There are a few remaining issues that need to be addressed by the Court.

### *(1) McKeon's Attempts to Incorporate Facts and Arguments*

At the end of his statement of uncontroverted facts, McKeon "incorporates by reference any co-Defendants' reference in concurrently filed Motions for Summary Judgment regarding the existence in the Xurex company charter of an exculpatory provision pursuant to 8 Del. Code § 102(b)(7), shielding independent directors from monetary liability for breaches of the duty of care."  Doc. #357, at 14-15.  McKeon's attempt to incorporate facts by reference violates the Federal Rules of Civil Procedure and the Court's Local Rules.  First, McKeon does not identify which of the 325 statements of facts asserted by Defendants (*see* Docs. #364-65, 373) he incorporates by reference.  This Court "is not required to speculate on which portion of the record" McKeon relies, "nor is it obligated to wade through and search the entire record for some specific facts" supporting McKeon's arguments.  *White v. McDonnell Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990) (citation omitted).  Second, as the moving party, McKeon is obligated to support each factual assertion with citations to the record, and show he is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), 56(c)(1); L.R. 7.0(a), 56.1.

In the argument section of his brief, McKeon states he "joins the argument of any other Defendant challenging the basis for Plaintiff's claimed calculation of damages, or the existence of any such damages, and accordingly, seeks summary judgment on any grounds raised by other Defendants, with regard to damages, that are equally applicable to McKeon."  Doc. #357, at 24.  McKeon does not set forth any facts or provide any legal argument supporting his argument that he is entitled to summary judgment on the existence or calculation of Plaintiff's damages.  Fed. R. Civ. P. 56(a), 56(c)(1); L.R. 7.0(a), 56.1.

McKeon's attempts to circumvent the rule requirements frustrate his ability to seek summary judgment on claims upon which he failed to set forth supported facts and

neglected to set forth the applicable law.  McKeon's disregard of the rules does not provide a factual or legal basis for the Court to consider his additional requests for summary judgment.  Accordingly, McKeon's requests for summary judgment on immunity from damages and Plaintiff's purported damages are denied.

### *(2) Plaintiff's Counter-Statement of Uncontroverted Material Facts*

Contrary to the federal and local rule requirements, Plaintiff sets forth several facts for which he cites nothing in the record – to wit, Facts 23, 30, 34, 37, 44, 60, 61, 67, 91, and 97.  Doc. #382, at 34-37, 39-40, 44-45.  Because Plaintiff failed to cite anything in the record to support Facts 23, 30, 34, 37, 44, 60, 61, 67, 91, and 97, those facts were not considered by the Court.

### *(3) McKeon's Responses to Counter-Statement of Uncontroverted Material Facts*

When responding to portions of Plaintiff's Counter-Statement of Uncontroverted Material Facts, McKeon fails to cite anything in the record controverting certain facts – i.e., Plaintiff's Facts 2, 20, 59, and 86.  Doc. #411, at 7, 14, 30, 40.  Other times, McKeon attempts to controvert a fact by arguing the cited record does not support the purported fact – i.e., Plaintiff's Facts 5-7, 9, 11, 15, 18, 84-85 – but fails to explain how or why the fact is not supported by the record.  Doc. #411, at 8-13, 40.  Similar to the facts for which Plaintiff failed to cite anything in the record in support, McKeon's responses to facts that fail to cite anything in the record were not considered by the Court.  Fed. R. Civ. P. 56(c)(1)(A) (stating a party asserting a genuine issue of material fact exists must cite to particular parts of the record to support his/her assertion); L.R. 56.1 (requiring an opposing party to "properly support its denial [of a given fact] in accordance with Fed. R. Civ. P. 56(c).").  Regarding McKeon's responses that do not clarify how or why the record does not support the purported fact, the Court reviewed the cited record to determine whether those purported facts are supported by the cited record and only considered those facts supported by the cited record.

## G. <u>Rose's Motion for Summary Judgment</u>

### *(1) Rose's Failure to Abide by Federal and Local Rules*

In December 2018, Rose, who is pro se, filed a motion for summary judgment. Doc. #294.  The Court denied Rose's motion without prejudice.  Doc. #306.  The Court noted numerous deficiencies with Rose's motion, cited the applicable rules, and informed Rose that any future motion for summary judgment he files must (1) provide a concise statement of uncontroverted facts, (2) set forth facts in numbered paragraphs, (3) cite and address the applicable law, (4) identify particular parts of the record, and (5) be supported by admissible evidence.  *Id.*

In March 2019, Rose filed another motion for summary judgment.  Doc. #367. His second motion, similar to his first motion, does not comply with the requirements set forth by the Federal Rules of Civil Procedure and the Court's Local Rules.  Fed. R. Civ. P. 56(c), 56(e); L.R. 56.1.  At a minimum, the motion fails to include a concise statement of uncontroverted facts, does not set forth facts in numbered paragraphs, generally refers to some exhibits without identifying specific portions of those exhibits,[45] and attaches inadmissible evidence.

Rose's motion blatantly ignores the Court's December 2018 Order.  At that time, the Court informed Rose it would not consider his initial motion for summary judgment due to the significant deficiencies.  Yet, other than reducing his page count from 220 to 31 pages, Rose files another summary judgment motion that disregards the Court's Order, Federal Rules of Civil Procedure, and Local Rules.  For this reason alone, the Court could deny Rose's motion.  Given Rose's pro se status, the Court overlooks the deficiencies and considers those arguments it can discern.

### *(2) Rose's Exhibit 96*

Rose primarily relies on one exhibit, Exhibit 96.  *See* Doc. #367.  Exhibit 96, which is 177 pages in length, contains, inter alia, Rose's thoughts, beliefs, and opinions about matters; his arguments against Plaintiff's claims; purported emails cut and pasted into the document; references to other exhibits proffered by Rose without identifying

---

[45] *See* Doc. #367-1 (177 pages), Doc. #367-5 (126 pages), Doc. #367-15 (1048 pages), Doc. #367-16 (73 pages), Doc. #367-17 (51 pages), Doc. #368-2 (54 pages).

specific pages; disputes with Plaintiff's discovery responses; discussions about legal actions he has taken against other companies; disagreements with Plaintiff's alleged damages; and settlement discussions.  Doc. #367-1.  Much of Exhibit 96 constitutes inadmissible evidence, which, as Rose knows from the Court's previous Order, cannot be used to support a summary judgment motion.  Doc. #306 (citations omitted).

Furthermore, Exhibit 96 appears to be Rose's attempt to disregard the page limitations set by the Court for summary judgment motions, ignore the requirements established by the Local Rules and the Federal Rules of Civil Procedure, and offer inadmissible evidence and/or legal argument unsupported by admissible evidence.  His exhibit also ignores the Court's December 2018 Order, which identified the applicable summary judgment rules and informed Rose he would not be excused from complying with the applicable rules.  Doc. #306; *see also Bennett v. Dr Pepper/Seven Up, Inc.*, 295 F.3d 805, 808 (8th Cir. 2002) (citation omitted) (stating a party's pro se status does "not entitle him to disregard the Federal Rules of Civil Procedure").  For these reasons, the Court disregards Rose's Exhibit 96 (Doc. #367-1).

### (3) Rose's Arguments Related to Plaintiff's Claims

Regarding his summary judgment motion, Rose's principal argument heading is he "is entitled to Summary Judgment on all Defenses Made in Response to Trustee's Complaint."  Doc. #367, at 6.  But his subheadings relate to breach of fiduciary duty, civil conspiracy, summary breach of fiduciary duty, affirmative defenses against other charges by plaintiff, and declaratory judgment actions.  *Id.* at 6-31.  Regarding breach of fiduciary duty, civil conspiracy, and declaratory judgment actions, the Court addressed Rose's arguments in the sections above addressing those particular claims.[46]

---

[46] In his summary judgment reply, Rose did not respond to all of Plaintiff's "Counter-Statement of Additional Uncontroverted Material Fact[s]."  Regarding the facts he attempted to controvert, Rose oftentimes did not "properly support [his] denial support his denial in accordance with Fed. R. Civ. P. 56(c)."  L.R. 56.1(b)(1).  The facts to which he lodged no response and the facts for which he provided no proper support for his denial "are deemed admitted for the purpose of summary judgment."  *Id.*  The Court also notes Rose, in his reply, states he "is more than qualified to comment on" Plaintiff's expert's report.  Doc. #389, at 34-37.  Unless Rose was timely and properly designated as an expert witness, he will not be permitted to provide expert testimony.  Doc. #174;

### *(4) Rose's Affirmative Defenses*

Rose claims he is entitled to summary judgment on his "affirmative defenses." He contends Plaintiff's claims "are barred by the doctrines of waiver and unclean hands"; he "is entitled to an elimination of his damages because Plaintiff…negligently and/or intentionally caused director and officer insurance coverage to expire"; Xurex waived its ability to hold Rose liable for any damages resulting from the execution of an invalidated amendments"; the subsequent Xurex board failed to continue Rose's work and efforts; Plaintiff failed to allege sufficient facts to support his claims; Xurex's acceptance of the January 2012 agreement absolves him of liability; and Plaintiff lacks jurisdiction to "attack the legitimacy of [Rose's] claim against the Xurex estate which the Bankruptcy Court specifically approved for [Rose] after [Rose's] motion to the Court to extend the filing deadline for all Xurex shareholders."  Doc. #367, at 23-29.

The Federal Rules of Civil Procedure govern the pleading standard for affirmative defenses and require a party "affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(c)(1).  These affirmative defenses include, but are not limited to, contributory negligence, estoppel, fraud, illegality, release, and waiver.  *Id.*; *Dollar v. Smithway Motor Xpress, Inc.*, 710 F.3d 798, 807 (8th Cir. 2013) (noting the list of affirmative defenses in Rule 8(c) is not exhaustive).  When a party pleads an affirmative defense, "[e]ach allegation must be simple, concise, and direct."  Fed. R. Civ. P. 8(d)(1). If the pleading "gives the plaintiff fair notice of the nature of the defense," federal courts will typically hold the affirmative defense satisfies Rule 8(d).  5 Charles Alan Wright et al., *Federal Practice & Procedure* § 1274 (3d ed. 2013); *see also Wisland v. Admiral Beverage Corp.,* 119 F.3d 733, 737 (8th Cir. 1997).  "Pleadings must be construed so as to do justice."  Fed. R. Civ. P. 8(e).

Rose's answer to the operative complaint does not contain any affirmative defenses.  *See* Doc. #252.  Generally, when a party fails to plead an affirmative defense, he waives that affirmative defense.  *First Union Nat'l Bank v. Pictet Overseas Tr. Corp.*, 477 F.3d 616, 622 (8th Cir. 2007) (citations omitted).  That is because the "Rule 8(c) pleading requirement is intended to give the opposing party both notice of the

---

Fed. R. Civ. P. 26(a)(2).  Rose may testify as to relevant matters if he establishes he has personal knowledge of those matters.  Fed. R. Evid. 602.

affirmative defense and an opportunity to rebut it." *Id.* (citations omitted).  Without any allegation pertaining to Rose's affirmative defenses, he has not placed Plaintiff on notice of the nature of his affirmative defenses, and therefore, has not satisfied the requirements of Rule 8(d).  Accordingly, Rose's motion for summary judgment on his affirmative defenses is denied.

Even if the Court were to find Rose has not waived his affirmative defenses, Rose, by seeking summary judgment on his affirmative (and other) defenses, bears the burden of proving those defenses.  *Foulk v. Charrier*, 262 F.3d 687, 697 (8th Cir. 2001).  But Rose fails to establish there is no genuine issue of any material fact, entitling him to summary judgment on his defenses.  *Williams*, 783 F.2d at 115.  For this additional reason, the Court denies Rose's motion for summary judgment on his affirmative defenses.  To the extent Rose seeks summary judgment on any other defenses, his request is denied for the same reason.

### (5) Rose's Failure to State a Claim Argument

Finally, Rose seems to argue Plaintiff fails to allege sufficient facts to state a claim.  He raised the same argument in response to Plaintiff's initial complaint.  Doc. #25.  The Court denied Rose's motion.  Doc. #42.  To the extent Rose is raising the same arguments, his motion is denied for the same reasons the Court denied his previous request.  Rose's motion is also denied because, contrary to the requirements of the Federal Rules of Civil Procedure, he did not assert a defense of failure to state a claim.  Fed. R. Civ. P. 12(b).  For these reasons, Rose's motion of summary judgment (or his motion to dismiss) for failure to state a claim is denied.

### (6) Plaintiff's Responses to Rose's Motion for Summary Judgment

In support of five of his purported facts, Plaintiff cites only Rose's Memorandum.  Doc. #383, at 7, 13, 21, 23 (citing Doc. #354-7).  He relies on the same document, at least in part, to establish six additional facts.  *Id.* at 11-12, 23, 25.  As set forth above, a party claiming a genuine issue of material fact exists may not rely upon denials or allegations but must support his assertion by showing "admissible evidence will be available at trial to establish a genuine issue of material fact."  *Brooks*, 425 F.3d at

1109; *Fin. Timing Publ'ns, Inc.*, 893 F.2d at 942 (citations omitted); Fed. R. Civ. P. 56(c)(1). This Court must only consider admissible evidence. *Murphy*, 372 F.3d at 982. Rose's Memorandum is not admissible evidence. Thus, Plaintiff's facts supported solely by Rose's Memorandum (i.e., Facts 20, 55, 56, 111, 125) and those portions of Plaintiff's facts that are supported only by Rose's Memorandum (i.e., Facts 42, 43, 44, 54, 124, 134) were not considered by the Court.

The Court also notes Plaintiff's Fact 45 is not supported by any citation to the record as required by the Federal Rules of Civil Procedure and the Court's Local Rules. Accordingly, the Court did not consider Fact 45.


### H.  Olson's Motion for Summary Judgment
#### (1) Olson's Attempts to Incorporate Facts and Arguments

Similar to McKeon, Olson attempts to incorporate other Defendants' facts and arguments in his motion. Olson states he "incorporates by reference" the "Omnibus Statement of Uncontroverted Facts" filed by Defendants Jose Di Mase, Giacomo Di Mase, Kraus, DuraSeal Pipe, DuraSeal Holdings, and HDI. Doc. #365. Olson's attempt to incorporate facts by reference violates the Federal Rules of Civil Procedure and the Court's Local Rules. Olson does not identify which of 250 facts (*see* Doc. #365) he incorporates by reference. This Court "is not required to speculate on which portion of the record" Olson relies, "nor is it obligated to wade through and search the entire record for some specific facts" supporting his arguments. *White*, 904 F.2d at 458. Further, Olson must support each factual assertion with citations to the record to show he is entitled to summary judgment. Fed. R. Civ. P. 56(a), 56(c)(1); L.R. 7.0(a), 56.1.

Olson also "joins the summary judgment efforts of any other defendant challenging Plaintiff's damage calculation or the existence of any such damages….[and] seeks summary judgment on any grounds raised by other Defendants that also apply to him." Doc. #365, at 36. Setting aside his failure to identify on what grounds (other than Plaintiff's damages) asserted by other Defendants he seeks summary judgment, Olson does not set forth facts or legal authority supporting his claim for summary judgment on Plaintiff's damages or any other basis for summary judgment. Fed. R. Civ. P. 56(a), 56(c)(1); L.R. 7.0(a), 56.1.

Olson's failure to follow the rules undercuts his ability to seek summary judgment on claims upon which he failed to set forth supported facts and cite applicable law. Olson does not provide a factual or legal basis for the Court to consider his requests for summary judgment on any basis other than the ones are supported in his motion. Thus, Olson's requests for summary judgment on Plaintiff's purported damages and any basis claimed by other Defendants are denied.

In his summary judgment reply, Olson represents "the basis for his summary judgment motion, and the arguments used against him by Plaintiff, are substantially similar to those presented in Defendant McKeon's summary judgment motion." Doc. #422, at 1 n.1. And for that reason, Olson "incorporates the arguments made in McKeon's reply suggestions in [Olson's] present motion." *Id.* McKeon's reply exceeds fifty pages in length. Yet, Olson does not point to anything specific he wishes to incorporate. Nevertheless, the Court is not obligated to and will not wade through another party's brief to ascertain what exactly Olson wishes to incorporate in his motion and/or reply. Thus, the Court did not consider McKeon's reply when addressing Olson's motion or reply.

### (2) Plaintiff's Responses to Olson's Statement of Facts

To controvert portions of Johnston's Statement of Facts, Plaintiff relies in whole or in part on Rose's Memorandum. Doc. #380, at 20, 28, 32-33, 36-37 (citing Doc. #354-7). As explained *supra*, section III(A), Plaintiff cannot rely on inadmissible evidence to establish a genuine issue of material fact exists. *Brooks*, 425 F.3d at 1109; *Fin. Timing Publ'ns.*, 893 F.2d at 942; Fed. R. Civ. P. 56(c)(1). This Court cannot consider Rose's Memorandum because it constitutes inadmissible evidence. *Murphy*, 372 F.3d at 982; *Firemen's Fund Ins. Co.*, 8 F.3d at 1310. Thus, the Court disregarded those portions of Plaintiff's responses to Olson's Facts 35, 44, 55, 56, 58, and 59 that solely relied on Rose's Memorandum.

### (3) Plaintiff's Counter-Statement of Additional Uncontroverted Material Facts

Like his response to Rose's summary judgment motion, Plaintiff cites only Rose's Memorandum to solely or in part support some of his additional purported facts. Doc.

#380, at 55, 58-60, 69, 71-72 (citing Doc. #354-7).  Because Plaintiff relies on inadmissible evidence to support these facts, the Court did not consider those portions of Plaintiff's Facts 20, 42, 44, 54, 55, 56, 111, 124, 125, and 134 that solely relied on Rose's Memorandum.

Additionally, Plaintiff's Fact 45 is not supported by any citation to the record. Therefore, the Court did not consider that fact.

### I.  Johnston's Motion for Summary Judgment

Johnston's arguments related to Plaintiff's claims and Plaintiff's responses thereto are addressed *supra*, section III(B).  Nevertheless, there are a few issues that need to be addressed by the Court.

### (1) Plaintiff's Responses to Johnston's Statement of Facts

To controvert some or portions of Johnston's Statement of Facts, Plaintiff relies wholly or in part on Rose's Memorandum.  Doc. #381, at 8, 13-20, 27 (citing Doc. #354-7).  As explained *supra*, section III(A), Plaintiff cannot rely on and the Court cannot consider inadmissible evidence to establish a genuine issue of material fact exists. *Brooks*, 425 F.3d at 1109; *Fin. Timing Publ'ns.*, 893 F.2d at 942; Fed. R. Civ. P. 56(c)(1).  Thus, the Court disregards those portions of Plaintiff's responses to Johnston's Facts 13, 23, 24, 25, 26, 28, 29, 31, and 43 that solely relied on Rose's Memorandum in Support of his Motion to Dismiss and exhibit thereto.

### (2) Plaintiff's Counter-Statement of Additional Uncontroverted Material Facts

Similar to his responses to Rose's and Olson's summary judgment motions, Plaintiff cites only Rose's Memorandum to support some of his purported facts.  Doc. #381, at 33, 36, 37-38, 47, 49-50 (citing Doc. #354-7).  Because only inadmissible evidence supports these facts, the Court did not consider Plaintiff's Facts 20, 42, 44, 54, 55, 56, 111, 124, 125, and 134.

Additionally, Plaintiff's Fact 45 is not supported by any citation to the record. Therefore, the Court did not consider that fact.

## J.  HDI's Motion for Summary Judgment

Plaintiff asserts claims against HDI of misappropriation of trade secrets, civil conspiracy, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty. HDI moves for summary judgment on all claims because (1) the Court lacks personal jurisdiction over HDI, and (2) HDI cannot be held liable for the alleged tortious conduct of DuraSeal Pipe or DuraSeal Holdings.  Doc. #362.  Plaintiff opposes HDI's motion. No other party filed opposition to HDI's motion.

### (1) Parties' Facts and Counter-Facts

Before addressing the substance of HDI's motion, the Court notes HDI's summary judgment "incorporate[s] by reference" the 250 facts in the Omnibus Statement of Uncontroverted Facts.  Doc. #362 (citing Doc. #364).  In response to HDI's motion, Plaintiff "incorporates by reference his responses to" the 250 facts in the Omnibus Statement of Uncontroverted Facts and the 270 facts in his "counter-statement of additional facts."  Doc. #401 (citing Doc. #403).  In its reply, HDI incorporates its responses to Plaintiff's counter-statement of additional facts."  Doc. #414, at 2.  The filings containing the relevant parties' proposed facts and responses thereto consist of more than 160 pages.  Doc. #403, at 1-95; Doc. #412.

Fortunately, HDI and Plaintiff identify by number the facts in support of its/his respective position.  Doc. #362, at 10; Doc. #401, at 3-5, 7-9.  Because the parties must set forth factual assertions and provide citations to the record supporting those factual assertions when moving for or opposing summary judgment, the Court considered only the facts identified in the parties' briefing of HDI's summary judgment motion.  Fed. R. Civ. P. 56(a), 56(c)(1); L.R. 7.0(a), 56.1; *see also White*, 904 F.2d at 458.

### (2) Personal Jurisdiction

There are two broad categories of personal jurisdiction.  "Specific jurisdiction refers to jurisdiction over causes of action that 'arise out of' or 'relate to' a defendant's activities within a state."  *Lakin v. Prudential Secs., Inc.*, 348 F.3d 704, 707 (8th Cir. 2003) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  "General jurisdiction…refers to the power of a state to adjudicate any cause of action involving a

particular defendant, regardless of where the cause of action arose." *Id.* (quotation omitted). In response to HDI's motion, Plaintiff argues the Court has specific jurisdiction over HDI and does not address general jurisdiction, thereby conceding the Court does not have general jurisdiction over HDI. Doc. #401, at 2-5.

A federal court in a diversity suit may exercise specific jurisdiction over an out-of-state defendant when two requirements are met: (1) jurisdiction is allowed by allowed by the Missouri long-arm statute; and (2) the reach of the long-arm statute comports with due process. *See Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co.*, 646 F.3d 589, 593 (8th Cir. 2011) (citation omitted). "Missouri's long-arm statute authorizes personal jurisdiction over defendants who, *inter alia,* transact business, make a contract, or commit a tort within the state." *Id.* (citing Mo. Rev. Stat. § 506.500.1).

"[D]ue process requires that such a defendant have 'minimum contacts' with the forum state such that maintenance of a suit against that defendant does not offend 'traditional notions of fair play and substantial justice.'" *Guinness Imp. Co. v. Mark VII Distribs., Inc.*, 153 F.3d 607, 614 (8th Cir. 1998) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The minimum contacts analysis required by the Fourteenth Amendment calls for consideration of the following factors: "(1) the nature and quality of contacts with the forum state; (2) the quantity of these contacts; (3) the relationship between the contacts and the cause of action; (4) the interest of the forum state; and (5) the convenience of the parties." *Wines v. Lake Havasu Boat Mfg.*, 846 F.2d 40, 42 (8th Cir. 1988). The first three factors are of primary importance. *See Austad Co. v. Pennie & Edmonds*, 823 F.2d 223, 226 (8th Cir. 1987).

"The nonresident defendant's conduct and connection with the forum state must be such that 'he should reasonably anticipate being haled into court there.'" *Guinness Imp. Co.*, 153 F.3d at 614 (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980)). In each case, "there [must] be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King*, 471 U.S. at 462 (citation omitted). A non-resident "defendant's contacts with the forum state must not be random, fortuitous, attenuated, or the result of unilateral activity of a third person or another party." *Guinness Imp. Co.*, 153 F.3d at 614 (citation omitted). According to the

Supreme Court, "there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'" *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017) (quoting *Goodyear Dunlop Tires Ops. v. Brown*, 564 U.S. 915, 919 (2011)). "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id.* (citation omitted).

HDI is a Luxembourg company with a business address in Luxembourg. Prior to the filing of this lawsuit, the only director and only employee of HDI was Ugo Anatra, who is a resident of Italy. Neither HDI nor Anatra have had a physical presence in Missouri. In 2012, HDI acquired ownership of DuraSeal Holdings, an entity organized under the laws of Italy with its principal place of business in Italy. In late 2013, HDI became the corporate parent of DuraSeal Holdings. HDI was not a party to the contracts at issue in this matter. In 2016, after the lawsuit was filed, Anatra retired, and Jose Di Mase became the sole director of HDI.

Who owns HDI is not entirely clear. According to Jose Di Mase's deposition testimony, Standard Equity Trust owns 100% of HDI. Doc. #364-14, at 3-4. UBI trustee, a professional trustee of the UBI banking group, is the administrator of the Standard Equity Trust. *Id.* The Standard Equity Trust's beneficiary is the Di Mase family. *Id.* Plaintiff identifies instances during the litigation that DuraSeal represented the Di Mases indirectly owned DuraSeal, and did not represent DuraSeal was owned by a trust of which the Di Mase family is the beneficiary. Doc. #403, at 95.

In August 2013, Jose Di Mase and/or Anatra described HDI as the "financial vehicle to acquire DuraSeal and Xurex shares." Doc. #403-33. Jose Di Mase testified HDI is a "paper company." #403-41, at 12. As he explained further: "One employee, Ugo first and then me. No more employee[s]. Everything was outsourcing. There's no structure costs. There are no offices." *Id.* An example of the outsourcing may include agreements HDI executed with individuals to provide assistance to DuraSeal Holdings. Kraus, Jensvold, and Jose Di Mase's daughter, Daniela Di Mase, executed year-long "advisory agreements" with HDI, wherein they agreed to provide "support skills" to DuraSeal Holdings, "which operates in the United States of America in the field of nanotechnology, based in Kansas City." Docs. #403-32, 403-30, 404-5. The

agreements indicate the support services could be performed at any location, but a consultant "will perform services on the telephone." *Id.*

Kraus appears to have been first hired by HDI as a consultant in September 2012. Doc. #403-32. His contract was for a year with his compensation set at $6,000 per month. *Id.* Simultaneous with his consulting agreement, Kraus served on the board for DuraSeal Holdings. Significantly, it was Kraus who executed the 9/25/14 Amendment on behalf of DuraSeal Holdings. Kraus also signed a stock purchase agreement, which will be detailed *infra.* It is unclear when Jensvold was first hired as a consultant for HDI, but the record reflects the latest he was hired was on January 8, 2012, with his compensation set at $6,000 per month. Doc. #403-30, at 5. That is, of course, three days before the 1/11/12 Amendment was executed by Xurex and DuraSeal Holdings. Notably, Jensvold executed the agreement on behalf of DuraSeal Holdings. His agreement with HDI was extended until at least December 31, 2014.

In January 2014, Kaiser communicated with Anatra about a "wire transfer of $35,000 US$ to DuraSeal on behalf of Xurex." Doc. #401-1. Anatra indicates the money will be wired to DuraSeal Holdings, and DuraSeal Holdings will transfer the money to Xurex. *Id.* HDI wired 135,000 EUR to DuraSeal Holdings on January 15, 2014, and on January 16, 2014, DuraSeal Holdings wrote a check to Xurex for $35,000. *Id.*; Doc. #401-2.

In April and May 2014, HDI wired nearly 500,000 EUR to DuraSeal Holdings. Doc. #404-2. On May 1, 2014, Xurex and DuraSeal Holdings entered into a stock purchase agreement whereby DuraSeal purchased 7,305,935 shares of Xurex's common stock with each share costing $0.04, for a total of $286,000. Doc. #354-20. This agreement was signed by Kaiser and Kraus. *Id.* at 10. The agreement indicates it will be subject to the "exclusive jurisdiction of the Federal District Court, Western District of Missouri. *Id.* at 7. On or about May 1, 2014, DuraSeal Holdings wired $186,000 to Xurex for "stock purchases." Doc. #403-28. DuraSeal Holdings previously paid $50,000 in September 2013 and $50,000 in October 2013 to Xurex for "stock purchases." *Id.*

Three days before the 9/25/14 Amendment was executed, Kraus emailed Jose Di Mase informing him that he would be making an "investment request to Ugo [Anatra]

tomorrow." Doc. #403-53. Kraus copied Giacomo Di Mase and Jensvold on this email. *Id.* Kraus informed the recipients that DuraSeal Holdings was "looking at providing a total of $105,500" to Xurex, with $48,000 for four barrels of product, and "the rest associated with the bankruptcy filing."[47] *Id.* One day before the 9/25/14 Amendment was executed, Kraus sent his request to Anatra, who informed Kraus that he would send the money in two payments. Doc. #403-54.

Based upon the foregoing, the Court finds it has specific jurisdiction over HDI. HDI's contacts with Missouri are more than minimal, HDI's actions establish purposeful availment of the privilege to conduct activities in Missouri, HDI is affiliated with the underlying controversies that took place in Missouri, and HDI's contacts with Missouri were in no way random, fortuitous, attenuated, or the result of a unilateral activity. HDI should have reasonably anticipated it would be haled into Missouri court. Furthermore, a suit against HDI does not offend the "traditional notices of fair play and substantial justice." Accordingly, the Court denies HDI's motion for summary judgment on the basis of lack of personal jurisdiction.

### (3) Liability for Alleged Tortious Conduct of Subsidiary

HDI also moves for summary judgment on the basis that Plaintiff is attempting to hold HDI liable for the alleged tortious conduct of its subsidiary. Based upon the agency theory of liability, Plaintiff maintains HDI is liable for Kraus's and Jensvold's acts that were performed for DuraSeal Holdings. The Court finds genuine issues of material fact exist with regard to whether Kraus and Jensvold were indeed "agents" of HDI, and if so, whether they acted within the scope of an agency relationship with HDI. Accordingly, the Court denies HDI's motion for summary judgment on this basis as well.

### IV.    PARTIES' SEALED EXHIBITS

On March 8, 2019, the Court granted the parties' request to file certain documents under seal. Doc. #349. The parties were instructed to filed unredacted versions of their briefs and exhibits under seal but also publicly file redacted versions of

---

[47] Xurex did not seek bankruptcy protection until mid-October 2014.

the same documents. *Id.* The Court directed that "[o]nly portions of those filings that are truly redactable – e.g., proprietary information, trade secrets, social security numbers, highly personal information – should be redacted." *Id.* However, in briefing these thirteen motions, the parties filed several documents under seal that should not have been filed under seal,[48] failed to file redacted versions of briefs and exhibits that were filed under seal,[49] and/or filed the same documents both publicly and under seal.[50]

These types of filings are contrary to the letter and spirit of the Court's March 8, 2019 Order. Accordingly, the Court suggests the parties closely review the filings associated with their summary judgment motions and *Daubert* motions. Unless otherwise directed by the Court, fourteen days after this Order is entered, the Clerk of the Court will unseal all documents associated with the parties' summary judgment motions and *Daubert* motions that were filed under seal. If a party seeks to maintain a document's sealed status, the party shall file a Notice of Filing that identifies, by Document Number, the exhibit the party seeks to remain sealed, and provides sufficient justification as to why the document or portions thereof should remain sealed.

## V. CONCLUSION

### A. Summary of the Court's Rulings

For all of the foregoing reasons, the Court issues the following rulings on the parties' pending motions:

- Defendant McKeon's Motion for Summary Judgment (Doc. #347) is granted with regard to Plaintiff's misappropriation of trade secrets claim but denied in all other respects.

- Plaintiff's Motion to Strike Pavone (Doc. #348) is denied.

- Plaintiff's Motion for Partial Summary Judgment (Doc. #350) is granted with regard to Defendants' affirmative defenses of commercial frustration or impossibility of performance, ratification related to the 9/25/14 Amendment, lack of consideration, failure to mitigate damages, and fraud in the inducement related to the 1/11/12 Amendment; however, Plaintiff's Motion for Partial Summary Judgment is denied in all other respects.

---

[48] *See, e.g.,* Doc. #352-18; Doc. #361-1; Doc. #364-15.
[49] *See, e.g.,* Doc. #373-69; Doc. #348; Doc. #356.
[50] *Compare* Doc. #364-2 *with* Doc. #373-43; *compare* Doc. #364-1 *with* Doc. #373-1.

- Defendants Jose Di Mase, Giacomo Di Mase, Kraus, DuraSeal Pipe, DuraSeal Holdings, and HDI's Motion to Strike Reilly (Doc. #356) is denied.

- Defendants Jose Di Mase, Giacomo Di Mase, Kraus, DuraSeal Pipe, DuraSeal Holdings, and HDI's Motion for Summary Judgment on Claim for Aiding and Abetting Breach of Fiduciary Duty (Doc. #358) is granted.

- Defendants Jose Di Mase, Giacomo Di Mase, Kraus and HDI's Motion for Summary Judgment on Claim for Civil Conspiracy (Doc. #359) is denied.

- Defendants DuraSeal Holdings and DuraSeal Pipe's Motion for Summary Judgment on Counts II, III, and IV (Doc. #360) is denied with regard to Counts II and III but granted with regard to Count IV.

- Defendants Jose Di Mase and HDI's Motion for Summary Judgment on Breach of Fiduciary Duty Claim (Doc. #361) is denied.

- Defendant HDI's Motion for Summary Judgment (Doc. #362) is denied.

- Defendants Jose Di Mase, Giacomo Di Mase, Kraus, DuraSeal Pipe, DuraSeal Holdings and HDI's Motion for Summary Judgment on Misappropriation of Trade Secrets (Doc. #363) is granted.

- Defendant Olson's Motion for Summary Judgment (Doc. #365) is denied

- Defendant Johnston's Motion for Summary Judgment (Doc. #366) is denied.

- Defendant Rose's Motion for Summary Judgment (Doc. #367) is denied.

In addition, fourteen days after this Order is entered, the Clerk of the Court shall unseal all summary judgment motion briefs, *Daubert* motion briefs, and exhibits attached to all briefs unless otherwise directed by the Court. If a party seeks to maintain a document's sealed status, the party must seek said relief from the Court as set forth above.

## B. Claims to Be Tried

Based upon the rulings issued on the pending motions, the Court understands the following claims will be tried:

**Count I** against DuraSeal Pipe alleging breach of the 1/13/10 Agreement.

**Count II** against DuraSeal Holdings alleging breach of 12/31/10 Agreement.

**Count III** against DuraSeal Holdings and DuraSeal Pipe alleging breach of the 1/11/12 Amendment.

**Count V** against Jensvold and Kaiser for misappropriation of trade secrets.[51]

**Count VI** against DuraSeal Holdings, DuraSeal Pipe, Giacomo Di Mase, Jose Di Mase, Kaiser, Jensvold, McKeon, Kraus, Johnston, Rose, Olson, and HDI for civil conspiracy.

**Count VII** against DuraSeal Holdings, DuraSeal Pipe, Giacomo Di Mase, Jose Di Mase, Kaiser, Jensvold, McKeon, Johnston, Rose, Olson, and HDI for breach of fiduciary duty.

**Count VIII** against Jensvold for aiding and abetting breach of fiduciary duty.[52]

**Count IX** against DuraSeal Pipe and DuraSeal Holdings alleging avoidance and recovery of constructive fraudulent transfers under 11 U.S.C. §§ 544, 548, and 550.

**Count X** against DuraSeal Pipe and DuraSeal Holdings alleging avoidance and recovery of constructive fraudulent transfers under Uniform Fraudulent Transfer Act.

**Count XI** against DuraSeal Pipe, Johnston, and Rose objecting to their claims in Xurex's bankruptcy estate and contending their claims should be disallowed under 11 U.S.C. § 3007.[53]

**Count XII** against DuraSeal Pipe, DuraSeal Holdings, Johnston, and Rose alleging their debts and/or equity interests should be subordinated to claims of Xurex's other unsecured creditors and equity holders.[54]

**Count XIII** against all Defendants seeking a declaration that the 1/11/12 and 9/25/14 Amendments are invalid and enforceable.[55]

**Count XIV** against all Defendants seeking a declaration that the "Amended Agreement" is not an executory contract subject to assumption or rejection, and "upon DuraSeal's pre-petition material breach of the original 2010 Agreements, the damages accruing from said breach…became an asset of Xurex and later an asset of the bankruptcy estate at the petition date."

---

[51] It is unclear if Plaintiff intends to withdraw this claim with regard to all Defendants or only those who filed motions for summary judgment.

[52] This claim remains because Jensvold did not seek summary judgment on this claim.

[53] No one sought summary judgment on Count XI. As a result, the parties have not addressed whether Plaintiff intends to prosecute his claims under Count XI, and if so, whether he has a right to a jury trial on said claims.

[54] Similar to Count XI, no one sought summary judgment on Count XII. It remains unclear if Plaintiff intends to prosecute his equitable subordination claims, and whether he has a right to a jury trial on said claims.

[55] In his First Amended Complaint, Plaintiff requested a jury trial "on all claims so triable." Doc. #244, at 1, 49. It is unclear if Plaintiff seeks to try the declaratory judgment actions to a jury. *See Northgate Homes, Inc. v. City of Dayton*, 126 F.3d 1095, 1099 (8th Cir. 1997) (citations omitted) (noting "if there would have been a right to a jury trial on the issue had it arisen in an action other than one for declaratory judgment, then there is a right to a jury trial in the declaratory judgment action").

Although several affirmative defenses likely remain pending, some affirmative defenses were the subject of a motion for summary judgment.  Of those affirmative defenses on which Plaintiff sought summary judgment, the following affirmative defenses remain: prior material breach; fraud in the inducement with regard to the 1/13/10 Agreement and the 12/31/10 Agreement; commercial frustration or impossibility of performance; ratification related to the 1/11/12 Amendment; failure of consideration; and failure to mitigate.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: June 17, 2019                          UNITED STATES DISTRICT COURT